–B/O

Rica Ty
_____ (Full Name)
rt11118888@gmail.com
_____ (Email Address)
61 Marbella
_____ (Address Line 1)
San Clemente, CA 92673
_____ (Address Line 2)
(949) 573-8414
_____ (Phone Number)
Plaintiff
_____ in Pro Per
(indicate Plaintiff or Defendant)

**F I L E D**
CLERK, U.S. DISTRICT COURT

04/08/2024

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ DVE _____ DEPUTY

IFP Submitted

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

Rica Ty
_____,

**PLAINTIFF,**

**vs.**

Alejandro N. Mayorkas,
_____
 Secretary,
_____
Department of Homeland Security
_____
(Citizenship and Immigration
_____
Services), Agency
_____

**DEFENDANT(S).**

**Case No.:** 8:24-cv-00760-JFW-(DFMx)
(To be supplied by the Clerk)

**COMPLAINT FOR:**

Title VII of the Americans with Disabilities Act (ADA)

Title VII of the Civil Rights Act; 42 U.S.C. § 12101, et seq.;

Age Discrimination in Employment Act (ADEA) of 1967

Title 18 of the U.S.C. § 1001

**Jury Trial Demanded:** ■ Yes   ☐ No

## I. JURISDICTION

1.  This Court has jurisdiction under 28 U.S.C. § 1331. Federal question jurisdiction arises pursuant to EEOC Right to File a civil action in a U.S. District Court dated January 09, 2024 (Exhibit 1).

_____
_____
_____

*Revised: October 2023*
*Form Prepared by Public Counsel*
*© 2010, 2023  Public Counsel. All Rights*
*Reserved.*

## II. <u>VENUE</u>

2. Venue is proper pursuant to 28 U.S.C. § 1391 because the events giving rise to this complaint happened in this district.

## III. <u>PARTIES</u>

3. Plaintiff's name is Rica Ty.  Plaintiff resides at 61 Marbella, San Clemente, CA 92673.

4. Defendant is Alejandro N. Mayorkas, Secretary, department of Homeland Security (United States Citizenship and Immigration Services), Agency.

## IV. <u>STATEMENT OF FACTS</u>

5.  On or around July 16, 2015, I was interviewed by Director David Radell and Hannah Mikesell, Supervisory Chief of Staff, for the position of Asylum Officer (AO), GS-0930-12, with the US Citizenship and Immigration Services (USCIS), Refugee, Asylum, & International Operations, Los Angeles Asylum Office, in Anaheim, CA.  Director Radell stated in his affidavit submitted November 02,

2020 that I "appeared to have limited use of one [my] hands" during my job interview in July 2015. (Exhibit 8)

6. On or around June 09, 2019, I began a required, intensive training period Los Angeles Asylum Office, in order to attend another intensive 6-week training in at FLETC (Federal Law Enforcement Training Center) in Glynco, GA scheduled around July 08, 2019 – August 14, 2019.

7. Between June 2019 – early December 2019, I was assigned under SAO (Supervisory Asylum Officer) Rebecca Tseng. After I returned from training at FLETC, I provided SAO Tseng my Emergency Contact Data form that listed some of my medical conditions. SAO Tseng stated she had noticed my hands and wondered about my ability to type, but had not wanted to initiate the conversation until I did.

8. I have prominent white hair on my head that make it obvious that I am above 40 years old. (Exhibit 2).

9. I have a rare autoimmune condition called Scleroderma that resulted in changes to my skin, blood vessels, muscles, and internal organs by destroying

healthy tissue and forming scars. The changes are physical impairments that affect major life activities, including but not limited to respiratory function and range of mobility. (Exhibits 2 and 12, sub-Exhibit A)

10. I also have Interstitial Lung Disease that affects my respiratory function, which includes shortness of breath, pulmonary hypertension. (*Id.*)

11. I also have Raynaud's phenomenon, a medical condition, which cause reduced blood flow to veins and capillaries, and have resulted in painful ulcers in my fingertips. (*Id.*)

12. My conditions make me particularly at risk if I contract Covid 19. According to a study published in the National Institute of Health, "The prevalence of COVID-19 in patients with systemic sclerosis-associated ILD was higher than in patients without ILD."[1]

13. As a result, I have had mobility issues that have impacted major life activities including but not limited to: my overall range of motion, eating,

---

[1] Hoffmann-Vold AM, Distler O, Bruni C, Denton CP, de Vries-Bouwstra J, Matucci Cerinic M, Vonk MC, Gabrielli A. Systemic sclerosis in the time of COVID-19. Lancet Rheumatol. 2022 Aug;4(8):e566-e575. doi: 10.1016/S2665-9913(22)00130-8. Epub 2022 Jul 21. PMID: 35891634; PMCID: PMC9302939.

breathing, holding/gripping, typing, bending, reaching. I experience shortness of breath with increased physical activity (e.g., climbing stairs, walking short distances, walking while carrying weighted objects) as well as general muscle weakness.

14. My hands are contracted, claw-like, and it is obvious.

   a. I provided my doctor's referral for physical therapy, which indicated "hand contracture," coded under "deformity of hand." This condition has impacted my typing ability and speed as I have had to alter hand positioning, for instance, to reach letters. (*Id.*)

   b. Director David Radell stated in his affidavit that I "appeared to have limited use of one [my] hands" during my job interview in July 2015. (Exhibit 8).

   c. SAO Miranda had looks of derision on her facial expression when she looked at my hands whilst I pointed out a fact on a case file I was discussing with her on a few occasions in her office, as well as in mine, and when I mentioned my medical condition.

15.  SAO Tseng stated in her Affidavit that she worked with Scheduling to alter some of my interview times so I may attend medical appointments, which continued after I returned from Georgia.

16.  On or around November / early December 2019, prior to my assignment to another Supervisor, SAO Rebecca Tseng mentioned to me that she noticed medical appointments were taking up my write up time either at the end of a workday during interview days or on Wednesdays, typically reserved for training and write-ups. SAO Teng suggested I try to avoid doing that.

17.  However, my Rheumatologist who is a specialist in my rare disease, only schedules clinics on Wednesdays.  In addition, I was undertaking an IV infusion treatment at the hospital, which lasts longer than a standard doctor's appointment, in addition to the travel time, and I also had to see other specialists and take various tests regularly because of the associated conditions.

18.  SAO Tseng also mentioned that people usually take at least 2 hours for sick leave. However, as I was still new and accumulating leave, I did not want to risk losing leave so quickly and I did not want to negatively impact my employer, as I

COMPLAINT

was scheduled to conduct 8 interviews a week. I had to come in earlier during the day so I could leave early enough to attend afternoon appointments.

19.  Unfortunately, this put me at a great disadvantage in closing out my cases and I developed a backlog.  Taking only an hour at the end of an interview day meant I still needed to conduct two full interviews and have less time to wrap up those cases.  Moreover, I only found out much later that I would not receive an automatic extension to submit cases as long as I clocked in for any part of a workday despite having a medical appointment or regular leave.

20.  I tried working faster to close out as many cases as possible, submitting both current and some from my backlog, particularly during the holiday periods in end 2019.

21.  Around that time period, I recall SAO Tseng asking to see my case drawer and noted at the time I had about 15 or so cases, which she stated was considered normal for Asylum Officers; a few cases were awaiting reinterview or administrative correction before I could take further action, as well as untimely, unsubmitted. SAO Tseng did also mention others had higher numbers and recalled

one officer having 200 cases when the office was previously located in Anaheim, CA.

22.  I began to trickle my backlog cases in with my current cases to try to stay at or above the 75% timeliness percentage on my biweekly timesheets. Although according to the affidavit of SAO Miranda, my requirement was 70%. (Exhibit 4)

23.  According to the Companion Guide to the Asylum Officer Performance Plan and Appraisal, Timeliness is considered 30% of Performance Goals of which only accounts for 60% of an AOs total rating, i.e., 30% of 60% is only 18% of an AOs total rating.  Quality and Fraud Detection are weighed more heavily. (Exhibit 13).

24.  Moreover, I was not the only AO with untimely, unsubmitted cases. During the pandemic, an officewide instruction was sent out for AOs to forward their untimely, unsubmitted cases to the General Backlog.

25.  Despite my challenges, SAO Tseng had provided the following feedback/ appraisal on me:

a. On October 16, 2019, SAO Tseng stated the following in my Interim Evaluation:

"Officer Ty performed at or above an acceptable level during the current FY19 rating period. She had demonstrated the ability to work and study independently, as well as to reach out to office POCs (whether clerical, administrative, or in relation to her affirmative asylum work) when appropriate. She has so far shown herself to be dedicated, professional, and hardworking officer who is interested in taking on new challenges and gaining additional knowledge and skills."

b. In a November 2019 Interview Performance Evaluation, I received a 100% rating from SAO Tseng, who added that it was a good credibility investigation.

c. In my December 2019 Interview Performance Evaluation, I received a 100% rating from SAO Tseng.

26. Moreover, around that time period, Deputy Director Marianne Hong requested my availability for MERP (Middle-Eastern RAIO Processing) Training scheduled around April 07-10, 2020 in Washington, DC. I confirmed my

availability. To me this meant my superiors had faith in my abilities to obtain

additional training to handle more complex cases.


27.  Around mid-December, I introduced myself to SAO Miranda, who became

my assigned Supervisor. The reception I received seemed less than lukewarm and

of disinterest.


28.  SAO Miranda confirmed in her Affidavit to the EEOC that SAO Tseng

notified her of my medical conditions and need for medical treatment.


29.  Between mid-December 2019 until my termination on March 27, 2020, I

was harassed by SAO Miranda.  Multiple incidents I experienced with SAO

Miranda include, but are not limited to:

    a.  Unreasonable and excessive interference in my work performance and

       work flow;

    b.  Accusing me of not communicating with her despite email evidence

       provide to the contrary; for example,

    c.  Barging into my office without knocking;

    d.  Loudly berating me;

COMPLAINT

e.  Startling me and interrupting my focus whilst I was preparing for interviews;

f.  All of this created stress and anxiety, and caused difficulty in sleeping over time even until then end. My work environment became intimidating, overwhelming, and hostile.  (Exhibits 2 and 5)

30.  SAO Miranda was frequently rude and condescending, as well as hostile, ill- and short-tempered when she spoke to me on various occasions. (*Id.*)

31.  Around January 2020, I did mention to SAO Miranda in my office that I was having medical/doctor appointments. SAO Miranda then gazed to my hands and her facial expression changed before she met my eyes again. (*Id.*)

32.  I also recall other occasions when SAO Miranda had looks of derision on her facial expression such as when she looked at my hands whilst I pointed out interview statements on case files that we were discussing in her office and mine.

33.  Around end December 2019/early January 2020, I had heard from other AOs that they were able to eliminate their backlog of untimely, unsubmitted cases by requesting to be given time to complete them. Additionally, a supervisor has the

discretion to waive timeliness. Seeing as how this exercise helped them and they were still employed, I made this request with SAO Miranda.

34.  SAO Miranda confirmed she would ask her supervisor, Section Chief Lynn, if this could be done, and indicated this could help me to "start over," "start fresh."  Although my termination letter implies the Defendant put me on the backlog write-up project because of my timeliness rating, it was not true.  I made the request after hearing positive feedback from other AOs who were given the same concession and were truly able to "start over," "start fresh."

35.  I was given time Between February 04-06, 2020 to work on my backlog cases. On three occasions in February, I provided SAO Miranda with status updates on my backlog cases. This included cases that were already assessed and only required administrative task closeouts to submit for her review. However, SAO Miranda instructed me to turn in remaining cases to the General Backlog, which included completed cases that she needed to review. SAO Miranda then lied to supervisors and claimed that I turned in cases to the General Backlog that should have been for her review instead. (*Id.*)

36.  On March 4, 2020, I mentioned to SAO Miranda that I had interviewed

people from Wuhan who entered the US between October and December 2019. SAO Miranda dismissed my concerns about COVID 19 even though she knew of my disabilities. She stated, "Oh don't worry, I'm sure you're fine."  SAO Miranda barged into my office on this day as well. (Exhibit 2)

37.  On March 05, 2020, SAO Miranda barged in my office multiple times, became confrontational. During the third time she barged back into my office, SAO Miranda proceeded to talk over me as I was speaking. I had to lean back further on my chair as she was rising from her chair, leaning over my desk, and moving her neck and her hand out towards me because she was moving in a threatening manner and violating my personal space. (Exhibit 2)

38.  SAO Miranda then lied about the incident of March 5, 2020 to supervisors and LER (Labor Employment Relations) by accusing me of raising my voice when it was she who initiated the confrontations and yelled at me.  (Exhibit 2 and 5)

39.  No one, including any supervisor: Section Chief Lynn, Deputy Director Hong, Director Radel, or HR or LER ever asked me about this incident. The first time I was made aware of this incident being raised was when I read two sentences about it in my termination letter on March 27, 2020. (Exhibits 2 and 5)

COMPLAINT

40.  SAO Miranda was on probation herself having begun her supervisory role only on November 10, 2019. It is unclear how well Management was overseeing SAO Miranda's own development. (Exhibit 4)

41.  I had discussed some of my issues with SAO Miranda with SAO Tseng. However, at the time SAO Tseng was reluctant to interfere with another supervisor despite the frequency of interference and hostility I received from SAO Miranda.

42.  SAO Miranda unreasonably interfered with my work performance. She did this in the following ways:

   a.  SAO Miranda bombarded me with repeat work and returns that would have required another person to address, in order for me to maintain my current workload and meet performance and timeliness goals. Miranda's statements in her affidavit alone demonstrate the enormous time and effort she spent solely on monitoring my every move. (Exhibits 2, 4 and 5)

   b.  The multiple times she barged into my office whilst I was preparing for an asylum interview or focused on closing out cases. (*Id.*)

COMPLAINT

i.    I am required to conduct two asylum interviews on an 8-hour day, 4 days a week; Wednesdays are reserved for training and write-up time, unless an afternoon re-interview has been scheduled.

ii.   Interviews typically take hours and some have exceeded over 4 hours. If I am limited to an 8-hour day, I don't have a lot of time to spare, much less take a break or eat lunch.

a.  Unfortunately, this was a common occurrence for other AOs as well, and therefore common practice.  I spoke with an AO at the Los Angeles Asylum Office in 2022 who also acknowledged having to conduct hours long interviews and was told by a supervisor that there is no time to take lunches or breaks.

c.  The tone and condescending way she spoke to me, the multitude of emails and skype chats that she expected an immediate answer to despite my preparing for, being in interview or focusing on closing them out

COMPLAINT

timely, and the rapid fire interrogations I was put through. (Exhibit 2 and 5)

d.  The false / misleading recommendation that if she gave me a few days for backlog write-up that it would "help [me] to start over, start fresh." However, this was a lie because she counted all the cases I submitted for this project against me and tanked my timeliness percentage during that biweekly period to 35.7%, then used that to notify supervisors that I was not meeting timeliness goals. This contributed to my termination. (*Id.*)

i.  Moreover, the case number for that period was altered in the record submitted by the Defendant to demonstrate a lower percentage. (Exhibit 14)

ii. The Defendant further stated that there was no improvement on timeliness thereafter.  However, this statement is false because my biweekly sheets indicated timeliness of 80.0% and 87.5% on the following two periods. Both are above 75%.  I was fired after that. (*Id.*)

e.  The false / misleading suggestion that I apply for maxiflex in order to change my telework hours and then contributed to the decision of denying it, which then led to my termination a week later.

43.  On two occasions, SAO Miranda instructed me to perform a security check incorrectly. I had to confer with SAO Tseng that my understanding of the protocol was in fact correct because SAO Tseng was the one who trained me to perform it correctly. SAO Tseng agreed with me. We had one of these discussions in person, as well as over skype chat/email from what I recall. (Exhibits 2, 5, and 12).

44.  My frequent experiences with SAO Miranda were severe and pervasive enough to cause anxiety, fear, and sleepless nights; meanwhile staying current on my cases was also at the forefront of my mind with the already limited time I had. In view of the above and Exhibits provided, I believe SAO Miranda had set me up to fail. The Cambridge dictionary defines sabotage as: "the act of intentionally trying to stop someone from achieving something or to stop something from developing."

45.  Ms. Rose Saraceno, President AFGE Local 1200 representing the USCIS

Los Angeles Asylum Office and the USCIS California Service Center, mentioned in her Affidavit that "another Asylum Officer, who was briefly supervised by SAO Miranda in early 2020," had "told [her that SAO Miranda] would often suddenly walk into his office unannounced and very abruptly when he was just getting into the office and signing into his computer;" moreover, "SAO Miranda was rude and condescending to this officer. The Asylum Officer also described how sometimes Ms. Miranda would speak very loudly in the hallway when he was performing his work, which made it difficult for him to properly complete his work. This employee is over 40 years of age and approximately [the] same age" as Saraceno. (Exhibit 11)

46.  Despite multiple incidents with SAO Miranda, according to an e-mail submitted by the Defendant to the EEOC Investigator, my case review (Interview Performance Evaluation) score was rated at 91.8% as of February.

47.  Coincidentally, I scored the same on my March 10, 2020 evaluation: 91.8%.  SAO Miranda stated my assessment was well-written; part of her point deduction was that I did not put headings in the assessment and did not order the security checks in her order preference.

48.  On March 13, 2020, I provided SAO Miranda an updated Emergency Data Sheets following an office wide request in preparation for starting Telework during the Covid-19 Pandemic; the form noted my medical conditions and had similar information as the original one I provided SAO Tseng previously; on March 16, 2020, I submitted an updated version of the Emergency Data Sheet.

49.  Around the week of March 13, 2020, I and other AOs were instructed by our respective SAOs to submit proposed telework hours because of the office closures as a result of the covid pandemic. Asylum interviews were being halted and we were being trained to perform other administrative tasks to assist the Refugee International Operations section.  I requested hours based on a proposed schedule whereby I could meet my 40-hour work week whilst still being able to attend medical appointments, including the planned increase of medical treatment days in April 2020 onwards.

50.  However, SAO Miranda stated that my Telework hours were limited to my current schedule (5, 8-hour days per week).

51.  SAO Miranda advised I would need to file for Maxiflex / AWS to first

request a schedule change, which would then be applied to the approved Telework Schedule.

52.  On March 17, 2020, I requested maxiflex/alternative work schedule (AWS), following advice from SAO Miranda.  (Exhibit 3)

53.  SAO Miranda asked for the reasons I was applying for maxiflex. I informed her that I wanted to schedule my medical appointments and treatments on non-core or shorter days without taking too much sick leave since the treatments would take between 4-5 hours per day and my appointments were at UCLA (1.5 to 2 hours away). The flexibility would also help with efficiency of time and case management.  SAO Miranda also asked for my EOD (Entrance on Duty) date.

54.  On March 20, 2020, the request was denied by SAO Miranda and Deputy Director Marianne Hong, citing not meeting the performance requirement of the MOA (Memorandum of Addendum) 2018. The MOA 2018 stems from the 2016 USCIS-AFGE CBA (Collective Bargaining Agreement).

55.  This was surprising considering SAO Miranda did not tell me or give the

impression the request would be refused, especially considering it was her

suggestion to apply.

56.  Moreover, SAO Miranda and Deputy Director Marianne Hong failed to

engage in an interactive process with me regarding my reasonable accommodation

request.

57.  A week later, USCIS terminated my position via a letter sent to my

home. I was again blindsided, particularly with the allegations.  Prior to this, I was

never brought to HR for any allegations SAO Miranda alleged against me; I was

not provided a midterm review to discuss performance, nor did HR reach out to

discuss my medical benefits moving forward, considering I had a medical

appointment and treatments lined up beginning April 2020.

58.  I address the termination in my Complaint to the EEOC and Affidavit.

(Exhibit 2)

59.  On March 27, 2020, I contacted Hannah Mikesell, Supervisory Chief of

Staff, as requested in her email that morning. I told Hannah Mikesell that SAO

Miranda had done what she accused me of to which Hannah Mikesell replied, "I'm

sorry it didn't work out."

60.  I also contacted SAO Tseng, and told her that SAO Miranda had me

terminated. She advised me to contact Rose [Saraceno, the American Federation of

Government Employees (AFGE) Local 1200 President]. (Exhibit 12, Sub Exhibit

E)

61.  In April 2020, I initiated a Complaint with the EEOC and was represented

by Union President Rose Saraceno. Here, I addressed the allegations on the

termination letter as well as described the harassment I faced whilst being

supervised by SAO Myrna Miranda. The mediation was quite brief with little to no

mediating from the EEOC assigned mediator.

62.  In June 2020, I filed a formal complaint with the EEOC.

63.  During the EEOC Complaint process, the EEO Investigator collected

Affidavits from Plaintiff, Rose Saraceno, SAO Myrna Miranda, Section Chief

Mallory Lynn, Deputy Director Marianne Hong, and Director David Radel.

(Exhibits 2, 4, 6, 8, 9,  and 11).

64.  I submitted rebuttals following each affidavit submitted by the Agency. I

identified various discrepancies in those affidavits and noted those in my rebuttals, as well as included snapshots of emails and other documentary evidence to counter and disprove statements made by the Defendant. (Exhibits 5 and 7, 10, 12 - 14)

65.   Although the Defendant provided e-mail trails claiming they intended to terminate me before I requested Maxiflex, their email evidence was submitted as a PDF and not with a proper electronic trail required for discovery, i.e. they were not authenticated. Given the number of false statements and discrepancies I have continued to highlight over the last four years in documents submitted by the Defendant, the request for authentication should not be considered immaterial.

66.   In February 2021, I filed a request for a hearing before an EEOC AJ.

67.   In June 2021, I filed a Response to Notice of Intent to Issue a Decision Without a Hearing wherein I noted incorrect conclusions made by the Defendant, as well as continued to highlight the false statements and discrepancies submitted by the Defendant. (Exhibit 12)

68.   I also submitted documents to demonstrate the Defendant's pattern and practice of discriminatory behavior by way of the following:

a. A copy of the *Caceres-Riveras v DHS*, U.S. Merit Systems Protection Board, Western Regional Office SF-0752-20-0696-I-1, March 9, 2021 (121 LRP 9234), wherein the MSPB determined the Los Angeles Asylum Office discriminated against Caceres-Riveras, who had been terminated in August 2020; the proposal to remove him from his position was made in July 2020 (during the covid pandemic). (Exhibit 12, Sub Exhibit B)

b. An Affidavit from Farhad Khorasani, a former Asylum Officer and colleague hired under Schedule A, and who was terminated in June 2020 (during the covid pandemic); Farhad states in his affidavit that he received various email messages from the Defendant which included announcements that the Agency had "a massive $1.2 billion budget shortfall as a result of the pandemic and the Agency's immigration policies, and was looking to furlough two-thirds/13,400 of employees at the end of July." (Exhibit 12, Sub Exhibit C)

c. A copy of the resignation letter dated May 03, 2021 from Brianna Jex, a former Asylum Officer, who experienced challenges in obtaining reasonable accommodation at the Los Angeles Asylum Office and felt

compelled to resign so she can focus on her health. (Exhibit 12, Sub Exhibit D)

   d.  In June 2021, spoke to former Asylum Officer Michael Fernandez, who also believed he was discriminated against when he submitted his reasonable accommodation request with the Los Angeles Asylum Office. Michael had waited several weeks to months for a response and when a response was provided, the Defendant provided an amenity he did not request.  Michael was terminated a month before he became permanent. Michael later filed a claim with the EEOC at the advice of the Office of California U.S. Representative Katie Porter.

   e. Glassdoor.com has multiple postings from former USCIS Asylum Officers and Immigration Officers from various offices around the country between 2018 – 2021, stating that there is a practice of discrimination and harassment within the Agency before and after my employment with the Agency, as well as describing typical working conditions. (Exhibit 15)

69.  During my EEOC Process, I submitted a letter from my rheumatologist

verifying my conditions, physical limitations, as well as my additional planned treatment starting April 2020. (Exhibit 12, Sub exhibit A)

70.   Around October 28, 2021, I submitted an Appeal with the EEOC wherein I addressed incorrect findings, as well as continued to highlight false statements and discrepancies noted throughout documents submitted by the Defendant. (Exhibit 13)

71.   Around July 04, 2023, I filed a Statement of Reconsideration with the EEOC wherein I continued to highlight the false statements and discrepancies noted throughout documents submitted by the Defendant. (Exhibit 14)

72.   The Defendant presented a comparator: another Asylum Officer, M. Ly, who was also on probation and supervised by SAO Miranda.  Records presented by the Defendant indicate Ms. Ly is under 40 and does not have a disability. Ms. Ly was also made permanent once her probationary period ended. (Exhibit 13 and 14)

73.   For the sake of comparison, kindly note that during the biweekly time period of February 18, 2020 – March 02, 2020, Ms. Hong's exhibit shows that I submitted ten (10) cases, eight (8) of which were timely, achieving an 80%

timeliness; Ms. Ly turned in only two (2) cases, both timely and thereby earned a 100% rating.  This is not an adequate or reasonable comparison.  I completed more work than Ms. Ly over a two-week period and turned in more timely cases than her.  What happened to the other cases (14) that she would have interviewed those two weeks?  (*Id.*)

74.   As stated in my affidavit, Ms. Ly expressed her concern to me about being able to turn in cases timely. Similarly, for the period between March 03, 2020 – March 16, 2020, I turned in eight (8) cases, 1 of which was considered untimely, dropping my timeliness percentage to 87.5%. Ms. Ly turned in seven (7) timely cases, which resulted in 100% timeliness. Again, where are her other cases for those two weeks?

75.   I would have also achieved a 100% rating for that biweekly period if I withheld the one (1) untimely case as well. I submitted one (1) more case than Ms. Ly and was still above the timeliness minimum percentage.

76.   My biweekly timesheet for March 17, 2020 – March 30, 2020, was due on March 30, 2020. However, I was terminated on March 27, 2020 and that timesheet was never turned in. Moreover, the data recorded by the Defendant for that time period is incorrect and unverified by me. (*Id.*)

COMPLAINT

77.   The Administrative Judge indicated my performance was "not up to snuff," yet I outperformed Ms. Ly by submitting 4x more timely cases than Ms. Ly using the first comparable biweekly period, and I submitted double the number of cases than Ms. Ly did for the first comparable month, whilst still achieving a timeliness percentage well above the minimum. (*Id.*)

78.   Therefore, using the Administrative Judge's own words: "case numbers speak for themselves." I performed better than Ms. Ly, yet I was terminated and Ms. Ly was retained and even approved for a maxiflex schedule. (*Id.*)

79.   Fortunately for Ms. Ly, it appears she was able to turn in her Unsubmitted / untimely cases to the general Backlog due to the office closure, without penalty. (Id.)

80.   In reference to paragraph 70a. I add the following:

    a.   Rose Saraceno provided an affidavit for my EEO case wherein she
         stated that she approached SAO Miranda regarding Caceres-Rivera's
         request for Reasonable Accommodation and "SAO Miranda

responded with words to the effect that it 'was not her problem and that it was not accurate information that she was responsible.'"

b.  Saraceno added that "SAO Miranda was not helpful, her tone of voice and facial expressions were angry, hostile and not respectful. SAO Miranda made it clear that she did not want to be bothered about a reasonable accommodation for an employee she supervised in any way.

c.  Because SAO Miranda refused to discuss or assist the employee in his reasonable accommodation, [Saraceno] advised him to send his request directly to Office of Equal Opportunity and Inclusion (OEOI)," which granted his request.

d.  Under laws such as the Americans with Disabilities Act (ADA) and the Rehabilitation Act of 1973, covered employers are required to engage in an interactive process with employees who request reasonable accommodations for disabilities.

81.  Rose Saraceno holds the following positions below:

a.  Asylum Officer, GS-0930-12, Department of Homeland Security, United States Immigration and Naturalization Service, Los Angeles Asylum Office;

b. President AFGE Local 1200 representing the USCIS Los Angeles Asylum Office and the USCIS California Service Center;

c. Western Regional Vice President NCISC Council 119 representing the Local USCIS offices in the Western Region of the United States.

82. Ms. Saraceno states that during her time with the Agency, she has "witnessed the way management [Los Angeles Asylum Office] treats other employees who request accommodations and the way employees over 40 are treated." This includes but is not limited to: the defendant not being supportive of disabled employees and reasonable accommodation requests, and the Defendant "regularly discriminates against disabled employees who request reasonable accommodation and typically does not promote employees over the age of 40." (Exhibit 11).

83. Furthermore, Ms. Saraceno also mentions that an employee who is over 65 years old, requested an accommodation due to her disability, and was told she would be granted the request. [However,] the request was never actually fulfilled. (*Id.*)

COMPLAINT

# V. CAUSES OF ACTION

# FIRST CAUSE OF ACTION

(Title VII of The Civil Rights Act of 1964 (42 U.S.C. 2000 et seq.), 42 U.S.C. § 12112; 29 CFR Part 1630, 5 USC § 2302, §501 of the Rehabilitation Act of 1973)

(As against Defendant(s): Alejandro N. Mayorkas, Secretary, Department of Homeland Security (Citizenship and Immigration Services), Agency)

Plaintiff hereby incorporates and re-alleges paragraphs 5 through 83 as is fully set forth herein.

84.  Title VII of the Civil Rights Act of 1964 (Title VII) prohibits discrimination based on race, color, sex, religion, or national origin, and the Americans with Disabilities Act (ADA) prohibits discrimination on the basis of disability.

85.   Section 1630.2(o) of Title 29 C.F.R. defines "reasonable accommodation" under the ADA to include modifications or adjustments to the job application process, the work environment, or the manner or circumstances under which the position held or desired is customarily performed.

86.  Under ADA, Rehabilitation Act, 29 CFR Part 1630, specifically:

§1630.2(g)(3) and Appendix § 1630.2(g), I qualify as disabled in the following ways:

    a.  I have a rare autoimmune condition called Scleroderma that resulted in changes to my skin, blood vessels, muscles, and internal organs by destroying healthy tissue and forming scars. The changes are physical impairments that affect major life activities, including but not limited to respiratory function and range of mobility.

    b.  I have Interstitial Lung Disease that affects my respiratory function, which includes shortness of breath, pulmonary hypertension.

    c.  I also have Raynaud's phenomenon, a medical condition, which cause reduced blood flow to end arterioles and have resulted in painful ulcers in my fingertips.

    d.  My hands are contracted, claw-like, and it is obvious.

        i. I provided my doctor's referral for physical therapy, which indicated "hand contracture," coded under "deformity of hand." This condition has impacted my typing ability and speed as I have had to alter hand positioning, for instance, to reach letters.

        ii. Director David Radell stated in his affidavit that I "appeared to have limited use of one [my] hands" during my job interview in July 2015.

    e.  I submitted a letter from my rheumatologist verifying my conditions,

physical limitations, as well as my additional planned treatment starting April 2020.

87.  The Agency had constructive knowledge of my disability:

a.  Director David Radell stated in his affidavit that I "appeared to have limited use of one [my] hands" during my job interview in July 2015.

b.  Around end summer 2019/early Fall 2019, I notified my first supervisor, SAO (Supervisory Asylum Officer) Rebecca Tseng, about my medical conditions when I provided her my Employee Emergency Data Sheet. SAO Tseng acknowledged she noticed my hands but had not wanted to ask about them until I brought it up. We discussed my symptoms and history of my conditions.

c.  SAO Miranda stated in her affidavit that SAO Tseng told her about my medical conditions and need for treatment.

d.  On March 13 and 16, 2020, I provided SAO Miranda updated Emergency Data Sheets, that listed some of my major medical conditions, following an office wide request in preparation for starting Telework during the Covid Pandemic.

e.  When I applied for maxiflex / AWS around March 17, 2020, I cited medical appointments and treatments, as well as productivity efficiency

COMPLAINT

(in view of my disabilities and medical appointments and treatments) as reasons for the request.

88.   On March 20, 2020, my request for maxiflex/AWS was denied by SAO Miranda and Deputy Director Marianne Hong, citing not meeting MOA (Memorandum of Agreement 2018) within the 2016 USCIS CBA (Collective Bargaining Agreement).

89.   SAO Miranda also never told me or gave the impression that the request would be denied despite her suggestion to apply.

90.   Moreover, the Defendant failed to consider my request as a reasonable accommodation. Section 1630.2(o) of Title 29 C.F.R. defines "reasonable accommodation" under the ADA to include modifications or adjustments to the job application process, the work environment, or the manner or circumstances under which the position held or desired is customarily performed.

91.   USCIS Management Directive No. 256-006 states, "[a] request does not have to include any special words, such as "reasonable accommodation," "disability," or "Rehabilitation Act." A request is any communication in which an

individual asks or states that he or she needs USCIS to provide or to change something because of a medical condition. A supervisor, manager, or OEOI Disability Accommodation Program staff, should ask an individual whether he or she is requesting a reasonable accommodation if the nature of the initial communication is unclear." [2]

92.   Moreover, SAO Miranda and Deputy Director Hong failed to engage in an interactive process with me regarding my reasonable accommodation request. Under the Americans with Disabilities Act (ADA) and the Rehabilitation Act of 1973, covered employers are required to engage in an interactive process with employees who request reasonable accommodations for disabilities.  This is in contrast to how SAO Tseng worked with Scheduling to alter my interview schedule so I could attend my prior appointments.

93.   Former AO Jex stated in her resignation letter that Section Chiefs told SAO Tseng that if she was ineligible to obtain Maxiflex under the CBA then she would need to request reasonable accommodation instead.  I was not provided

---

[2] (Management Directive: Disability Accommodations for Employees and Job Applicants,  Effective Date: May 7, 2015, USCIS Management Directive No. 256-006; Page 5; https://www.uscis.gov/sites/default/files/document/legal-docs/Disability-Accommodations-for-Employees-and-Job-Applicants-MD-256-006.pdf. (accessed November 21, 2020)).

COMPLAINT

with this same advice when I applied for Maxiflex.

94. I was fired about a week after I submitted my reasonable accommodation request. Title VII also prohibits retaliation for a protected activity.

95. Consequently, the reasons outlined in my termination are also a pretext.

## SECOND CAUSE OF ACTION

(Title 29 U.S.C.§ 791(f) under the Rehabilitation Act of 1973: Reasonable accommodation absent undue hardship on the employer; § 501 of the Rehabilitation Act of 1973))

(As against Defendant(s): Alejandro N. Mayorkas, Secretary, Department of Homeland Security (Citizenship and Immigration Services), Agency)

Plaintiff hereby incorporates and re-alleges paragraphs 5 through 83 as is fully set forth herein.

96. "Section 791(f) of Title 29 of the United States Code (U.S.C.) mandates that federal agencies provide reasonable accommodation to qualified employees or applicants with disabilities unless doing so would impose undue hardship on the agency."

97.   Federal Government Agencies must, absent undue hardship, "provide reasonable accommodation for the known physical or mental limitations of a qualified individual with a disability;"[3]

98.   "Undue hardship means that the accommodation would be too difficult or too expensive to provide, in light of the employer's size, financial resources, and the needs of the business (29 C.F.R. § 1630.2(p)). An employer may not refuse to provide an accommodation, however, just because it involves some cost."

99.   Records of various reasonable accommodation requests that have been granted for Asylum Officers at the Los Angeles Asylum Office between March 2018 – March 2020 include but were not limited to: **a flexible work schedule**, temporary reduction of caseload, alternative workload accommodation, episodic telework, and reassignment. These records were provided by the Defendant during the EEO Investigation. Therefore, a flexible or alternative work schedule would not be construed as causing "undue hardship," and considering we were already teleworking and performing more administrative tasks until further notice.

---

[3]  (Equal Employment Opportunity Commission Management Directive 715, "Federal responsibilities under Section 717 of Title VII and Section 501 of the Rehabilitation Act" (October 1, 2003)).

COMPLAINT

## THIRD CAUSE OF ACTION

(Title VII of the Civil Rights Act of 1964, Title V of the Americans with Disabilities Act (ADA), Section 501 of the Rehabilitation Act (Rehabilitation Act), Retaliation)

(As against Defendant: Alejandro N. Mayorkas, Secretary, Department of Homeland Security (Citizenship and Immigration Services), Agency)

Plaintiff hereby incorporates and re-alleges paragraphs 5 through 83 as is fully set forth herein.

100.     Each of the Equal Employment Opportunity (EEO) laws prohibits retaliation and related conduct: Title VII of the Civil Rights Act of 1964 (Title VII), the Age Discrimination in Employment Act (ADEA), Title V of the Americans with Disabilities Act (ADA), Section 501 of the Rehabilitation Act (Rehabilitation Act)...

101.     Retaliation occurs when an employer takes a materially adverse action because an applicant or employee asserts rights protected by the EEO laws.

102.     Around March 20, 2020, I requested reasonable accommodation.

103.     My request was denied without engagement in an interactive process and then I was fired a week later.

104.     According to USCIS – NCISC Master Agreement 2016, Article 3 – Employee Rights, "No disciplinary or adverse action will be taken against an employee upon unsubstantiated rumors or gossip."(p. 6). This is also referred to as the USCIS 2106 CBA (Collective Bargaining Agreement).

105.     The Defense will try to argue that they intended to terminate my position since mid Feb 2020.  However, given the multiple instances of severe and pervasive harassment I suffered under SAO Miranda, as well as the multiple submissions of false statements and documents with discrepancies prior to my termination and during the EEO process, I believe the reasons outlined in my termination letter were a pretext to my disabilities and request for reasonable accommodation. (Exhibits 2, 5, 7, 10, 12 - 14)

106.     As per SAO Miranda, I was already approved for telework under my original schedule. It was SAO Miranda who suggested I submit the maxiflex in order to change my current schedule and then update my Telework schedule.  At

no time did SAO Miranda state or imply that my request would be denied.

107.     SAO Miranda specifically asked for the reasons I was requesting Maxiflex, to which I mentioned medical treatment and appointments, as well as efficient productivity.

108.     SAO Miranda also asked when my EOD (Entrance on Duty) was, which I provided.

109.     Since the EOD date was within a year, the Defendant then terminated me under 5 C.F.R. § 315.801 Termination During Probationary Period, for which I would then have limited appeal rights.

110.     I was not involved or notified about those "discussions" or brought forth to address misconduct allegations made by SAO Miranda.  The Defendant only provided PDF versions of emails related to their "discussions" with LER regarding my termination, but not the actual electronic data trail that cannot be easily altered, i.e., authenticated.

111.     The termination caught me by surprise, since I was teleworking from

COMPLAINT

home when I received the termination letters via courier.  Moreover, around December 2019, Deputy Director Hong had requested my availability for MERP (Middle East RAIO Processing) training in Washington DC, scheduled for April 07 – 10, 2020.  Despite the Defendant's claims of my having untimely, unsubmitted cases or staying past my tour at the time, this meant I was performing well enough to receive further training on more complex matters.

112.    Furthermore, if the events leading to my termination were true according to the Defendant, then there would have been no need for the Defendant to submit false statements and records with discrepancies to the EEOC Court against penalty of perjury within Title 18 USC Section 1001, which they continued to utilize throughout the process.  See Exhibits 2, 5, 7, 10, 12 - 14.

## **FOURTH CAUSE OF ACTION**

(Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act of 1990, (ADA), §501 of the Rehabilitation Act of 1973, DHS Directive 256-01 Anti-Harassment Program: Harassment and Hostile Work Environment))

(As against Defendant(s): Alejandro N. Mayorkas, Secretary, Department of Homeland Security (Citizenship and Immigration Services), Agency)

Plaintiff hereby incorporates and re-alleges paragraphs 5 through 83 as is fully set forth herein.


113.    "The ADA prohibits discrimination based on an actual, history of, or perceived disability, including disparate treatment or harassment. Under Title VII, a hostile work environment exists when the workplace is "permeated with discriminatory, intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.""


114.    "Section 501 is a non-discrimination law specific to employment with the Federal government that: Protects qualified individuals with disabilities from disparate treatment or harassment based on disability."


115.    Between mid-December 2019 until my termination on March 27, 2020, I was harassed by SAO Miranda.  Multiple incidents I experienced with SAO Miranda include, but are not limited to:

    a.  Unreasonable and excessive interference in my work performance and
        work flow;

b.  Accusing me of not communicating with her despite email evidence

provide to the contrary; for example,

c.  Barging into my office without knocking;

d.  Loudly berating me;

e.  Startling me and interrupting my focus whilst I was preparing for

interviews;

f.  All of this created stress and anxiety, and caused difficulty in sleeping

over time even until then end. My work environment became

intimidating, overwhelming, and hostile.  (Exhibits 2 and 5)

116.    Types of Harassment include, but are not limited to:

"Disability-based harassment: It is a type of harassment directed towards an

individual who suffers any disability…; Psychological Harassment: It is being

constantly put down and always having their ideas trivialized by the supervisors…

It also includes…making impossible demands and deadlines, etc.; Verbal

Abuse:…It includes yelling…offensive gestures…in public or private. If such

harassment is based on one's protected class, it is…illegal."[4]

---

[4] "Most Common Types of Harassment: 8 Types." Online Diversity and Sexual Harassment Training for Companies,

www.getimpactly.com/post/most-common-types-of-

117.     My frequent experiences with SAO Miranda were severe and

pervasive enough to cause anxiety, fear, and sleepless nights; meanwhile staying

current on my cases was also at the forefront of my mind with the already limited

time I had. In view of the above and Exhibits provided, I believe SAO Miranda had

set me up to fail. The Cambridge dictionary defines sabotage as: "the act of

intentionally trying to stop someone from achieving something or to stop

something from developing."

118.     Moreover, the EEOC recognizes: "The fact that there are no eye-

witnesses to the alleged harassment by no means necessarily defeats the

complainant's credibility, since harassment often occurs behind closed doors." [5]

119.     According to the USCIS – NCISC Master Agreement 2016, Article 3

– Employee Rights wherein "all parties should conduct themselves in a

professional manner and refrain from abusive conduct and language when

---

harassment#:~:text=(iv)%20disability%2Dbased%20harassment,necessary%20and%20reasonable%20accommodations%2C%20

etc. Accessed 6 Apr. 2024.

[5] Equal Employment Opportunity Commission, "Enforcement Guidance: Vicarious Employer Liability for Unlawful Harassment

by Supervisors," No. 915.002 (June 18, 1999) https://www.eeoc.gov/laws/guidance/enforcement-guidance-vicarious-liability-

unlawful-harassment-supervisors#_ftn17.

COMPLAINT

communicating with each other." (Master Agreement Between U.S. Citizenship and Immigration Services and American Federation of Government Employees - National Citizenship and Immigration Services Council (uscis.gov), p. 5); see also Exhibits 13 and 14.

120.     Further, "Employees shall be treated with courtesy, dignity, and respect" [Id. 6].

121.     In January 2020, I did mention to SAO Miranda in my office that I was having medical/doctor appointments. SAO Miranda then gazed to my hands and her facial expression changed before she met my eyes again.

122.     I also recall other occasions when SAO Miranda had looks of derision on her facial expression when she looked at my hands whilst I pointed out interview statements on case files that we were discussing in her office and mine.

123.     I provide additional analysis with citations regarding the harassment I experienced in Exhibits 13 and 14.

124.     *In Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000)*

The Court clarified that a plaintiff can prove discrimination through both direct and circumstantial evidence.

125.    On March 27, 2020, I contacted Hannah Mikesell, Supervisory Chief of Staff, as requested in her email following my termination. I told Hannah Mikesell that it was Myrna Miranda who had done what Miranda accused me of; Ms. Mikesell's response was," I'm sorry it didn't work out."

126.    According to USCIS Management Directive 256-01 of the DHS Anti-Harassment Program, Section IV. F.:

> *"All Managers and Supervisors [are responsible for taking] all allegations and instances of potential harassment and/or retaliation seriously, [to] report any complaints or incidents of harassment and/or retaliation consistent with the applicable Component anti-harassment reporting procedures, and [to] take prompt remedial action to correct harassment, or to address any claims of retaliation stemming from harassment allegations."*

127.    This did not happen. Ms. Mikesell did not engage further and my reporting was ignored.

*128.*     The Directive also states that "Managers and supervisors who knowingly tolerate or ignore harassment or retaliation, including managers or supervisors who fail to immediately report such misconduct, are in violation of the DHS Anti-Harassment Policy Statement and subject to discipline." (*Id.*)

## FIFTH CAUSE OF ACTION

(Title VII of the Civil Rights Act of 1964, ADA: Disparate Treatment))
(As against Defendant(s): Alejandro N. Mayorkas, Secretary, Department of Homeland Security (Citizenship and Immigration Services), Agency)

Plaintiff hereby incorporates and re-alleges paragraphs 5 through 83 as is fully set forth herein.

129.     Title VII of the Civil Rights Act of 1964 (Title VII) prohibits discrimination based on race, color, sex, religion, or national origin, and the Americans with Disabilities Act (ADA) prohibits discrimination on the basis of disability.

130.     Discrimination based on disparate treatment occurs when an

employer treats a disabled employee or applicant differently than it treats non-disabled individuals because of the employee's or applicant's disability, such as firing the employee because of his or her disability.

131.    The Defendant presented a comparator: another Asylum Officer, M. Ly, who was also on probation and supervised by SAO Miranda.  Records presented by the Defendant indicate Ms. Ly is under 40 and does not have a disability. Ms. Ly was also made permanent once her probationary period ended. (Exhibit 13 and 14).

132.    Documentary evidence submitted by the Defendant and I show discrepancies in the record keeping of the Defendant, which I repeatedly questioned. I outline these details in paragraphs 72 – 79, as well as in Exhibit 13 and 14).

133.    The Administrative Judge indicated my performance was "not up to snuff," yet I outperformed Ms. Ly by submitting 4x more timely cases than Ms. Ly using the first comparable biweekly period, and I submitted double the number of cases than Ms. Ly did for the first comparable month, whilst still achieving a

timeliness percentage well above the minimum. Using the Administrative Judge's own words: "case numbers speak for themselves." (Id.)

134.    See also Caceres-Rivera v DHS in Exhibit 10, Sub Exhibit B, wherein the MSPB determined the Defendant allowed a non-disabled employee to retake their exam but not Caceres-Riveras, who has a disability and requested reasonable accommodation.

135.    Former AO Briana Jex indicated in her affidavit she was aware other AOs were granted maxiflex without meeting 2016 USCIS CBA, but she was denied maxiflex for not meeting requirements under the CBA and then faced difficulty when she tried to apply for maxiflex as a reasonable accommodation. Ms. Jex was compelled to resign to focus on her health. See Exhibit 12, sub Exhibit D.

## SIXTH CAUSE OF ACTION

(Title VII of the Civil Rights Act of 1964, SEC. 2000e-6. *[Section 707]* Pattern or Practice)

(As against Defendant(s): Alejandro N. Mayorkas, Secretary, Department of Homeland Security (Citizenship and Immigration Services), Agency)

Plaintiff hereby incorporates and re-alleges paragraphs 5 through 83 as is fully set forth herein.

136.    The courts have found a "pattern or practice" when the evidence establishes that the discriminatory actions were the defendant's regular practice, rather than an isolated instance.

137.    In addition to my case, as well as the affidavit of Union President Rose Saraceno, I highlight additional cases wherein Asylum Officers on probation who were hired under Schedule A or had declared disabilities and/or requested a reasonable accommodation were terminated within a short time period or had felt compelled to resign due to difficulties in requesting accommodation:

138.    The MSPB determined that the Defendant, specifically the Los Angeles Asylum Office, discriminated against Jimy Caceres-Riveras, a military veteran, when the Defendant did not allow him a reasonable accommodation to retake his first exam when the Defendant offered a non-disabled employee the opportunity to retake their exam. (Exhibit 12, Sub Exhibit B)

139.    Of note is also the fact that SAO Myrna Miranda was the assigned

supervisor to Jimy Caceres-Rivera at the same time I was.  President AFGE Local 1200 Rose Saraceno stated in her affidavit that she approached SAO Miranda regarding Caceres-Rivera's request for Reasonable Accommodation and "SAO Miranda responded with words to the effect that it 'was not her problem and that it was not accurate information that she was responsible.'" Saraceno added that "SAO Miranda was not helpful, her tone of voice and facial expressions were angry, hostile and not respectful. SAO Miranda made it clear that she did not want to be bothered about a reasonable accommodation for an employee she supervised in any way. Because SAO Miranda refused to discuss or assist the employee in his reasonable accommodation, [Saraceno] advised him to send his request directly to Office of Equal Opportunity and Inclusion (OEOI)."  (Exhibit 11)

140.    Under the Americans with Disabilities Act (ADA) and the Rehabilitation Act of 1973, covered employers are required to engage in an interactive process with employees who request reasonable accommodations for disabilities.

141.    Ms. Saraceno also mentioned "another Asylum Officer, who was briefly supervised by SAO Miranda in early 2020," and "who told [her that SAO Miranda] would often suddenly walk into his office unannounced and

very abruptly when he was just getting into the office and signing into his computer;" moreover, "SAO Miranda was rude and condescending to this officer. The Asylum Officer also described how sometimes Ms. Miranda would speak very loudly in the hallway when he was performing his work, which made it difficult for him to properly complete his work. This employee is over 40 years of age and approximately [the] same age" as Saraceno.

142.     Ms. Saraceno also states the following in her Affidavit:

a. The Defendant is not supportive of disabled employees and reasonable accommodation requests;

b. The Defendant "regularly discriminates against disabled employees who request reasonable accommodation and typically does not promote employees over the age of 40."

c. Two of the employees who she assisted with in applying for their accommodations "experienced hostility from members of management at the Los Angeles Asylum Office."

d. "Employees who are over 40 as well as employees who have a disability are afraid to report discrimination at the Los Angeles Asylum Office because they fear retaliation."

    e.  "Employees with disabilities are afraid to request reasonable accommodations because they fear retaliation."

    f.  "Employees who witness harassment are afraid to afraid to step forward because they are afraid they will be harassed and retaliated against."

    g.  "An employee who is over 65 years old requested an accommodation due to her disability and was told she would be granted the request. The request was never actually fulfilled."

143.    Farhad Khorasani, another former colleague, hired under Schedule A, was terminated on June 23, 2020. He mentioned the challenges he faced while trying to obtain reasonable accommodation. Rose Saraceno also assisted him with applying for his accommodation.

144.    In addition, like me, Khorasani was caught by surprise when he was fired and then charged with misconduct, which was not officially brought to his attention, nor was he asked for his side of the story or requested to participate in an investigation on.  He stated he was preparing for his first scheduled asylum interview and then asked to go to the conference room with his laptop and credentials.  There, Deputy Director Marianne Hong announced his termination, and his laptop was immediately taken away so that he could not have access to any

COMPLAINT

evidence of communication or documents that could have supported his case.

145.     Brianna Jex, a former Asylum Officer at the Los Angeles Asylum Office, provided her resignation letter to me which outlined her challenges with obtaining reasonable accommodation.

146.     Jex also stated in her letter that she was aware that other AOs were accommodated with Maxiflex accommodations regardless of meeting requirements under USCIS 2016 CBA held for employees not requesting a reasonable accommodation. She stated that Section Chiefs told SAO Rebecca Tseng that if she was ineligible under the 2016 CBA, that she would need to request reasonable accommodation.

147.     I was advised to speak to former Asylum Officer Michael Fernandez, who also believed he was discriminated against when he submitted his reasonable accommodation request with the Los Angeles Asylum Office. Michael had waited several weeks to months for a response and when a response was provided, the Defendant provided an amenity he did not request.  Michael was terminated a month before he became permanent. Michael later filed a claim with the EEOC at the advice of the Office of California U.S. Representative Katie Porter.

148.     Glassdoor.com has multiple postings from former USCIS Asylum Officers and Immigration Officers from various offices around the country between 2018 – 2021, stating that there is a practice of discrimination and harassment within the Agency before and after my employment with the Agency, as well as describing standard working conditions. (Exhibit 15)

## SEVENTH CAUSE OF ACTION

### (Title 18 of the U.S.C. § 1001)

(As against Defendant(s): Alejandro N. Mayorkas, Secretary, Department of Homeland Security (Citizenship and Immigration Services), Agency)

Plaintiff hereby incorporates and re-alleges paragraphs 5 through 83 as is fully set forth herein.

149.     During the Mediation process, the EEO Investigator collected Affidavits from the SAO Myrna Miranda, Section Chief Mallory Lynn, Deputy Director Marianne Hong, and Director David Radel. (Exhibits 4, 6, 8, and 9)

150.     Affidavits required attestation and understanding of Section 1001,

Title 18 of the US Code, which states:

> *"Whoever, is any manner within the Jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up any trick, scheme, or device a material fact; or makes false, fictitious or fraudulent statements or representation, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned to more than 5 years , or both."*

151.    I submitted rebuttals following each Affidavit from the Agency wherein I also included snapshots of emails and documentary evidence to disprove statements made by the Defendant. (Exhibits 2, 5, 7, and 10)

152.    The Defendant continued to utilize their "facts" that I questioned during the entire EEOC process, despite providing documentary evidence contrary to the claims made by the Defendant. (Exhibits 2, 5, 7, 12-14).

153.    I also rebutted conclusions made by the Judges. (Exhibits 12 - 14).

COMPLAINT

# EIGHTH CAUSE OF ACTION

(Title 25 of the U.S.C. § 1625.2, Age Discrimination in Employment Act of 1967, (ADEA), 5 USC 2302)

(As against Defendant(s): Alejandro N. Mayorkas, Secretary, Department of Homeland Security (Citizenship and Immigration Services), Agency)

Plaintiff hereby incorporates and re-alleges paragraphs 5 through 83 as is fully set forth herein.

154.     The Age Discrimination in Employment Act of 1967 prohibits discrimination on the basis of age with respect to individuals who are at least 40 years of age.

155.     I was born in 1976. I was over 40 years of age at the time of my employment (June 2019 – March 2020) with the Defendant. (Exhibit 2)

156.     I have prominent white hair on my head which make it obvious that I am above 40. (*Id.*)

157.     President AFGE Local 1200 stated the following in her affidavit:

a. The Defendant "regularly discriminates against disabled employees who request reasonable accommodation and typically does not promote employees over the age of 40."

b. "Employees who are over 40 as well as employees who have a disability are afraid to report discrimination at the Los Angeles Asylum Office because they fear retaliation."

c. "The Los Angeles Asylum Office favors employees under 40 years of age for promotion to Supervisory Asylum Officer or to Senior Asylum Officer. Most of the Supervisory Asylum Officers are women under 40 years of age. The few exceptions are employees promoted over a decade ago."

d. "An employee who is over 65 years old requested an accommodation due to her disability and was told she would be granted the request. The request was never actually fulfilled."

158. Ms. Saraceno also mentioned "another Asylum Officer, who was briefly supervised by SAO Miranda in early 2020," and "who told [her that SAO Miranda] would often suddenly walk into his office unannounced and very abruptly when he was just getting into the office and signing into his computer;" moreover, "SAO Miranda was rude and condescending to this officer. The Asylum

Officer also described how sometimes Ms. Miranda would speak very loudly in the hallway when he was performing his work, which made it difficult for him to properly complete his work. This employee is over 40 years of age and approximately [the] same age" as Saraceno. (*Id.*)

159.     The Defendant presented a comparator: another Asylum Officer, M. Ly, who was also on probation and supervised by SAO Miranda.  Records presented by the Defendant indicate Ms. Ly is under 40 and does not have a disability. Ms. Ly was also made permanent once her probationary period ended. (Exhibit 13 and 14).

160.     Documentary evidence submitted by the Defendant and I show discrepancies in the record keeping of the Defendant, which I repeatedly questioned. I outline these details in paragraphs 72 – 79, as well as in Exhibit 13 and 14).

161.     The Administrative Judge indicated my performance was "not up to snuff," yet I outperformed Ms. Ly by submitting 4x more timely cases than Ms. Ly using the first comparable biweekly period, and I submitted double the number of cases than Ms. Ly did for the first comparable month, whilst still achieving a

timeliness percentage well above the minimum. Using the Administrative Judge's own words: "case numbers speak for themselves." (Id.)

# VI. REQUEST FOR RELIEF

WHEREFORE, the Plaintiff requests:

162.     Back pay since March 28, 2020, including pay out of accrued annual leave and any other type of applicable leave that would have accumulated since, until this case is resolved in Plaintiff's favor.

163.     Reimbursement of attorney fees paid by Plaintiff during the EEOC Process amounting to $16,361.50.

164.     Compensation for pain and suffering, including to not limited to discrimination experienced during Plaintiff's employment with the Defendant, the length of time the case took to be resolved due to the false statements and discrepancies in documents submitted by the Defendant to unnecessarily prolong resolution of this case, the loss of retirement earning potential as Plaintiff was enrolled in a retirement plan through USCIS.

165.     Clean record, e.g.  an updated SF-51/SF-50, with allegations of

misconduct and poor performance removed from Plaintiff's record and removal of the terminated status.

Dated: 04/07/2024

Signed: _____
                Rica Ty

# **DEMAND FOR JURY TRIAL**

Plaintiff hereby requests a jury trial on all issues raised in this complaint.

Dated: 04/07/2024

Signed: _____
                Rica Ty

Rica Ty, Plaintiff
v.
Alejandro N. Mayorkas, Secretary,
Department of Homeland Security
(Citizenship and Immigration Services), Agency, Defendant

## **EXHIBIT SUBMISSION TABLE OF CONTENTS**

1.  Exhibit 1 – Complainant's Right to File a Civil Suit

2.  Exhibit 2 – Affidavit of Rica Ty (as submitted to EEOC Investigator)

3.  Exhibit 3 – Request for Reasonable Accommodation (Maxiflex)

4.  Exhibit 4 – Affidavit of SAO Myrna Miranda

5.  Exhibit 5 – Rica Ty Rebuttal to SAO Miranda's Affidavit (as submitted to
    EEO Investigator.  The ROI version had been overly reduced in
    image quality and overly redacted)

6.  Exhibit 6 – Affidavit of Section Chief (SC) Mallory Lynn

7.  Exhibit 7 – Rebuttal to SC Mallory Lynn's Affidavit (as submitted to EEO
    Investigator

8.  Exhibit 8 – Affidavit of Director David Radell

9.  Exhibit 9 – Affidavit of Deputy Director Marianne Hong

10. Exhibit 10 – Rebuttals to Affidavit of David Radell and Marianne Hong (as
    submitted to EEO Investigator.)

11. Exhibit 11 – Affidavit of Rose Saraceno

Complaint

12. Exhibit 12 – Rica Ty Response to NOI 06-14-2021

        a.  Sub Exhibit A – Letter from my Rheumatologist

        b.  Sub Exhibit B – Jimy Caceres-Rivera, Appellant, v. Department of Homeland Security, Agency U.S. Merit Systems Protection Board, Western Regional Office SF-0752-20-0696-I-1, March 9, 2021

        c.  Sub Exhibit C – Affidavit of Farhad Khorasani

        d.  Sub Exhibit D – Resignation Letter of Briana Jex

        e.  Sub Exhibit E – Text message with SAO Rebecca Tseng

13. Exhibit 13 – Rica Ty Appeal Brief

14. Exhibit 14– Rica Ty Reconsideration Statement

15. Exhibit 15 – Employer reviews from former USCIS Asylum and Immigration Officers submitted on Glassdoor.com

Complaint

# EXHIBIT 1



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
Office of Federal Operations
P.O. Box 77960
Washington, DC 20013

Rica Ty a/k/a
Juanita K.,[1]
Complainant,

v.

Alejandro N. Mayorkas,
Secretary,
Department of Homeland Security
(Citizenship and Immigration Services),
Agency.

Request No. 2023003974

Appeal No. 2021005216

Hearing No. 480-2021-00268X

Agency No. HS-CIS-01464-2020

<u>DECISION ON REQUEST FOR RECONSIDERATION</u>

Complainant timely requested that the Equal Employment Opportunity Commission (EEOC or Commission) reconsider its decision in EEOC Appeal No. 2021005216 (June 5, 2023). EEOC Regulations provide that the Commission may, in its discretion, grant a request to reconsider any previous Commission decision issued pursuant to 29 C.F.R. § 1614.405(a), where the requesting party demonstrates that: (1) the appellate decision involved a clearly erroneous interpretation of material fact or law; or (2) the appellate decision will have a substantial impact on the policies, practices, or operations of the agency. <u>See</u> 29 C.F.R. § 1614.405(c).

During the relevant time, Complainant was employed by the Agency as a GS-0930-12 Asylum Officer in Tustin, California. On June 30, 2020, Complainant filed a formal complaint, alleging discrimination based on disability, age, and in reprisal for prior protected EEO activity when she was subjected to harassment by the Supervisory Asylum Officer, when her request for a maxi-flex schedule as a reasonable accommodation was denied, and when she was terminated during her probationary period.

---

[1] This case has been randomly assigned a pseudonym which will replace Complainant's name when the decision is published to non-parties and the Commission's website.

Following an investigation, Complainant requested a hearing before an EEOC Administrative Judge (AJ). The assigned AJ issued a summary judgment decision, finding that Complainant did not establish that she was subjected to discrimination as alleged. The Agency issued a final order fully implementing the AJ's decision. Complainant appealed.

In EEOC Appeal No. 2021005216, the Commission affirmed the Agency's final order implementing the AJ's summary judgment decision finding no discrimination based on disability, age, and/or reprisal.

In the instant request for reconsideration, nothing that Complainant has submitted supports a determination that the prior decision affirming the Agency's final order was in error. Complainant reiterates arguments previously raised and addressed on appeal. A request for reconsideration is not a second appeal to the Commission. Equal Employment Opportunity Management Directive for 29 C.F.R. Part 1614 (EEO MD-110), Chap. 9 § VI.A (Aug. 5, 2015); see, e.g., Lopez v. Dep't of Agric., EEOC Request No. 0520070736 (Aug. 20, 2007). Rather, a reconsideration request is an opportunity to demonstrate that the appellate decision involved a clearly erroneous interpretation of material fact or law, or will have a substantial impact on the policies, practices, or operations of the Agency. Complainant has not done so here.

After reviewing the previous decision and the entire record, the Commission finds that the request fails to meet the criteria of 29 C.F.R. § 1614.405(c), and it is the decision of the Commission to DENY the request. The decision in EEOC Appeal No. 2021005216 remains the Commission's decision. There is no further right of administrative appeal on the decision of the Commission on this request.

## COMPLAINANT'S RIGHT TO FILE A CIVIL ACTION (P0610)

This decision of the Commission is final, and there is no further right of administrative appeal from the Commission's decision.  You have the right to file a civil action in an appropriate United States District Court **within ninety (90) calendar days** from the date that you receive this decision.  If you file a civil action, you must name as the defendant in the complaint the person who is the official Agency head or department head, identifying that person by his or her full name and official title.  Failure to do so may result in the dismissal of your case in court. "Agency" or "department" means the national organization, and not the local office, facility or department in which you work.

## RIGHT TO REQUEST COUNSEL (Z0815)

If you want to file a civil action but cannot pay the fees, costs, or security to do so, you may request permission from the court to proceed with the civil action without paying these fees or costs. Similarly, if you cannot afford an attorney to represent you in the civil action, you may request the court to appoint an attorney for you. **You must submit the requests for waiver of court costs or appointment of an attorney directly to the court, not the Commission.** The court has the sole discretion to grant or deny these types of requests.

3                                                        2023003974

Such requests do not alter the time limits for filing a civil action (please read the paragraph titled Complainant's Right to File a Civil Action for the specific time limits).

FOR THE COMMISSION:

_____

Carlton M. Hadden, Director
Office of Federal Operations

January 9, 2024
Date

# Date Calculator: Add to or Subtract From a Date

Enter a start date and add or subtract any number of days, months, or years.

Count Days     Add Days     Workdays     Add Workdays     Weekday     Week №

From **Tuesday, January 9, 2024**
Added 90 days

## Result: Monday, April 8, 2024

### Calendar showing period from January 9, 2024 to April 8, 2024

**January 2024**
22 days added

| Sun | Mon | Tue | Wed | Thu | Fri | Sat |
|-----|-----|-----|-----|-----|-----|-----|
|     | 1   | 2   | 3   | 4   | 5   | 6   |
| 7   | 8   | 9   | 10  | 11  | 12  | 13  |
| 14  | 15  | 16  | 17  | 18  | 19  | 20  |
| 21  | 22  | 23  | 24  | 25  | 26  | 27  |
| 28  | 29  | 30  | 31  |     |     |     |

**February 2024**
29 days added

| Sun | Mon | Tue | Wed | Thu | Fri | Sat |
|-----|-----|-----|-----|-----|-----|-----|
|     |     |     |     | 1   | 2   | 3   |
| 4   | 5   | 6   | 7   | 8   | 9   | 10  |
| 11  | 12  | 13  | 14  | 15  | 16  | 17  |
| 18  | 19  | 20  | 21  | 22  | 23  | 24  |
| 25  | 26  | 27  | 28  | 29  |     |     |

**March 2024**
31 days added

| Sun | Mon | Tue | Wed | Thu | Fri | Sat |
|-----|-----|-----|-----|-----|-----|-----|
|     |     |     |     |     | 1   | 2   |
| 3   | 4   | 5   | 6   | 7   | 8   | 9   |
| 10  | 11  | 12  | 13  | 14  | 15  | 16  |
| 17  | 18  | 19  | 20  | 21  | 22  | 23  |
| 24  | 25  | 26  | 27  | 28  | 29  | 30  |
| 31  |     |     |     |     |     |     |

**April 2024**
8 days added

| Sun | Mon | Tue | Wed | Thu | Fri | Sat |
|-----|-----|-----|-----|-----|-----|-----|
|     | 1   | 2   | 3   | 4   | 5   | 6   |
| 7   | 8   | 9   | 10  | 11  | 12  | 13  |
| 14  | 15  | 16  | 17  | 18  | 19  | 20  |
| 21  | 22  | 23  | 24  | 25  | 26  | 27  |
| 28  | 29  | 30  |     |     |     |     |

☐ = Start date (Jan 9, 2024)   ☐ = Final result date (Apr 8, 2024)



**Time & Date Calculator App for iOS**

See how long remains before a deadline or exactly when those 30 days are up.

# EXHIBIT 2

## AFFIDAVIT

In the matter of:

Complaint # **HS-CIS-01464-2020**

Rica Ty

v.

Chad F. Wolf
Acting Secretary, Department of Homeland Security

AFFIDAVIT: **Rica Ty**

Pursuant to the investigation of the subject complaint in accordance with 29 C.F.R.1614.108.

BEFORE: **Jennifer Weihert, EEO Investigator**

On behalf of the United States Department of Homeland Security, U.S. Citizenship and
Immigration Service

Jennifer Weihert
19453 W. Catawba Ave., Suite D
Cornelius, NC 28031

1.  Please state your full name, former position title, job series, grade and organizational units
    (from smallest to largest).

    Rica Ty; Asylum Officer, GS-0930-12; USCIS / Department of Homeland Security / Los

    Angeles Asylum Office / 14101 Myford Road / Tustin, CA 92780

2.  How long did you work in your most recent position (hire date)?  How long have you
    worked for the Federal Government (hire date)?

    9 months, 18 days (entrance of duty (EOD) was June 9, 2019 and I received the termination

    letter on March 27, 2020) – I was actually offered this position back in July 2015, and it

Page ___1___ of ___41___ Pages            Initials: _____

000076

took the Office of Security and Integrity 3.5 to 4 years to complete my background

investigation.

3.    Who were your first- and second-line supervisors and their titles during the period of the issues of this complaint (December 2019 to March 2020)?

1st line supervisor: Myrna Miranda, Supervisory Asylum Officer (SAO)

2nd line supervisor: Mallory Lynn, Section Chief

4.    Who do you allege is responsible for the current discriminatory and harassing actions? What was your organizational relationship to this individual(s)?

Primarily, SOA Myrna Miranda (first line supervisor); however, Deputy Director Marianne

Hong played a role in rejecting my maxi flex / alternate work scheduled request and

Director David Radel is the one who signed my termination letter. Both Ms. Hong and Mr.

Radel were both in my chain of command (3rd and 4th level).

5.    Please state you age with month and year of birth.

44; July 1976

6.    Was the person(s) responsible for the current discriminatory and harassing actions aware of your age? If so, when and how did he/she become aware of your age?

Presumably, yes, they were as they all had access to my files. I also interviewed with Mr.

Radel back in 2015 initially. They would have had constructive knowledge from my

previous supervisor; because I also have some white hair that is prominent, people can

deduce I'm over 40.

7.    What is the exact nature of your disability? Are you considered disabled in agency records?

I have ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉. I do

not know if the Agency considered me disabled, but I did notify my first supervisor, SAO

Rebecca Tseng, back when I was first provided the employee emergency contact sheet to

fill out (late summer, early fall 2019) that I had these medical conditions.

8.  Does your disability substantially limit one or more major life activities? If yes, please explain what activity it limits and how.

Yes. I get shortness of breath with increased physical activity (e.g., climbing flights of stairs, carrying objects for short distances, such as walking down hallways, etc.). I typically experience overall muscle weakness due to the loss of elasticity in my connective tissues (as the condition creates scar tissue internally and proceeds outwards). My hands are curved, which limits mobility and flexibility – unable to hold my fists closed, prone to finger ulcers, etc. Having finger ulcers further limited use of my fingers/hands due to the pain. My fingers have shortened; my right thumb is noticeably much shorter than the other. The cold exacerbates my conditions. For example, inflammation increases, particularly in the hands; they'll feel thicker and the tips turn purple/white to indicate limited to no blood flow. So when the office reaches extremely cold temperatures (for me), then it can be challenging to work. Kindly note that it was immediately after prolonged exposure to extreme cold during a transatlantic flight when my initial symptoms of my disease manifested (please see my response to Question 9). Additionally, this has affected the way I type; speed and accuracy are both affected. I have limitations in mobility pretty much everywhere including joints and limbs. I have experienced issues with nerves, digestion, eating (e.g., holding utensils in a different way, mouth cannot open as widely as before) and sleeping (e.g., insomnia at times). My sleep was greatly affected even more so when I was being supervised by SAO Miranda. My sleep was more disturbed; I woke up frequently during the night, 2-3 times and sleep quality was poor, less restful. I was stressed, anxious and constantly worried about SAO Miranda's unpredictable actions and unprofessional and disrespectful confrontations that I would be subjected to on any given

day. When startled and made sudden movements, I experience a sharp tingling and shooting sensation from my nerves – starts in my back and shoots out to my extremities.

9. When was the onset of this disability? Have you recovered in whole, or in part? What is the prognosis?

Initially, in 2007, I presented with an inflammation of the heart and lung tissues, with fluid collecting in the sac around my heart and in my lungs. Following treatment for this, I was immediately diagnosed with a connective tissue disorder, which was then identified as ▮▮▮▮▮▮▮▮ in 2007. ▮▮▮▮▮▮▮ is a rare, chronic, autoimmune disease which causes hardening or fibrosis with vascular changes throughout the body and can lead to death. It can involve your skin, joints, internal organs, all major organs. Shortly after the disease began to progress, it manifested in my extremities. In March 2018, my new Rheumatologist noticed the ▮▮▮▮▮▮▮▮▮▮▮ Technically, there is no cure for ▮▮▮▮▮▮ especially once the lung is affected. My current medical treatment is to manage the symptoms and to prevent or retard any progression of the disease.

10. Did you tell your supervisor(s) about your disability? If so, to whom and when?

I did notify my first supervisor, SAO Rebecca Tseng, of my medical conditions back when I was first provided the employee emergency contact sheet to fill out (late summer, early fall 2019). SAO Miranda would have had constructive knowledge of my disabilities when she became my supervisor in December 2019 as the emergency contact sheet was in my file and meant for the supervisors' records should there be an emergency. Additionally, my hands are visually curved in, a bit disfigured/claw-like, and are limited in mobility, less flexible; therefore, others would have noticed. More specifically, when I interviewed with Mr. Radel in 2015, he would have noticed my hands. While discussing my medical conditions with SAO Tseng, she had mentioned she previously noticed the condition of my

hands. In January 2020, I did mention to SAO Miranda that I was having medical/doctor appointments. When I did, she gazed to my hands and her facial expression changed before she met my eyes again. Also, in March 2020, after she returned from TDY at FLETC, I did mention to her that I had been interviewing people who had entered the US from Wuhan between October to December 2019 and she said, "Oh don't worry, I am sure you're fine." In addition, during the week of March 13, 2020 they had asked us to provide them with an updated emergency contact sheet because people were starting to prepare to go to telework. As such, I gave SAO Miranda a copy of my emergency contact sheet on March 13, 2020, which indicated the same conditions in the form I had previously given SAO Tseng. However, I realized that I had forgotten to write down that I had ███████████████████ On March 16, 2020, I emailed SAO Miranda an updated emergency contact sheet with the addition of this information. Lastly, when I filed for my alternate work schedule request, SAO Miranda asked for my EOD and the reasons I was applying. I informed her that I wanted to schedule my medical appointments and treatments on non-core or shorter days without taking too much sick leave since the treatments take between 4-5 hours per day and my appointments were at UCLA (1.5 to 2 hours away). From all of these interactions, SAO Miranda was aware of my disabilities and that I was undergoing medical treatment.

11. What are the essential functions of your job? Does your disability affect your performing of these functions? If so, how?

Prior to COVID-19 telework, I typically interviewed applicants and I adjudicated affirmative asylum applications. I conducted credible fear and reasonable fear screenings. Additionally, I adjudicated applications under the Nicaraguan Adjustment and Central American Relief Act. I was on a 5-days per week, 8-hours per day schedule. Four days out of the week, I would conduct two affirmative asylum applications per day and Wednesdays

were reserved for training days. If I was assigned a credible fear or reasonable fear

screening, then I would need to interview a couple more people.

My typing skills were affected by my disability; speed and accuracy have been reduced.

During the interviews, I usually used more abbreviations so that I captured the record more

accurately at the speed that the interview was occurring. However, I would then have to go

back and ensure that I undid the abbreviations and corrected any misspellings. This added

additional time especially when an interview lasted three or more hours. If I carried a large

number of files, I would not be able to carry them long distances due to being out of breath.

12. Were you able to perform these duties and responsibilities without an accommodation? If
not, have you requested a reasonable accommodation?

I was doing my best to meet the standards; I thought I was meeting my standards even

though it was challenging given my limitations. I never needed to apply for a special

accommodation even at my previous jobs as I have had this disease since 2007. I have

always accomplished my tasks as necessary. If I was not meeting my standards, then I do

believe I would have met them if USCIS gave me the accommodation that I did request –

i.e., maxi flex / alternate work schedule.

13. Was the person(s) responsible for the current discriminatory and harassing actions aware of
your disability? If so, when and how did he/she become aware of your disability?

Please see my response to question 10 above regarding SAO Miranda and Mr. Radel's

awareness of my disabilities. As for Ms. Hong, I do not know for certain whether she was

or not; however, presumably I believe she would have constructive knowledge of my

disabilities based on the information in my file (including the emergency contact sheet) and

SAO Miranda, if SAO Miranda disclosed my medical conditions to Ms. Hong, including

the reasons I applied for maxi flex/alternate work schedule. Additionally, Ms. Hong was

involved in the decision to deny my maxi flex / alternate work schedule request. As such, if

she had no knowledge of my disability prior to my request, she likely did once I made the

request for maxi flex or alternate work schedule. Kindly note, on June 08, 2020, I asked the

USCIS Attorney Arnulfo Urias if SAO Miranda disclosed the reasons I filed my

AWS/Maxiflex to Ms. Hong and he replied that he did not have that information.

14.  Did you request reasonable accommodations? If so, when?

Yes, I requested maxi flex or an alternate work schedule on March 17, 2020. I did not have

any experience with having a need to request a reasonable accommodation before, so I

approached SAO Miranda about my request.

15.  Was the person(s) responsible for the current discriminatory and harassing actions aware of
your reasonable accommodation requests? If so, when and how did he/she become aware
of this activity?

Yes, they would have been. The decision to deny my maxi flex or alternate work schedule

request came from SAO Miranda and Ms. Hong; therefore, they would have been or should

have been aware of my request.

    a.  Was Mr. Radel aware of your reasonable accommodation request? If so, when
and how did he become aware of this activity?

    *I do not know if Mr. Radel was aware of my reasonable accommodation request.
However, it is his name on my termination letter.

1.  **From mid-December 2019 through March 27, 2020, you were subjected to
harassment from your Supervisor, Myrna Miranda, creating a hostile work
environment. Some incidents include, but are not limited to, the following:**
    - **On multiple occasions between December 2019 and March 2020, in both her
office and yours, SAO Miranda raised her voice with the door open, and when
she recognized she was becoming louder, ordered you to close the door.**
    - **On multiple occasions between December 2019 and March 2020, SAO
Miranda barged into your office without knocking, startled you and
interrupted your focus, causing anxiety.**
    - **On multiple occasions between December 2019 and March 2020, SAO
Miranda berated you in a rude and condescending manner. On January 28,**

2020 when you tried to defend yourself, she began yelling at you. On March 5, 2020, she lied about you raising your voice when you did not.

- **In January 2020, SAO Miranda was dismissive when you informed her that your disability and need for medical appointments was the primary reason for your backlog.**
- **On March 4, 2020, when you mentioned to SAO Miranda that you had interviewed people from Wuhan who entered the US between October and December 2019, she dismissed your concerns about COVID 19 even though she knew of your disabilities. She stated, "Oh don't worry, I am sure you will be fine".**

16. You stated that you were subjected to harassment from your Supervisor, Myrna Miranda, when on multiple occasions between December 2019 and March 2020, in both her office and yours, SAO Miranda raised her voice with the door open, and when she recognized she was becoming louder, ordered you to close the door. Is this true? Please explain exactly what happened and be specific. (Include date, location and details about the incident, etc.)

Yes, this is true. Typically, when I would be in SOA Miranda's office and she would begin

raising her voice, she would tell me to close her door since I was closer, especially after I

looked behind me when my back was to her open doorway or I looked out the hallway

when sitting in one of her chairs. When we would be in my office and she began to raise

her voice, she would be the one to typically close the door since she was closer and

especially when I would look towards the open door to see if anyone was passing by. So

she closed the door or had the door closed so she could continue with her raised tone rather

than calming down. For example, on a couple of occasions in January 2020, SAO Miranda

asked me to come to her office to discuss my backlog. I brought my computer in to take

notes and she snarkily told me to close my laptop as she was trying to give me instruction.

When I explained that I was trying to take notes, she said I did not have to, I just needed to

listen to her. In another instance, I went into her office asking her to change a push to a

mailout, she raised her voice because she did not like the fact that I did not tell her five

days before that I needed to change it to a mailout despite the fact the case was a bit more

complex than normal. When I looked behind me towards the open door, she tells me in a

Page __8__ of __41__ Pages          Initials: __RT__

000083

huffed tone to close it. She also speaks to me in an irritated , snarky huffed tone on the phone at times. For example, she gave me a list of cases that the system showed as being in my possession and asked me to go through it, which I did. I gave her the status of each case. She then proceeded to call me via telephone and berated me saying she did not want it that way. In a similar situation, she gave me a list of cases that she wanted me to turn in, which I did. Then, she proceeded to complain about why I included certain cases on the list, which she created herself. Essentially, a lot of my interactions with her consisted of her raising her voice and/or being condescending with the door usually open.

On February 24, 2020, I stayed to complete SAO Miranda's requested task. SAO Miranda raised her voice at me in her office because she was berating me for staying after my 8-hour shift. When I explained to her that we had agreed that I would hand files to her but was not able to locate her for a period of time. I even sent a Skype message to her asking her to let me know when she returned so I could hand her the files and leave. Essentially, I had already stopped working, I was just waiting for her to let me know when she got back. I saw her walk by my office window and called her back saying that I had been waiting for her. I brought a couple files back with me as we walked back to her office and then I was intending to grab the cart so I could bring the rest of the files back to her office. As I placed the files I brought to her desk, she looked at the clock and began interrogating me:

Myrna: what time were you supposed to leave?

Rica: I needed to leave already but I was waiting for you.

Myrna: **what time**?

Rica: 3:45 [the time on her clock was 3:52/3 PM]

Myrna: Rica, what have we talked about. You are supposed to leave after your shift. You cannot work past that time. We discussed this. Why can't you follow instructions?

Rica: Myrna, we just talked a little while ago and you said to come to your office to get the cart so I can bring the files to your office. I came by 10-15 minutes before I had to leave but you were not in your office. I also went back and forth a few times after to check if you were back but you were still not here. I wasn't even working after my shift; I was just sitting waiting for you and my purse was already out so I can leave immediately after. I saw you walk past my door and that's when I called you.

Myrna: NO, NO. That doesn't matter. We talked about working past your scheduled time and you worked past your scheduled time. If you had to leave you should have just sent me a message to let me know you needed to go.

Rica: Myrna, I skyped you and like I said, we discussed earlier that you wanted these files today and I did not want to delay giving them to you.

Myrna: NO RICA we talked about this. You can give the rest tomorrow. You need to leave NOW.

Meanwhile, the door is open for the whole conversation and her tone throughout this conversation was raised, irritated and hostile.

On March 04, 2020, SAO Miranda barged into my office while I was organizing a family file. Apparently, she skyped me a message but because my volume was off [usually off to prevent interruptions during interviews] and I was not looking at my screen, I did not hear or see her message. After barging in, she asked if I saw her message. The door was ajar as she was holding it open. I asked, "Oh you sent me a message?" I looked at my screen on the left and after refreshing it, I noted a skype message, but I still had not read it because

she immediately and in an irritated tone, said, "I just skyped you and you have not responded. Skype is for urgent messages and you are not paying attention! You see, this is what I'm talking about. When I skype you, I need you to respond to me right away!" I looked at the open door; she followed my gaze, after which she closed it.  I told her I was in the middle of organizing a family case and pointed to the files and papers on my desk. She said she messaged me asking about how one or two of the BLR cases already had decisions made and asked why they were in the backlog. I told her that I originally entered a decision but that I needed to discuss the case again to determine if I would maintain the decision, but since she told me to stop working on any case that was untimely unsubmitted, I never got a chance to rereview some of them during my BLR time [Feb 3,4,6] because there wasn't enough time to complete all of them. I added that I cannot back out of the decision myself as a supervisor would have to do it for me and because the files were on the list she told me to turn in to her, I forwarded them to her as she instructed. Still in an irritated tone, she said I needed to have communicated that to her and it didn't make sense to have that in the backlog if a decision was already made. I told her that I did previously communicate the status of the cases to her but that she complained that she did not want their status, only if they were timely or untimely; and she specifically instructed me to stop working on any of those cases until my assigned BLR time. After my backlog write up time, I also told her that I had already written assessments on many of the cases, but needed more time to finalize and submit; furthermore, updated security checks would have to be conducted again, printouts re-done including using the new/updated form, as well as to update the actual decision on global if that decision were to remain. She said we didn't need to use the new form and asked in a snarky tone, "How long does it take redo checks

again and to organize a file? uh like a few minutes," and that it's only "common sense" to not give her a file with a decision already in place. [She repeats herself and in an irritated, snarky tone again asks, "It's just common sense, right?"]. Then she left and then she came back a few minutes later, again just barging into my office without knocking, and said, "Oh I kind of looked through the assessment for that one file anyway and it looks like there might be an issue with it, but I'll just put it in the backlog anyway, don't worry about it." The door was open during this last conversation. She then proceeded to take her cart to deposit BLRs and she never told me what specifically the problem was with the case, which again corroborates my point of how she is diverting work away from herself. On March 05, 2020, I came into work, SAO was not in her office, so I began reviewing a case for interview that morning around 7:50 AM. A couple minutes later she suddenly barges into my office asking if I read her e-mail. I said not yet. She snarkily said, "Well, just read it and get back to me." The door was open during this time, then she left. Apparently, it was about a file that our filing system showed I had forwarded to her the day before, but that was not in her office and it appeared to be from the San Antonio Office. Eight of the nine digits were the same as one of my cases set for the backlog; she asked if it was a typo. When I brought other files I had in my drawer to her office, I told her I don't know how that particular file would have ended up being marked to her since it was not one of my cases. Then she asked if I read her email. I replied yes. She asked how I was entering the numbers in RAILS, if I was entering them by typing them in. I replied no I scan them using the barcode as entering them manually is cumbersome because you have to enter it twice for it to be accepted. She said we need to fix that right away. I replied OK. As she had someone already in her office, I left. A few minutes later she barges into my

office again and irritated. She wanted an update. I told her the file in question was an

APSO CF [They're digital files]. So there would not have been a physical file.

Myrna [irritated tone]: You need to get that off my list. E-mail Kevin Van and ask him how

to do it because now another office is involved.

Rica: ok

Myrna: Do it as a matter of priority, today! That has to be done NOW!

Rica. ok, I'll e-mail Kevin

[Then she walked out, but the door was open during that conversation]

• I e-mailed Kevin then continued preparing for my interview. A few minutes later, SAO

Miranda barged back into my office and immediately closed my door:

Myrna: We just talked about how you were not supposed to include cases in the backlog

where a decision had already been made. But you can't seem to follow my instructions.

We've talked about this [she says this is an irritated and huffed voice, like she's

exasperated]

Rica: Myrna, we discussed that yesterday end of day and those cases were already with you

before that and

Myrna: EXCUSE ME! EXCUSE ME! RICA! DON'T INTERRUPT ME! I'M NOT DONE

TALKING. YOU ARE BEING DISRESPECTUFL AND UNPROFESSIONAL. [Myrna

leans in and shakes her neck side to side and points her right hand out].YOU ARE

INTERRUPTING ME. THIS IS A PROFESSIONAL SETTING AND YOU HAVE TO

BE PROFESSIONAL AT ALL TIMES AND YOU ARE NOT BEING PROFESSIONAL.

YOU ARE BEING DISRESPECTFUL. AND YOU MAKE FACES AT ME. THAT IS

DISRESPECTFUL AND UNPROFESSIONAL. YOU NEED TO BE PROFESSIONAL

Rica: Excuse me Myrna you've just done exactly what you are accusing me of. You are the one that makes faces and are doing exactly what you are accusing me of. You have been like this from the beginning.

Myrna: RICA! STOP! DO NOT INTERRUPT ME! [she yells this while I was talking]

Rica: Excuse me Myrna

Myrna: EXCUSE ME! EXCUSE ME RICA! I'M STILL TALKING. I HAVE TOLD YOU REPEATEDLY BUT YOU ARE FAILING TO FOLLOW MY INSTRUCTIONS. THIS IS WHAT I'M TALKING ABOUT. YOU CANNOT BE DISRECPECTFUL TO ME. I HAVE BEEN RESPECTFUL AND PROFESSIONAL. AND YOU HAVE RAISED YOUR VOICE TO ME BEFORE RICA, YOU HAVE [pointing her open right hand to me and then continuing in a snarky tone] and you saying that you are responding that way because you think I am doing that to you is wrong.

Rica: No, I didn't say I was doing what you are doing. I said you are accusing me of doing exactly what you have been doing to me.

Myrna [in a snarky tone]: No I haven't Rica! So do you have any questions about what I just said?

Rica: How do you want me to respond to that? You're the one doing exactly what you are accusing me of.

Myrna [still snarky]: No I'm not! Do you have any questions about what I have said?

Rica: No

[Then she gets up and leaves].

On March 20, 2020, SAO Miranda berated me on the telephone. SAO Miranda was already on telework by this time and she called my phone stating that she looked up my

RAILS profile and saw I still had files under my name and asked why I had not submitted the untimely unsubmitted cases to backlog as instructed. I told her that I had submitted untimely unsubmitted cases to the backlog except for those I had already made decisions on but held back to tweak the assessments on before handing them over because she previously instructed me not to turn in cases I had already entered decisions on in Global because it was "common sense." Then she paused and said in a huffed, fast and snarky tone: "RICA, ugh, what I told you before one or two weeks ago no longer applies. These are fast changing times. You are not following my instructions. I instructed you to put all untimely unsubmitted cases to backlog. Why can't you follow my instructions!? Prepare backlog cover sheets for all untimely unsubmitted cases and turn them in today." Then she hangs up and sends an email saying that she is only there to help.

17. Who was responsible for this action? What is your organizational relationship to this individual?

SAO Myrna Miranda, my first line supervisor at the time.

18. Why do you believe that your age and disability were the reason you were subjected to the harassment identified in this claim?

I believe SAO Miranda discriminated against me because of my age. I am older, I believe that I am older than SAO Miranda. I have some white hair that is prominent, which would lead people to conclude that I am above the age of 40. Additionally, SAO Miranda is a supervisor. Any time I have tried expressing my opinion or point of view that is different than hers, she becomes irked and snarky. She is always reasserting her own belief that she is correct and that I should just listen and follow her process because it works for her. I have expressed my opinions to other supervisors, even those who appear younger than me, and have always had a positive and constructive discussion with them. SAO Miranda

appears to be the only one who is constantly confrontational, aggressive, disrespectful and

bullying towards me. In regard to my disability, I have seen SAO Miranda look at my

hands on multiple occasions. When she does, her facial expression changes to one of

derision. Although it may have been brief, I noticed it as I am conscious about my hands

when talking to people to see where their eyes go.  She has also typically dismissed any

health concerns I presented, or failed to engage any time I mentioned medical treatment.

19. Why do you believe that your reasonable accommodation requests were the reason you were subjected to the harassment identified in this claim?

Most, but not all, of these interactions that I discussed above occurred prior to my request

for maxi flex / alternate work schedule. That being said, I believe it is just part and parcel

of SAO Miranda's behavior towards me the entire time. Anything I asked for, she would

just deny it and her reactions towards me seemed as if they were automatic. She has been

dismissive of me every time I brought up my treatments or health concerns about COVID-

19. She was aware of my lung and autoimmune conditions that make me more susceptible

to contracting the virus.

20. You stated that you were subjected to harassment from your Supervisor, Myrna Miranda, when on multiple occasions between December 2019 and March 2020, SAO Miranda barged into your office without knocking, startled you and interrupted your focus, causing anxiety. Is this true? Please explain exactly what happened and be specific. (Include date, location and details about the incident, etc.)

There have been multiple incidents where SAO Miranda would barge into my office

without knocking. She would typically do so as soon as I logged in or while I was

preparing for an interview or focusing my attention on a task. Each time she did this, the

disruption would startle me, interrupt my focus on the task I was working on and would

cause me stress and anxiety. Additionally, it would create an intimidating, offensive and

hostile work environment.

Examples:

On January 28, 2020, as I was preparing for my interview, SAO Miranda barged into my office, shut the door and began pacing back and forth behind the chairs in front of my desk. She started huffing and yelling about office procedures and not working past my scheduled time. She stated that I should have stopped the interview and given them a mailout for rescheduling, so I did not go past my time. She said that it did not matter if I was in the middle of an interview. She went on to say that I was not communicating with her and she was handing cases back to me and my backlog. I replied saying that she had been targeting me from day one.

She then said, "EXCUSE ME! EXCUSE ME RICA! DO NOT INTERRUPT ME! I'M NOT DONE TALKING! AND YOU'RE INTERRUPTING ME! And I have not been targeting you from day one."

She went back again about working past my scheduled time and not to do it again and she will write me up next time then asked if I have any questions. I replied that I am on a 5/8 (5-day, 8-hours/day) schedule, conducting two interviews per day and expected to turn in 1.5 cases per day, I only had part of a Wednesday to use to write up assessments and turn in cases, so how does she expect me to complete all that while reducing my backlog in addition to correcting the growing feedback she is giving me for cases that are not to her personal satisfaction [i.e. Missing that one sentence, small nitpicky items] also in a timely manner. She was actually quiet. I told her she was overly critical with her assessments and I did not understand why she was micromanaging me. She said she is not offended by someone telling her she micromanages and that she actually thinks it's a compliment. I told her that I had turned in other cases to other supervisors and they have not returned them to

me in the volume she was doing so even for such small, nitpicky items. She said she has high expectations and expects everyone to have high expectations, and that I should stop comparing her to other SAOs. Then she asked if I had any other questions. I replied no & she left.

On January 30, 2020, I had barely logged into Skype and went to my locker to put away my purse. As I was taking papers out of the locker to shred, [I was crouched down and my back was towards the door],* SAO Miranda barged into my office without knocking again, which startled me. I jerked around to see who had just barged in, she said, "Oh, you're just getting here?" When I said yes, she replied saying that she was DO for the day in case I needed her to just Skype her. It was bizarre for her to just barge into my office that way when I already knew she was DO for the day as it was in the roster.

*Kindly note that you wouldn't be necessarily able to see me easily, where I was crouched down in front of my locker, from the window next to the door without needing to peer in.

On March 4, 2020 and again on March 5, 2020, SAO Miranda barged into my office suddenly without knocking again. Please see my response to question 16 above where I described how she barged into my office multiple times.

On March 20, 2020, SAO Miranda berated me again via telephone.  Please see my response to Question 16.

21.  Who was responsible for this action? What is your organizational relationship to this individual?

SAO Myrna Miranda, my first line supervisor at the time.

22.  Why do you believe that your age and disability were the reason you were subjected to the harassment identified in this claim?

Please see my response to Question 18.

23.   Why do you believe that your reasonable accommodation requests were the reason you were subjected to the harassment identified in this claim?

Please see my response to Question 19.

24.   You stated that you were subjected to harassment from your Supervisor, Myrna Miranda, when on multiple occasions between December 2019 and March 2020, SAO Miranda berated you in a rude and condescending manner. On January 28, 2020 when you tried to defend yourself, she began yelling at you. On March 5, 2020, she lied about you raising your voice when you did not. Is this true? Please explain exactly what happened and be specific. (Include date, location and details about the incident, etc.)

Please see my response to Question 20 regarding the events on January 28, 2020. Please

see my response to Question 16 regarding the events on March 05, 2020.

25.   Who was responsible for this action? What is your organizational relationship to this individual?

SAO Myrna Miranda, my first line supervisor at the time.

26.   Why do you believe that your age and disability were the reason you were subjected to the harassment identified in this claim?

Please see my response to Question 18.

27.   Why do you believe that your reasonable accommodation requests were the reason you were subjected to the harassment identified in this claim?

Please see my response to Question 19.

28.   You stated that you were subjected to harassment from your Supervisor, Myrna Miranda, when in January 2020, SAO Miranda was dismissive when you informed her that your disability and need for medical appointments was the primary reason for your backlog. Is this true? Please explain exactly what happened and be specific. (Include date, location and details about the incident, etc.)

In January 2020, SAO Miranda and I were discussing my backlog. I informed her that the

reason I had a backlog was because I was scheduling medical appointments and treatment

on Wednesdays (our training days). I explained that because I was requesting sick leave on

Wednesdays when I was not interviewing anyone, that was my write up time. So even

though I had already completed the interview, this took time away from me to finish up the

Page ___19___ of ___41___ Pages          Initials: ___RT___

000094

case. I was told by my previous SAO that it was typical for AO's to have 9-12 cases in

backlog; it was considered normal, average. SAO Miranda was dismissive of my reasons

and just said to work on getting the backlog reduced.

29. Who was responsible for this action? What is your organizational relationship to this
individual?

SAO Myrna Miranda, my first line supervisor at the time.

30. Why do you believe that your age and disability were the reason you were subjected to the
harassment identified in this claim?

Please see my response to Question 18.

31. Why do you believe that your reasonable accommodation requests were the reason you
were subjected to the harassment identified in this claim?

Although this occurred prior to my request for maxi flex / alternate work schedule, I

believe it is just part and parcel of SAO Miranda's behavior towards me the entire time.

Anything I asked for, she would just deny it and her reactions towards me seemed as if they

were automatic. She has been dismissive of me every time I brought up my treatments or

health concerns about COVID-19. She was aware of my lung and autoimmune condition

that makes me more susceptible to contracting the virus. She does not engage with me or

ask me if there is anything that I needed to make things easier.

32. You stated that you were subjected to harassment on March 4, 2020, when you mentioned
to SAO Miranda that you had interviewed people from Wuhan who entered the US
between October and December 2019, she dismissed your concerns about COVID 19 even
though she knew of your disabilities. She stated, "Oh don't worry, I am sure you will be
fine." Is this true? Please explain exactly what happened and be specific. (Include date,
location and details about the incident, etc.)

On March 4, 2020, after SAO Miranda returned from her TDY, we were in her office

discussing the remaining backlog writeup list. At the time, there had been a lot of emails

circulating within the office and in the media about COVID-19. I mentioned to her that I

had interviewed applicants who had come from Wuhan. In fact, the last interview that I did

with an applicant from Wuhan China, where the virus was said to have originated, was on

February 27, 2020. I recall the applicant mentioning that his daughter was stuck in China

and could not get back to Australia because of the virus. She dismissed my concern and

said, "Oh don't worry. I am sure you're fine."

33. Who was responsible for this action? What is your organizational relationship to this individual?

SAO Myrna Miranda, my first line supervisor at the time.

34. Why do you believe that your age and disability were the reason you were subjected to the harassment identified in this claim?

Please see my response to Question 18.

35. Why do you believe that your reasonable accommodation requests were the reason you were subjected to the harassment identified in this claim?

Please see my responses to Question 31.

**Claim 1 - Overall Harassment Questions:**

36. Were there witnesses to any of the incidents described above? If so, who? Please identify each witness by name, position title, telephone number and email address. For each witness identified above, please also state the nature of the information he/she can provide regarding the accepted claim(s).

Typically, SAO Miranda and I were the only two people in her and my office when the

incidents occurred. When the door was open, others may have heard what was happening,

but I did not see anyone in my line of sight. As such, I would not know who specifically

would have been in the vicinity to hear nor have I asked anyone if they ever heard

anything; I have heard APSO calls through my walls though. I am aware that SAO Miranda

typically barged into the office of another AO who is also in the same protected age group.

Additionally, I am aware of SAO Miranda publicly interrupting the interview of another

AO who is also in the same protected age group; the AO had to get up twice to ask her to take her conversation elsewhere as the interpreter had a difficult time hearing and interpreting. Kindly note that at the end of the day, people are highly concerned about job security and it is hard for them to speak up concerning what they see or hear, and especially in view of the furlough that initially was going to take place during summer as well as the other AOs on probation and with disabilities who were actually or in line to be terminated during the pandemic.

  a.  Please provide the names of the two AOs referenced above.

  *Please speak to Rose Saraceno, Union president, as she was the one who was informed by the AO whose office SAO Miranda barged into, about those incidents. **AO Maricella (Marci) Chipman told me about the incident where SAO Miranda interrupted her interview because of her loud conversation in front of her office. *** The Union President Rose Saraceno also has had experience with SAO Miranda and can serve as a witness.

37. Please state how the alleged actions described above altered the condition of your work environment.

SAO Miranda barging into my office without knocking, berating and raising her voice at me, interfered with my work performance. Each time she did this, the disruption would startle me and interrupt my focus on the task I was working on. She used her position of authority to continuously harass me. In turn, my sleep was disrupted due to the increased anxiety and stress from such interactions with her. In addition, it would create an intimidating, offensive and hostile work environment. Anything I asked for, she would just deny it and her reactions towards me seemed as if they were automatic. Despite all my attempts to adapt to her preferred style and moods, she only found new things to nitpick. She has been dismissive of me every time I brought up my treatments or health concerns about COVID-19. She was aware of my lung and autoimmune condition that makes me

more susceptible to contracting the virus. She does not engage with me or ask me if there is anything that I needed to make things easier. Although I still believed in the mission of the work we were doing, I began disliking having to go into work because of her. I found myself rushing out of the office daily to ensure that I did not stay past my departure time because she was monitoring every single minute of my day. I would even purposefully avoid walking in front of her office and only dealt with her when I had no other choice.

38. Did you inform the individual(s) responsible for <u>each</u> of the actions described above that their behavior was unwelcome, offensive or harassing?
    a. If so, when and how (verbally or in writing)?
    b. What was their response, if any and when?

I did inform SAO Miranda that the way she spoke to me was offensive. On January 28, 2020 and again on March 5, 2020, I tried to defend myself when she would yell and speak offensively to me. On January 28, 2020, I told Myrna I felt she had been targeting from day one. She practically yelled at me as she accused me of interrupting her.  Please see my response to Question 20 for details. On March 05, 2020, I also told SAO Miranda that she was behaving exactly the same way she was accusing me of behaving towards her (which I was not). Please see my response to Question 16 for details. After the second time (March 5, 2020), that was the last time I tried expressing my opinion on how she was treating me.

39. Did you report any of the above incidents to anyone in management or upper management?
    a. If so, when and how (verbally or in writing) did you report <u>each</u> incident? If in writing, please provide a copy.
    b. To whom did you report <u>each</u> incident described above?

No, I did not. I was new and on probation. There was no reason for me to be confrontational with anyone nor had I ever been. I had never been bullied or harassed in this manner before and especially not by a supervisor. As such, I was shocked by her behavior and my stress/anxiety increased more and more with every interaction with SAO

Miranda. Not to mention, it took me almost four years from my original date of hire in

2015 to start this position; therefore, I was not about to risk losing it by making complaints

to management about one of their own. I had discussed my concerns about SAO Miranda

previously with another experienced AO who advised that it would reflect negatively on

me if I complained because management like each other. I also tried understanding that

everyone has different management styles, and I did my best to adapt to her preferred style.

In doing so, she only found new things to nitpick and continue her harassment against me.

On March 27, 2020, I called Hannah Mikesell, Supervisory Chief of Staff, and asked why

no one ever asked me to address the allegations in my termination letter. She replied that

that was how it was and that she did not know what was in my termination letter because

she was not involved. I also mentioned to Hannah Mikesell that it was SAO Miranda who

subjected me to a hostile work environment. However, she politely stated that she was not

involved in the termination and she was sorry it didn't work out.

40.  Were any actions taken by management to stop of the harassment?
    a.  If so, when?
    b.  If so, what actions were taken?
    c.  Did the harassment stop?

No, they did not. I was never asked if SAO Miranda's allegations against me were true.

They simply and deceptively had me terminated based on a SAO Miranda's lies and

manipulation. Again, it took me almost four years from my original date of hire in 2015 to

start this position; therefore, I was not about to risk losing it by making complaints to

management about one of their own. Additionally, I was advised by an experienced AO

against complaining to management as it would look badly on me. I am not the type of

person to just complain anyway. As such, my method was to try and adapt to SAO

Miranda's style. However, regardless of what I did, she only found new things to nitpick

and continue her harassment and discrimination against me.

41. Have you received training on anti-harassment/hostile work environment while employed by the agency? If so, when?

In the beginning, when you are receiving training, you are handed chapters to read as part

of your training; core values being one of them. I do recall this policy being referenced

within this training. However, please refer to my response to Question 40 where an

experienced AO and longtime employee advised me against complaining to management as

it would reflect negatively on me.

42. Is the agency anti-harassment/hostile work environment policy posted in your facility?

I do not recall specifically.

**2. On March 20, 2020, SAO Miranda and Deputy Director Marianne Hong denied your request for a maxi-flex/AWS schedule as a reasonable accommodation without any engagement to address your concerns on how to successfully meet the demands of your position given your disabilities.**

43. Did you submit a request for a maxi-flex/AWS schedule as a reasonable accommodation? If so, please provide the following information:
    a. When and how (verbally or in writing) did you make this request? If in writing, please provide a copy.
    b. To whom did you submit this request?

Please see my response to Question 10. On March 17, 2020, I filed a request for maxi-flex

or an alternate work schedule (AWS) to SAO Myrna Miranda using the required Request

for Maxi-flex Schedule form. I did not have any experience with having a need to request a

reasonable accommodation before, so I approached SAO Miranda about my request for a

maxi-flex or alternate work schedule. The following day, March 18, 2020, SAO Miranda

asked me to add my EOD to the request, which I did. Then, on March 19, 2020, she asked

me the reasons for the maxiflex / AWS request. In response, I advised her that it would

allow me to be able to schedule my doctor's appointments and medical treatment on non-core/shorter days without using up too much of sick leave, since the days that I had medical treatments took between 4-5 hours per day excluding my drive out to UCLA (another 1.5 to 2 hours from the office). I also noted that I had planned medical treatments in April and May.

44.  Did you submit any medical documentation to support your request for a maxi-flex/AWS schedule as a reasonable accommodation? If so, to whom and when? If not, why not?

No, I did not as I was never asked to provide medical documentation to support my request. In my history of employment, I have never been asked to supply medical records if I needed to schedule medical appointments. Furthermore, USCIS was put on notice about my disabilities on more than one occasion. The earliest being in late summer, early fall 2019 when I provided SAO Rebecca Tseng with my employee emergency contact sheet that stated my medical conditions. Additionally, I indicated the needs of my primary health conditions and that I had a chest port on the updated emergency data sheet that I submitted to SAO Miranda on March 13, 2020. On March 16, 2020, I provided SAO Miranda with another updated emergency data sheet that included the ██████████████████ amongst my other conditions previously listed.

45.  Did you request to meet to address your concerns on how to successfully meet the demands of your position given your disabilities? If so, please provide the following information:
    a.  When and how (verbally or in writing) did you make this request? If in writing, please provide a copy.
    b.  To whom did you submit this request?

No, I did not. When my request was denied, I did not know if I had further recourse especially because Ms. Hong, the Deputy Director, had also denied my request for a maxi-flex or alternate work schedule as the second signatory. Given SAO Miranda's consistent bullying and harassment, I really was not surprised at all by her denial or lack of

engagement. When she first told me that it had been denied, she did not provide a reason. I had to specifically email her asking for a reason, which is the only time she responded. In the end, whenever I mentioned medical-related concerns, treatments or appointments, SAO Miranda was always dismissive. There was never any engagement from her at all; she dismissed them.

46. Did you receive a response to meet to address your concerns on how to successfully meet the demands of your position given your disabilities? If so, please provide the following information:
    a. What response did you receive?
    b. When did you receive this response?
    c. Who provided this response?

N/A as I did not request to meet to address my concerns on how to successfully meet the demands of my position given my disabilities. Again, when my request was denied, I did not know if I had further recourse especially because Ms. Hong, the Deputy Director, had also denied my request for a maxi-flex or alternate work schedule as the second signatory. Given SAO Miranda's consistent bullying and harassment, I really was not surprised at all by her denial or lack of engagement. When she first told me that it had been denied, she did not provide a reason. I had to specifically email her asking for a reason, which is the only time she responded. In the end, whenever I mentioned medical-related concerns, treatments or appointments, SAO Miranda was always dismissive. There was never any engagement from her at all; she dismissed them.

47. Was your request for a maxi-flex/AWS schedule as a reasonable accommodation denied without any engagement to address your concerns on how to successfully meet the demands of your position given your disabilities?

Yes, it was on March 20, 2020. When SAO Miranda first told me that my request had been denied, she did not provide a reason. I had to specifically email her asking for a reason, which is the only time she responded. In the end, SAO Miranda and Ms. Hong failed to

engage in any dialogue or communication with me regarding my request as it related to my

medical treatments and appointments.

48. Who is responsible for denying your request for a maxi-flex/AWS schedule as a reasonable accommodation without any engagement to address your concerns on how to successfully meet the demands of your position given your disabilities? What was your organizational relationship to this individual at the time?

SAO Myrna Miranda, my first line supervisor at the time, and Deputy Director, Marianne

Hong, my third line supervisor at the time.

49. Were you provided with any alternate or interim accommodations? If so, please provide the following information:
    a. What accommodations were provided and when?
    b. Are those accommodations still in place? If not, when did they stop?

No, I was not.

50. Were you provided with an explanation as to why your request for a maxi-flex/AWS schedule as a reasonable accommodation was denied without any engagement to address your concerns on how to successfully meet the demands of your position given your disabilities? If so, please provide the following information:
    a. What explanation was provided?
    b. When was it provided?
    c. Who provided it?
    d. Why do you believe this explanation was not plausible? Please explain and be specific.

Initially, no I was not. On March 20, 2020, SAO Miranda emailed me simply stating that

my request for a maxi-flex/AWS schedule was denied; she did not provide an explanation.

In turn, I had to ask her the reason for denial. She replied saying that the reason my request

was denied was because "one of the requirements is that you are performing at or above the

achieved expectations level." She then stated that I was not achieving expectations in the

timeliness requirement under PPA standards and then attached a copy of the MOA.

I do not think that this explanation was plausible because I was asking for a maxi-

flex/AWS schedule in regard to my disability and medical needs. However, SAO Miranda

did not engage with me in that way at all. If she was concerned that I was not achieving

expectations in the timeliness requirement under PPA standards, then why did she not

address the fact that I had mentioned medical appointments to her before? Especially when

I told her in January 2020 that one of the reasons I had the backlog was because of how I

was having to schedule my medical treatments and appointments. At the end of the day, she

did not care and did not engage.  In addition, SAO Miranda was purposely trying to tank

my timeliness and PPA because she put me on an unnecessary backlog project, which

diverted my time away from my regular tasks, as well as discounting my own method of

trickling in my backlog in order to maintain timeliness each biweekly period, and she

diverted work she should have been reviewing herself to others, all under the guise of

"helping me," then indicated timeliness as a reason for denying my reasonable

accommodation request and subsequent termination.

51.  Why do you contend that because of your age, your request for a maxi-flex/AWS schedule
     as a reasonable accommodation was denied without any engagement to address your
     concerns on how to successfully meet the demands of your position given your disabilities?

Given SAO Miranda's consistent bullying, harassment and discrimination towards me

because of age and disability, I really was not surprised at all by her denial or lack of

engagement. Regardless of my compliance with whatever she asked me to do, she still was

not satisfied. As such, she had that underlying discriminatory behavior against me already.

As for Ms. Hong, she signed off on the denial as per whatever SAO Miranda told her. She

never once came to me asking me what I needed or why. She simply believed SAO

Miranda.

52.  Why do you contend that because of your disability, your request for a maxi-flex/AWS
     schedule as a reasonable accommodation was denied without any engagement to address
     your concerns on how to successfully meet the demands of your position given your
     disabilities?

Please see my response for Question 51.

53.  Why do you contend that because of your reasonable accommodation requests, your request for a maxi-flex/AWS schedule as a reasonable accommodation was denied without any engagement to address your concerns on how to successfully meet the demands of your position given your disabilities?

I believe it is just part and parcel of just SAO Miranda's behavior towards me the entire time. Anything I asked for, she would just deny it and her reactions towards me seemed as if they were automatic. She has been dismissive of me every time I brought up my treatments or health concerns about COVID-19. She was aware of my lung and autoimmune condition that makes me more susceptible to contracting the virus. As for Ms. Hong, she signed off on the denial as per whatever SAO Miranda told her. She never once came to me asking me what I needed or why. She simply believed SAO Miranda. In addition, SAO Miranda was purposely trying to tank my timeliness and PPA because she put me on an unnecessary backlog project, which diverted my time away from my regular tasks, as well as discounting my own method of trickling in my backlog in order to maintain timeliness each biweekly period as other AOs have done, and she diverted work she should have been reviewing herself to others, all under the guise of "helping me," then indicated timeliness as a reason for denying my reasonable accommodation request and subsequent termination.

54.  Were others treated differently under similar circumstances (i.e., with regards to reasonable accommodations)? If so, please provide the following information:
     a.  Who? What is your organizational relationship to this individual?
     b.  Please explain how they were treated differently and be specific.
     c.  If known, what is his/her age, disability status, prior protected activity status?

I am not typically privy to others' medical conditions or requests for accommodations. That being said, I do feel that I was treated differently by SAO Miranda. There was another AO (Mai Ly) that appeared to be younger and she expressed SAO Miranda being very

accommodating, nice and helpful to her. This AO was also put on a backlog project with 12

cases. To my knowledge, she is still working.

55. Do you have any witnesses who have first-hand knowledge of this issue? Identify by name, title, email, and nature of information to be provided.

No as I only gave the request to SAO Miranda and she forwarded it to Ms. Hong. As far as

I know, they were the only names on the form.

### 3. On March 27, 2020, you were terminated during your probationary period

56. Were you terminated during your probationary period? If so, when?

Yes, it was on Friday, March 27, 2020.

57. When and how did you learn that you were being terminated during your probationary period?

I thought it was just a regular telework day as I had already started working from home at

this point. Shortly after about 9am on March 27, 2020, USPS and FedEx envelopes were

delivered to my home both containing a copy of the termination letter. Subsequently, I

realized that my PIV card had been disabled. Then, sometime in the afternoon, a USPS

envelope was sent to my home containing a third copy of the termination letter.

58. Who is responsible for terminating you during your probationary period? What was your organizational relationship to this individual at the time?

David Radel, Asylum Office Director and my fourth level supervisor, was the name on the

termination letter, but it appears it was signed on his behalf by someone else. Presumably,

it was the details that SAO Miranda gave to them, so she was clearly involved as well.

59. Were you provided reasons for being terminated during your probationary period? If so, what reasons were provided and when?

Please refer to the termination letter for details. According to the termination letters that I

received on March 27, 2020, I had allegedly failed to demonstrate acceptable performance

as an AO, failed to submit cases in a timely manner and failed to maintain the required

75% timeliness rate. It also alleged that I failed to maintain a respectful tone with my

supervisor when given instruction on supervisory review procedures and failed to follow

her instructions. It also stated that on numerous occasions between November 12, 2019 and

January 16, 2020, I improperly remained in the office outside of my eight-hour workday.

Lastly, it alleged that I failed to follow office hours and leave procedures.

60.   Were the reasons provided for terminating you during your probationary period true? If
not, please identify each false statement and explain why it is false.

No, they were not. With reference to the allegation that I failed to maintain the required

75% timeliness rate, the letter stated that due to being at a 61% rating in pay period 26 and

65% rating pay period 1, I was taken off the interview schedule in order to work on

backlog reduction. However, my biweekly timesheets for pay period 26 indicate that I was

at 84.6% and 80% for pay period 1. I continued to improve with the exception of the time I

was placed in the unnecessary backlog writeup project, which because I was working on

the backlog, SAO Miranda counted all those cases against me even though she claimed that

the project was supposed to help me. AOs are provided a performance plan in which to

improve their timeliness, but SAO Miranda gave me three 8-hour days (Feb. 3rd, 4th and 6th)

to work on approximately 18-20 cases. However, some of those included cases on hold for

various reasons and not ready for adjudication, which I told her previously, but which she

berated me for. Other AOs have essentially told me that I did not have to worry about the

timeliness aspect in the PPA because supervisors are supposed to work with you to help

you achieve the minimum goal. Additionally, according to the Union President, AOs need

at least a year to really know the job and understand everything. In any event, I was already

working on improving and ensuring my timeliness maintained at or above the minimum 75%.

With regard to the March 5, 2020 incident, please refer to my detailed response provided above under question 16. With regard to the February 24, 2020 incident, please refer to my detailed response provided under question 16 above.

With regard to staying outside of the 8-hour workday, the letter states that there were numerous occasions that this occurred; however, it did not provide any specific dates. Additionally, the December 19, 2010 and January 17, 2020 emails that were referenced in the letter were email reminders sent to the entire office as a lot of AOs stay longer as a common practice. They were not addressed to me specifically. I question why I was being singled out when this was a common practice. I may have mentioned this previously during my informal mediation, but kindly note that working more than 8 hours is considered a reasonable accommodation if the person's impairment requires additional time to reasonably complete a task.

The letter also stated that I stayed past my regular working hours without authorization on January 27, 2020. SAO Miranda observed my first interview of the day on this date. We started late because she came late and needed to review the case as well. I gave her a brief summary of what my concerns were about the case prior to the start of the interview. My second scheduled interview had been a no-show, but the Duty Officer (DO) assigned me a new case to interview. I shared this with SAO Miranda and asked her if we could discuss feedback on the interview that she sat in on later because the interview already ran long, I needed to prepare for the new case and the candidate waiting for the second interview had already been waiting. SAO Miranda said no that we had things to discuss and she had to

leave by a 2 PM. This mandatory discussion that she had me participate in took 30-40 minutes. Meanwhile, I had an applicant waiting downstairs and we ended up starting the interview later than we should have started. During the interview, I received a Skype message from SAO Miranda around 3:22 PM asking if I was still interviewing. I replied saying yes but I was going to finish soon. She then began questioning me saying, "Weren't you supposed to leave already? Didn't you get here early? What time are you supposed to leave?" I replied saying that technically I was supposed to leave at 3, but I was just finishing the second interview. She told me that I was supposed to leave at my scheduled time and to give the applicant a mailout to reschedule. I had to stop the interview and escort the applicant out. She then discussed this matter with me on January 28, 2020, which I explained above in my response to Question 20.

The letter also stated that I failed to follow office procedures of contacting the DO or another supervisor of my late arrival on February 12, 2020. On this date, I was able to log into the system at 9:14am, but I was already in the building and in the parking lot well before that time. This was a Wednesday and at the time, it was not mandatory to sign in on the DSI (Digital Sign-In) on Wednesdays as they were typically a writeup and training day. Trainings typically started at 9:30 or later. I signed in that day because I had a follow-up interview scheduled for that afternoon and wanted to make sure that the DO knew I was in the office and had the interview scheduled for later that afternoon. I made up that 14 minutes at the end of the day. Then on February 13, 2020, SOA Miranda subjected me to a rapid-fire interrogation about my office timings for February 12, 2020 because she said someone reported I had walked applicants out at 5:59 PM; I told her that was not true as another AO walked them out on my behalf so I could leave on time.  SAO Miranda's facial

expression was one of disappointment, but she became excited upon hearing my 9:14 am

DSI. Kindly note that this was one of the days SAO Miranda looked at my hand with

derision as I was pointing out an arrest code for an applicant's case I was about to interview

and which she would be observing.  Additionally, she was rude to the interpreter during

that interview.

61.  Were you counseled on any performance and/or conduct issues prior to being terminated
     during your probationary period? If so, when and by whom? If so, what specific
     performance and/or conduct issues were you counseled on?

SAO Miranda did mention core hours being 9 to 2:30 and not working past the 8-hour

workday, but there was no official counseling session or a one-on-one sit down where I had

to officially sign off with a supervisor or HR, regarding my performance or conduct. I

never even had a midyear review.

62.  Did your performance and/or conduct improve prior to being terminated? If so, please
     explain how you believe your performance and/or conduct improved.

I was not given any advance warning that the termination letter was forthcoming.

Regardless, as I mentioned previously, I was already working on improving my timeliness

ratings and ensuring my timeliness to maintain the minimal 75%. Pay Period 2 was at

100%; Pay Period 3, however fell below 75% but that was because of the three, 8-hour

days I was assigned to work on that unnecessary backlog project; so those cases were all

counted against me, even though being given time to complete my backlog was supposed

to "help" me, it hurt me instead as it brought down my timeliness percentage all in one

biweekly period. During that time I was simultaneously working on regular cases that also

had to be turned in in a timely manner. I wrote a lot of assessments during that time, but

still need another day or two to finalize and then submit the cases, which I told SAO

Miranda.  However,  SAO Miranda was not providing me with an opportunity to do that.

Instead she insisted on placing everything untimely in the backlog area for others to complete. Pay Period 4 was at 80%; Pay Period 5 was at 87.5%.

63. Prior to being terminated during your probationary period, were you given a proposal to remove? If so, when?

No, I was not. In fact, USCIS was rather deceptive with my termination. On Tuesday, March 24, I recall going to the office to finish up a couple of cases so I could submit them timely and there were a couple of cases that needed to be forwarded to FDNS. However, when I came to the office, I noticed all those remaining files were missing. I found out from SAO Miranda that she had the DO (I believe, SAO Jacobson) retrieve them from my locked drawer to place in backlog because of the current plan. I explained the status of each case, as not all of them were supposed to be placed in backlog. Then on Thursday, I recall having log in issues so I went to the office to work. I completed most of my I-730 cases and had a couple remaining. Section Chief Lynn then messaged to enquire about my I-730 cases and any other cases the RAILS log still indicated were in my possession. I forwarded a copy of that case status update I gave SAO Miranda to Section Chief Lynn, copying in SAO Frederick. I also provided my interview notes and assessments for those cases I completed or were to be completed on Tuesday. Section Chief Lynn said to leave all the I-730 cases as there were AOs who had not yet had the opportunity to work on how to enter their data in the database. I advised her that I no longer had any and I told her I wouldn't have any files to work on Friday. She said that was fine. I didn't think anything of it because on Monday we were going to be trained on how to adjudicate the I-730 cases. And of course on Friday morning, I found out about my termination via Fedex and UPS.

64. Were you given an opportunity to present a response? If so, please provide the following information:

    a. Did you present a response? If so, to whom?

    b. When and how (verbally or in writing)? If in writing, please provided a copy.

No, I was not. No one ever asked me if the allegations made within the termination letter were true. Instead, they simply and deceptively had me terminated based on SAO Miranda's lies and manipulation. On March 27, 2020, I spoke with Hanna Mikesell, Supervisory Chief of Staff. Please see my response to Question 39 for details.

65. Why do you contend that because of your age, you were terminated during your probationary period?

I believe SAO Miranda discriminated against me because of my age. I am older, I believe that I am older than SAO Miranda. I have some white hair that is prominent, which would lead people to conclude that I am above the age of 40. Furthermore, upper management had all these allegations against me, but never once asked me what my side was. As such, I believe management's actions in this matter were discriminatory based on my age, disability and in retaliation for requesting an alternate work schedule as an accommodation.

66. Why do you contend that because of your disability, you were terminated during your probationary period?

In regard to my disability and filing for the alternate work schedule, I mentioned my concerns about COVID-19 to management, which was dismissed by SAO Miranda, and I also provided management with an update on my medical conditions via the emergency contact data sheets. Regardless, management made the decision to terminate me knowing that I had a compromised immune system, as well as a respiratory condition which made me highly susceptible to COVID-19. As such, I believe their actions were discriminatory based on my disability and retaliatory in nature because I requested an alternate work schedule. Additionally, I have been made aware that others who were terminated after me either have a disability or had requested a reasonable accommodation.

67. Why do you contend that because of your reasonable accommodation requests, you were terminated during your probationary period?

In regard to my disability and filing for the alternate work schedule, I provided management with an update on my medical conditions via the emergency contact data sheet. Regardless, management made the decision to terminate me knowing that I had a compromised immune system, as well as a respiratory condition which made me highly susceptible to COVID-19. As such, I believe their actions were discriminatory based on my disability and retaliatory in nature because I requested an alternate work schedule. Additionally, I have been made aware that others who were terminated after me either have a disability or had requested a reasonable accommodation.

68. Were others, who were in their probationary employment, treated differently under similar circumstances (i.e., meaning they were not terminated) under the same management official? If so, please provide the following information:
    a. Who? What is your organizational relationship to this individual?
    b. Please explain how they were treated differently and be specific.
    c. If known, what is his/her age, disability status, prior protected activity status?

Mai Ly, another AO, joined after me and would have been a probationary employee. She also had to do a backlog project. To my knowledge, she is still there. She appears younger than me. I am not aware of whether she has had a disability or requested accommodations.

69. Do you have any witnesses who have first-hand knowledge of this issue? Identify by name, title, email, and nature of information to be provided.

Rose Saraceno, AFGE Union President, has already had experience with SAO Miranda as well. She can attest to encountering a similar issue with SAO Miranda with others.

70. Do you have any documents to provide to support your contentions?

I will provide any applicable documents with the return of my affidavit.

71. What are you seeking in resolution of this complaint?

- Reinstatement, fulltime, into either my AO position or a lateral position with no lapse in benefit coverage or remaining probationary time; should this favorably resolve past June 8, 2020, which would have been 1-yr from my EOD, then I should be made permanent.

- Backpay and lost wages from the date of the termination until I am formerly reinstated.

- Payment and reimbursement for all attorney fees that I incur as a result of my EEO complaint and any related proceedings.

- Upon reinstatement, I be given a different supervisor and never be supervised by SAO Miranda again.

- Clean record; any allegations of misconduct or poor performance be removed from my record.

- Restoration of sick leave, annual leave and other previously provided or standard benefits such as time in grade, TSP benefits, etc.

72. Is there anything else you would like to add, relevant to the accepted claim(s) which has not been addressed?

On March 27, 2020, after receiving my termination letter, management quickly disabled my PIV card. At this point, I was in complete shock about the termination and I began receiving multiple calls from a 714 number. Additionally, I received an email from Hannah Mikesell, the Supervisory Chief of Staff, asking me to contact her as soon as possible. When I called her back, I asked her why no one ever asked me to address the allegations in my termination letter. She replied saying that this was how it was done and that she did not know what was in the termination letter because she was not involved. I told her that it was SAO Miranda who subjected me to a hostile work environment. In response, she politely stated that she was not involved in the termination and sorry that it did not work out. She

wanted to make sure that I made arrangements with Monica Dang, who was an admin, to return the government property that I was issued for the office as soon as possible. I made arrangements to meet Ms. Dang at the office that afternoon to return my laptop, PIV card and business credit card. Ms. Dang and another officer watched me pack my belongings and then she had me sign an NDA prior to leaving to ensure that I did not share what I learned while employed there. I asked if signing the NDA would prohibit me from filing a claim as per my options in the termination letter and she said no. She had her hands folded and the other officer was standing at my door. I felt that I was forced into signing the NDA. In talking to a colleague, she said that she had never heard of anyone else signing an NDA for that specific reason.

I would also like to note that prior to being assigned to SAO Miranda, I was asked by Ms. Hong if I was available for MERP training in Washington, DC, in April 2020, which I confirmed being available. If USCIS thought that I was not a good AO or did not have the potential, then why would they invest in further training me. My former supervisor, Ms. Tseng, had already praised the fact that I had already done a few credibility referrals, which can be challenging to AOs. Based on all of this, I believed I was performing relatively well. Kindly note that because of my unjust termination, I lost access to my specialist. I was on the PPO plan to ensure I had access to my specialist at UCLA because my disease is rare and UCLA has world-renowned experts in the disease. SAO Miranda was aware I had upcoming medical treatment and ensured I lost my livelihood, which I use to support my child, and medical insurance. I had to obtain state medical insurance and was limited to a local HMO plan, which delayed me getting my IV treatment.

## CERTIFICATION

I have read the attached affidavit consisting of __41__ pages, and it is true and complete to the best of my knowledge and belief. In making this affidavit, I understand Section 1001, Title 18 of the U.S. Code which states:

> "*Whoever, is any manner within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up any trick, scheme, or device a material fact, or makes false, fictitious or fraudulent statements or representation, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than 5 years, or both.*"

The collection of this information is authorized by Public Law 92.261, Equal Employment Act of 1972; and Executive Order 11478 as amended. This information will be used to adjudicate complaints of alleged Discrimination. As a routine use, this information may be disclosed to persons involved in the processing and/or adjudication of this compliant; to the Equal Employment Opportunity Commission or to the Merit System Protection Board, as appropriate, to adjudicate complaints of alleged discrimination; to a court, party or counsel for a party to judicial or administrative litigation; to a congressional office at your request; or to a labor organization as may be required by the NLRA. Provisions of the information requested are mandatory for the complainant, U.S. Citizenship and Immigration Services employees, and other federal employee witnesses. Failure of U.S. Citizenship and Immigration Services or other federal employees to provide the requested information could result in disciplinary action.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Signature of Affiant

Rica Ty _____
Printed or Typed Name

*Jennifer Weihert*
Signature of Investigator

October 30, 2020 _____
Date

# EXHIBIT 3

# Reasonable Accommodation Request & Denial

**From:** Ty, Rica <rica.ty@uscis.dhs.gov>
**Sent:** Tuesday, March 17, 2020 11:08 AM
**To:** Miranda, Myrna M <myrna.m.miranda@uscis.dhs.gov>
**Subject:** telework request

Hi Myrna,

Please let me know if there is anything else I need. Since I was not on Maxiflex before, do I need to submit a request for that before the telework request?

Thank you
Regards,

Rica Ty | Asylum Officer | Los Angeles Asylum Office | DHS | USCIS | RAIO
14101 Myford Rd. | Tustin | CA | 92780 | ☎ (714) 868 - 5348 | ✉ Rica.Ty@uscis.dhs.gov

---

**From:** Miranda, Myrna M
**Sent:** Tuesday, March 17, 2020 11:23 AM
**To:** Ty, Rica <rica.ty@uscis.dhs.gov>
**Subject:** RE: telework request

Rica,

Maxiflex is not a requirement to TW. Can you please also submit your CSAT certificate of completion?  Thanks!

Myrna

---

📄 RTy_Maxiflex Request Form Final.pdf
174 KB

**From:** Ty, Rica <rica.ty@uscis.dhs.gov>
**Sent:** Tuesday, March 17, 2020 3:44 PM
**To:** Miranda, Myrna M <myrna.m.miranda@uscis.dhs.gov>
**Subject:** RE: telework request

Hi Myrna,

I updated the Maxiflex & telework request. Sorry about that.

Regards,

Rica Ty | Asylum Officer | Los Angeles Asylum Office | DHS | USCIS | RAIO
14101 Myford Rd. | Tustin | CA | 92780 | ☎ (714) 868 - 5348 | ✉ Rica.Ty@uscis.dhs.gov

**From:** Miranda, Myrna M <myrna.m.miranda@uscis.dhs.gov>
**Sent:** Wednesday, March 18, 2020 9:25 AM
**To:** Ty, Rica <rica.ty@uscis.dhs.gov>
**Subject:** RE: telework request

Hi Rica, Please add your EOD date on your Maxiflex request. Thank you, Myrna

**From:** Ty, Rica <rica.ty@uscis.dhs.gov>
**Sent:** Wednesday, March 18, 2020 9:28 AM
**To:** Miranda, Myrna M <myrna.m.miranda@uscis.dhs.gov>
**Subject:** RE: telework request

Hi,
Done. Thank you.

Rica

**From:** Miranda, Myrna M <myrna.m.miranda@uscis.dhs.gov>
**Sent:** Thursday, March 19, 2020 11:21 AM
**To:** Ty, Rica <rica.ty@uscis.dhs.gov>
**Subject:** Maxiflex request

Hi Rica,

Can you please let me know the reason for your maxiflex AWS request? Thanks!

Myrna



Reply  Reply All  Forward  IM

move        tags        Find        PhishAlarm®

Thu 3/19/2020 11:50 AM

Ty, Rica

RE: Maxiflex request

To   ☐Miranda, Myrna M

Hi Myrna,

In general, if we were on a normal operating interview schedule, this might be a more efficient use of my time. Devoting 2-3 days on just interviews and having a full day + some time on training day, of just writing assessments/finishing cases will be more efficient than being interrupted in between an interview or at the end of 2 interviews, when I likely/usually end up running out of time.

Maxiflex AWS will allow me to extend or reduce the time as needed to devote to certain tasks as needed. I'll also, if necessary, be able to schedule my doctor's appointments and medical treatment on non-core/ shorter days without using up too much of my sick leave, since the days I have medical treatment take between 4-5 hours per day and that excludes my drive out to UCLA, which can be between 1.5-2 hours from here.  My next ones are in April & May.

In the current episodic constraints, since I am on I-730s through April 1, the maxiflex/AWS will allow me to change my schedule as necessary including work 4/10s if possible.

Thanks.

Regards,

**Rica Ty** | Asylum Officer | Los Angeles Asylum Office | DHS | USCIS | RAIO
14101 Myford Rd. | Tustin | CA | 92780 | ☎ (714) 368 - 5848 | ✉ Rica.Ty@uscis.dhs.gov

From: Miranda, Myrna M <myrna.m.miranda@uscis.dhs.gov>
Sent: Friday, March 20, 2020 7:58 AM
To: Ty, Rica <rica.ty@uscis.dhs.gov>
Subject: FW: Maxiflex denial

Hi Rica,

Attached is your Maxiflex request. Please note that your request has been denied.

Thank you,

Myrna Miranda
Supervisory Asylum Officer
Los Angeles Asylum Office
(714) 368-5433



Fri 3/20/2020 9:10 AM
Ty, Rica
RE: Maxiflex denial

To ☐ Miranda, Myrna M

Hi Myrna,

Thanks for letting me know.

What is the reason for the denial?

I'd like to reapply again even if for a gliding 4/10 schedule.
Thanks.

Regards,

**Rica Ty** | Asylum Officer | Los Angeles Asylum Office | DHS | USCIS | RAIO
14101 Myford Rd. | Tustin | CA | 92780 | ☎ (714) 368 - 5348 | ✉ Rica.Ty@uscis.dhs.gov



⟲ Reply  ⟲ Reply All  ⟲ Forward  ⟲ IM

Fri 3/20/2020 1:58 PM
Miranda, Myrna M
RE: Maxiflex denial

To ☐ Ty, Rica

📄 AHR Maxiflex MOA 11.08.18.pdf
253 KB

Hi Rica,

Your Maxiflex request was denied because one of the requirements is that you are performing at or above the achieved expectations level - you are not achieving expectations in the timeliness requirement under PPA standards. I've attached the Maxiflex MOA. Please let me know if you have any further questions.

Thank you,
Myrna



Office of the Chief Human Capital Officer
U.S. Department of Homeland Security
Washington, DC 20528

NOV 0 8 2018

**MEMORANDUM FOR:**   Judy S. McLaughlin, Chief
Labor and Employee Relations Division
U.S. Citizenship and Immigration Services
633 3rd Street, NW
Washington, DC  20529

Rose Saraceno

**FROM:**   Gwen Yandall
Executive Director, Human Capital Policy and Programs

**SUBJECT:**   Agency Head Review of Memorandum of Agreement between
USCIS and AFGE Local 1200

Pursuant to Title 5, United States Code § 7114 (c) (1), the Memorandum of Agreement between U.S. Citizenship and Immigration Services and American Federation of Government Employees (AFGE), Local 1200 signed on October 16, 2018, regarding the Maxiflex schedule policy for the Los Angeles Asylum Office bargaining unit employees, was submitted for review.  The Memorandum of Agreement has been reviewed and is hereby approved.

## MEMORANDUM OF AGREEMENT
## BETWEEN
## U.S. CITIZENSHIP AND IMMIGRATION SERVICES
## AND
## AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES,
## LOCAL 1200
## REGARDING THE MAXIFLEX SCHEDULE AT THE LOS ANGELES ASYLUM OFFICE

### I.   INTRODUCTION

The parties to this Memorandum of Agreement (MOA) are the U.S. Citizenship and Immigration Services (USCIS) and the American Federation of Government Employees (AFGE), Local 1200.

### II.   AUTHORITY

This MOA is authorized under the provisions of 5 USC § 7114 and the Collective Bargaining Agreement (CBA), Master Agreement 2016.

### III.   PURPOSE

The purpose of this MOA is to set forth the negotiated terms and conditions concerning the Maxiflex schedule at the Los Angeles Asylum Office (ZLA). These terms and conditions do not apply at any circuit ride locations, Asylum Pre-Screening Officer (APSO) locations, or any other temporary duty locations.

### IV.   SCOPE

The scope of this MOA applies to all bargaining unit employees (BUEs) within the ZLA chain of command. This MOA does not impact management rights, nor does it apply to non-bargaining unit employees or employees from other bargaining units.

### V.   TERMS AND PROVISIONS OF AGREEMENT

Employee Eligibility:

- A BUE is eligible to be considered to participate in the Maxiflex schedule if s/he meets the requirements in the authorities cited above, has been a ZLA employee for at least 90 days, and is performing at or above the achieved expectations level.
- In addition to the aforementioned requirements, Asylum Officers (AOs) are eligible to be considered to participate in the Maxiflex schedule after completing at least 60 days on a full interview schedule.
- Participation is voluntary.

000127

## General Terms:

- **Maxiflex Schedule**
  - The Maxiflex schedule is defined as a flexible work schedule that contains core hours on fewer than ten (10) workdays in the biweekly pay period and in which a full-time employee has a basic biweekly work requirement of eighty (80) hours. The employee may vary the number of hours worked on a given workday or the number of hours each week within the established basic work schedule.
- **Work Hours**
  - Standard operating hours are Monday through Friday from 6:00 a.m. to 6:00 p.m.
  - The basic biweekly work requirement of 80 hours must be completed during standard operating hours. Employees are permitted to work a maximum of ten (10) hours per day.
- **Core Hours**
  - Core hours are from 9:00 a.m. to 2:30 p.m.
  - Employees on the Maxiflex schedule may designate up to one (1) day per week as a "non-core day" on which core hours are not applicable. AOs may not designate a training day as a non-core day.
  - Any requests to change a designated non-core day must be submitted at least two (2) pay periods in advance and must receive supervisory approval.
- **Holidays**
  - Employees will be credited with eight (8) hours towards the basic work requirement on a holiday.
- **Credit Hours**
  - Credit hours may not be accrued.

## Application Process:

- Eligible employees must complete the Maxiflex request form and submit it to his/her supervisor to obtain approval at least two (2) pay periods in advance of the intended start date.
- Employees are required to indicate their intended daily work hours on the Maxiflex request form. Slight variances from approved intended work hours are permissible provided that: 1) employees report for duty for any scheduled work duties/assignments; and 2) the work hours otherwise comply with existing policies and regulations.
- In addition to the Maxiflex request form, Asylum Officers (AOs) must submit an interview pre-assignment schedule form that corresponds to their requested Maxiflex schedule. AOs may schedule a maximum of one (1) three-case, eight-hour day per week.
- Management reserves the right to deny an employee's request to participate in the Maxiflex schedule for performance or conduct reasons, the latter to include but not limited to habitual violation of time and attendance policies.
- Management will consider and approve, amend or terminate schedule requests in order to ensure operational coverage across all business days. When management cannot approve

2

all requested work schedules, work schedules will be prioritized in order of seniority as defined in the CBA.

**Reporting:**

- Employees must report their time by using the most current approved time and attendance recording mechanisms for all ZLA employees.
- Employees are responsible for keeping an accurate count of time worked and time "owed" in order to accumulate the requisite eighty (80) hours per pay period. Overage will be compensated only to the extent that it comports with existing policy and regulation regarding overtime and compensatory time, including the requirement that all overtime and compensatory time be preapproved in writing by a supervisor.

**Termination or Suspension:**

- An employee shall be removed from participation in the Maxiflex schedule and returned to a standard work schedule for six (6) months if the employee has two (2) or more instances of failing to manage their schedule in accordance with this MOA and all authorities cited herein, including but not limited to failing to comply with core hours requirements, failing to timely record time and attendance, failing to maintain an 80-hour biweekly work schedule (e.g., employee works less than 80 hours and has to supplement with a leave request on the last day of the pay period or works more than 80 hours and requests other compensation to cover the overage without prior supervisory approval).

## VI.   IMPLEMENTATION PLAN

ZLA management will implement the terms of this Agreement after the Agency Head review process has been completed. Within one calendar week of receiving Agency Head approval, management will initiate for all ZLA employees a thirty calendar day open season period. At the end of the thirty day period, management will have two weeks to review requested schedules. Schedules will go into effect no later than four pay periods later. Thereafter, open enrollment will occur as noted above.

## VII.   OTHER PROVISIONS

Nothing in the MOA is intended to conflict with current law or government-wide rule or regulation, or the CBA, including Article 2D, Governing Laws and Regulations, Scope of Coverage.

All existing policies regarding time and attendance and alternate work schedules remain in effect unless specifically superseded by this MOA.

## VIII.  TERMINATION

This MOA will expire upon the expiration date of the CBA that was effected on July 1, 2016, and any extensions thereto or upon the expiration date of any of the other authorities cited in Section II of this MOA, unless terminated by mutual agreement at an earlier date.

## IX.  MODIFICATION

This MOA may only be modified upon the mutual written consent of the parties.

## EFFECTIVE DATE

This MOA, four (4) pages in length, shall become effective upon Agency Head Review, but no later than thirty (30) calendar days after the last date of signature by the parties below.

**FOR THE UNION:**

**FOR THE AGENCY:**

Rose Saraceno
President
AFGE Local 1200

David M. Radel
Director
Las Angeles Asylum Office
U.S. Citizenship and Immigration Services

Date:  OCT 1 6 2018

Date: 10/16/2018

# EXHIBIT 4

## AFFIDAVIT

In the matter of:

Complaint # **HS-CIS-01464-2020**

Rica Ty

v.

Chad F. Wolf
Acting Secretary, Department of Homeland Security


AFFIDAVIT: **Myrna Miranda**

Pursuant to the investigation of the subject complaint in accordance with 29 C.F.R.1614.108.


BEFORE: **Jennifer Weihert, EEO Investigator**

On behalf of the United States Department of Homeland Security, U.S. Citizenship and Immigration Service

Jennifer Weihert
19453 W. Catawba Ave., Suite D
Cornelius, NC 28031

1.   Please state your full name, position title, job series, grade and organizational units (from smallest to largest).

Myrna Marisa Miranda, Supervisory Asylum Officer

Series: GS 0930 - 13


2.   How long have you worked in your current position (hire date)?  How long have you worked for the Federal Government (hire date)?

Supervisory Asylum Officer hire date: 11/10/2019

Federal Government hire date: 04/03/2016

i

3. Who are your first- and second-line supervisors and their titles?

   First-line Supervisor: Alejandra Kim, Section Chief

   Second-Line Supervisor: Marianne Hong, Deputy Director

4. Who were your first- and second-line supervisors and their titles during the period of the issues of this complaint (December 2019 to March 2020)?

   First-line Supervisor: Mallory Lynn, Section Chief

   Second-Line Supervisor: Marianne Hong, Deputy Director

5. What is/was your working relationship with Complainant (i.e., coworkers, first level supervisor, second level supervisor, etc.) and dates of that relationship?

   I was Complainant's first-line supervisor from December 9, 2019 until March 27, 2020.

6. Please state your age with month and year of birth.

   Age 31; Month/year of birth: 06/1989

7. Were you aware of Complainant's age? If so, how and when did you become aware of Complainant's age?

   I have no knowledge of Complainant's age.

8. If you choose to state your disability status for the record, please do so now by stating "I have a disability" or "I do not have a disability." If you choose not to share your disability status, please state "I choose not to answer this question."

   I choose not to answer this question.

9. Were you aware of Complainant's disability? If so, how and when did you become aware of Complainant's disability?

   Complainant's former first-line supervisor informed me that Complainant had a

   medical condition but that she did not need an accommodation for it. I did not inquire any

further with the supervisor as I did not consider it appropriate to do so. I do not recall the date when this occurred

Complainant informed me of her medical conditions for the first time on March 13, 2020. On March 13, 2020, due to the pandemic and imminent office closure, I emailed the Asylum Officers under my supervision a form titled "Employee Data Sheet." This form asked for contact information, emergency contacts, and has a space for employees to list medical conditions; the form indicates this is optional. Complainant submitted two employee data sheets; one on March 13, 2020 and voluntarily submitted an updated form on March 16, 2020 in which she listed additional medical conditions.

10. Does Complainant have work limitations?  If so, what are the limitations?

I have no information that Complainant had any work limitations.

11. What are the essential functions of the Complainant's job?

Asylum Officers' essential functions are to interview and adjudicate asylum applications; review applications and supporting evidence; conduct asylum interviews, research appropriate information, and interpreter and apply appropriate policy, regulations, and precedent decisions to make formal, written eligibility determinations. Additionally, to research and review information from government databases and other records.

12. Does Complainant's medical condition affect her ability to perform the work assignment? If so, how?

I have no information that her medical condition affected her ability to perform the work assignments.

iii

13.  Have you been involved in prior EEO and/or other protected activity before (i.e., as a witness, responding official, complainant, etc.)? If so, please identify the following:
   a)  The nature of the EEO and/or other protected activity;
   b)  The date of the activity and current status; and
   c)  Whether it involved the Complainant.

   I have no prior involvement.

14.  Were you aware of the Complainant's reasonable accommodation request? If so, when and how did you become aware of this activity?

   I have no knowledge of Complainant submitting a reasonable accommodation request.

1.  **From mid-December 2019 through March 27, 2020, you were subjected to harassment from your Supervisor, Myrna Miranda, creating a hostile work environment. Some incidents include, but are not limited to, the following:**
   - **On multiple occasions between December 2019 and March 2020, in both her office and yours, SAO Miranda raised her voice with the door open, and when she recognized she was becoming louder, ordered you to close the door.**
   - **On multiple occasions between December 2019 and March 2020, SAO Miranda barged into your office without knocking, startled you and interrupted your focus, causing anxiety.**
   - **On multiple occasions between December 2019 and March 2020, SAO Miranda berated you in a rude and condescending manner. On January 28, 2020 when you tried to defend yourself, she began yelling at you. On March 5, 2020, she lied about you raising your voice when you did not.**
   - **In January 2020, SAO Miranda was dismissive when you informed her that your disability and need for medical appointments was the primary reason for your backlog.**
   - **On March 4, 2020, when you mentioned to SAO Miranda that you had interviewed people from Wuhan who entered the US between October and December 2019, she dismissed your concerns about COVID 19 even though she knew of your disabilities. She stated, "Oh don't worry, I am sure you will be fine".**

15.  Complainant states that on multiple occasions between December 2019 and March 2020, in both your office and hers, you raised your voice with the door open, and when recognizing that you were becoming louder, ordered her to close the door. Is this true? If not, what is your recollection? Please explain exactly what happened and be specific. (Include date, location and details about the incident, etc.)

   a.  For example, she mentioned that this occurred on a couple of occasions in January



2020 when you came to her office to discuss her backlog; on another occasion when she came to your office to ask about changing a push to a mailout; and on February 24, 2020, when she stayed to complete a task. What is your response to this contention?

I never raised my voice at Complainant.

16. What is your direct involvement in this matter? If not involved, please name the management official involved and their position title.

I never raised my voice at Complainant. I never ordered Complainant to close the

door for realizing that I am becoming louder.

17. Did your actions in this matter have anything to do with the Complainant's age, disability and/or reasonable accommodation requests? If so, please explain and be specific.

My interactions with Complainant had nothing to do with the Complainant's age,

disability or reasonable accommodation requests. I have no knowledge of her age. I

have no knowledge of her having submitted a reasonable accommodation request.

18. Complainant states that on multiple occasions between December 2019 and March 2020, you barged into her office without knocking, startling her, and interrupting her focus, causing anxiety. Is this true? If not, what is your recollection? Please explain exactly what happened and be specific. (Include date, location, and details about the incident, etc.)

   a. For examples, she mentioned that on January 28, 2020, you barged into her office without knocking and started talking about office procedures and her not working past her scheduled time; on January 30, 2020, you barged into her office without knocking to inform her that you were the DO for the day; on March 4, 2020, you barged into her office without knocking asking if she had seen a Skype message that you sent her; and on March 5, 2020, you barged into her office multiple times without knocking about a file that she forwarded you the day before and later about not including cases in the backlog where a decision had already been made. What is your response to these contentions?

   I never barged into Complainant's office.

On January 28, I spoke with Complainant about her having worked past her 8-hour workday on January 27, 2020. I do not recall whether her door was open or closed when I arrived at her office but I did not barge into her office.

I have no recollection of having gone to Complainant's office on January 30, 2020. Once I informed Complainant that I was the Duty Officer (DO) because I happened to walk by her office. I do not recall the date. Given that the DO often has to step away from their office for sometimes extended periods of time, I let her know that she could call the Duty phone if she needed me and I was away from my desk. I do not recall whether her door was open or closed but I have never barged into hers or anyone's office.

I have no recollection of having gone to Complainant's office on March 4, 2020.

On March 5, 2020, I went to Complainant's office to discuss cases she had incorrectly placed on a shelf. I do not recall whether her door was open or closed when I arrived at her office but I never barged into her office.

19. What is your direct involvement in this matter? If not involved, please name the management official involved and their position title.

As indicated above, I have never barged into Complainant's office.

20. Did your actions in this matter have anything to do with the Complainant's age, disability and/or reasonable accommodation requests? If so, please explain and be specific.

000252

My interactions with Complainant had nothing to do with the Complainant's age,

disability or reasonable accommodation requests. I have no knowledge of her age. I

have no knowledge of her having submitted a reasonable accommodation request.

21. Complainant states that on multiple occasions between December 2019 and March 2020, you berated her in a rude and condescending manner. Is this true? If not, what is your recollection? Please explain exactly what happened and be specific. (Include date, location and details about the incident, etc.)

I never treated Complainant in a rude and condescending manner.

    a. More specifically, she states that on January 28, 2020, you berated her about trying to complete her second interview from the day before and going past her 8-hour shift. She contends that when she tried to defend herself, you begin yelling at her. Is this true? If not, what is your recollection? Please explain exactly what happened and be specific. (Include date, location, and details about the incident, etc.)

I did not berate Complainant nor did I yell at her. I did address her working past her

8 hours as it is part of my duties as her first-line supervisor to address any incidents

in which Asylum Officers I supervise do not adhere to office policies.

On January 27, 2020, I discovered that Complainant was working past her 8 hours.

This is a very serious infraction. I instructed her to go home. The following day, I

discussed this with her. I also discussed a case I had returned because she had

disagreed with my feedback and submitted another case with the same errors, so I

wanted to show her the guidance I had referred to in giving her the feedback. I also

discussed Communication as a Core Competency for which all Asylum Officers are

evaluated on. I explained that she needed to improve her communication with me

regarding anything she was struggling with. I sent her two emails on January 28

memorializing our conversations; one was regarding her working past her 8 hours

000253

on January 27, 2020 and the second was addressing her concerns about my

feedback and summarizing our conversation regarding communication. Both emails

have been submitted.

b.  More specifically, she states that on March 5, 2020, you lied about her raising her
voice when she did not. She explains that this occurred when you barged into her
office multiple times that day without knocking about a file that she forwarded you
the day before and later about not including cases in the backlog where a decision
had already been made. Is this true? If not, what is your recollection? Please explain
exactly what happened and be specific. (Include date, location, and details about the
incident, etc.)

I wrote the following Memo on March 5, 2020 regarding my conversation with

Complainant. I emailed a copy to my Section Chief and placed a hard copy in

Complainant's Employee folder:

AO Rica Ty submitted completed cases that were ready for supervisory review to me to place

on the BLR shelf.  I discussed with her that those cases should be submitted to me for

supervisory review, not BLR, and followed up in an email. However, AO Ty later submitted

another completed case with a BLR cover sheet. I went to confirm with AO Ty that the file was

in fact ready for review after the decision was entered, and she said yes and that she could take

it back but that she would have to update the date on the BISC. As I was explaining to her that

it was not necessary to update the BISC unless the checks had expired, AO Ty was visibly

upset and interrupted me. I explained to her that it is important to maintain a respectful tone

given that we are in a professional environment, which includes not raising her voice or

imitating someone verbally or by facial expressions, as she has done to me in the past. AO Ty

then said that I was condescending coming in with my face.  I explained to her that it was

inappropriate to comment on other people's physical appearances in this office, and that she

was required to behave in a respectful manner with all employees, including me. I asked AO

Ty if she had any questions or concerns about our conversation and she indicated that she did

not.

22.  What is your direct involvement in this matter? If not involved, please name the management official involved and their position title.

On March 5, 2020, I had a conversation with Complainant about the types of files

she was submitting to the backlog reduction shelf, which is where we place files

that require completion, as it seemed that some were completed and ready to

review.

23.  Did your actions in this matter have anything to do with the Complainant's age, disability and/or reasonable accommodation requests? If so, please explain and be specific.

My actions have nothing to do with the Complainant's age, disability or reasonable

accommodation requests. I have no knowledge of her age. I have no knowledge of

her having submitted a reasonable accommodation request.

24.  Complainant states that in January 2020, you were dismissive when she informed you that her disability and need for medical appointments was the primary reason for her backlog. Is this true? If not, what is your recollection? Please explain exactly what happened and be specific. (Include date, location and details about the incident, etc.)

See answer below.

25.  What is your direct involvement in this matter? If not involved, please name the management official involved and their position title.

Complainant never informed me that her disability was a reason for her backlog. I

do not recall the date, but Complainant informed me that in the past, she had

scheduled appointments in the past on Wednesdays, which is the day Asylum

Officers typically use to write up their cases. She did not specify the type of

appointment, i.e., whether it was medical, nor did she tell me that she was unable to schedule her appointments on any other day during the week. She also had not requested significant amount of leave during the time I had supervised her. In February 2020, Complainant was given additional time to write up her cases that were untimely.

As stated above, Complainant informed me of her medical conditions for the first time on March 13, 2020.

26. Did your actions in this matter have anything to do with the Complainant's age, disability and/or reasonable accommodation requests? If so, please explain and be specific.

My interactions with Complainant have nothing to do with the Complainant's age, disability or reasonable accommodation requests. I have no knowledge of her age. I have no knowledge of her having submitted a reasonable accommodation request.

27. Complainant states that on March 4, 2020, when she mentioned to you that she had interviewed people from Wuhan who entered the US between October and December 2019, you dismissed her concerns about COVID-19 even though you knew she had disabilities. She contends that you stated, "Oh don't worry, I am sure you will be fine." Is this true? If not, what is your recollection? Please explain exactly what happened and be specific. (Include date, location and details about the incident, etc.)

See answer below.

28. What is your direct involvement in this matter? If not involved, please name the management official involved and their position title.

I have no recollection of this conversation.

29. Did your actions in this matter have anything to do with the Complainant's age, disability

x

and/or reasonable accommodation requests? If so, please explain and be specific.

> I have no recollection of this conversation. My interactions with Complainant have nothing to do with the Complainant's age, disability or reasonable accommodation requests. I have no knowledge of her age. I have no knowledge of her having submitted a reasonable accommodation request.

## Claim 1 - Overall Harassment Questions:

30. Did Complainant inform you that any of the alleged actions described above were unwelcome, harassing or creating a hostile work environment? If so, when and how? What was your response if any?

> On March 5, 2020, after I spoke to her about her performance and failure to follow instructions, Complainant told me that I was condescending coming in with my "face." I explained to her that it was inappropriate to comment on other people's physical appearances in this office, and that she was required to behave in a respectful manner with all employees, including me. I asked Complainant if she had any questions or concerns about our conversation and she indicated that she did not.

31. Were any actions taken to stop the alleged harassment? If so, when and what? Please explain and be specific.

> I never harassed Complainant.

32. Can you provide any witnesses to the events of the above accepted claims, who can provide relevant information? If so, who? Please identify each witness by name, position title, telephone number and email address.

> None.

33. For each witness identified above, please also state the nature of the information he/she

000257

can provide regarding the accepted claim(s).

Not applicable.

34. Have you received training on anti-harassment/hostile work environment while employed by the agency? If so, when?

Preventing and Addressing Workplace Harassment Training – Completed 5/26/2019

**2. On March 20, 2020, SAO Miranda and Deputy Director Marianne Hong denied your request for a maxi-flex/AWS schedule as a reasonable accommodation without any engagement to address your concerns on how to successfully meet the demands of your position given your disabilities.**

35. Did Complainant submit a request for a maxi-flex/AWS schedule? If so, when and how (verbally or in writing) did she make this request?

Complainant submitted an incomplete Maxi-flex request by email on March 17, 2020. I

asked that she add additional information that was required on the Maxi-flex form, and

she submitted a complete Maxi-flex request on March 18, 2020.

a. Did Complainant provide an explanation as to why she was requesting a maxi-flex/AWS schedule? Please explain and be specific.

On March 19, 2020, I asked Complainant to provide a reason for requesting a maxi-flex

schedule. She provided the following response in an email:

In general, if we were on a normal operating interview schedule, this might be a

more efficient use of my time. Devoting 2-3 days on just interviews and having a

full day + some time on training day, of just writing assessments/finishing cases

will be more efficient than being interrupted in between an interview or at the end

of 2 interviews, when I likely/usually end up running out of time.

xii

Maxiflex AWS will allow me to extend or reduce the time as needed to devote to certain tasks as needed. I'll also, if necessary, be able to schedule my doctor's appointments and medical treatment on non-core/ shorter days without using up too much of sick leave, since the days I have medical treatment take between 4-5 hours per day and that excludes my drive out to UCLA, which can be between 1.5-2 hours from here. My next ones are in April & May.

In the current episodic constraints, since I am on I-730s through April 1, the maxiflex/AWS will allow me to change my schedule as necessary including work 4/10s if possible.

A copy of the email is provided.

36.  Did Complainant submit a request for a maxi-flex/AWS schedule as a reasonable accommodation? If so, when and how (verbally or in writing) did she make this request?

No, Complainant's request for a maxi-flex schedule was not a request for an accommodation.  Complainant requested change in schedule was simply to allow her to use less leave in attending doctor's appointments and for what she believed might be a more efficient use of her time.  However, I am aware of no information that Complainant was unable to change her appointment days as she saw fit.  Also, the time that Complainant used for leave was not counted against her, e.g., for purposes of production.  I am also aware of no information that Complainant was unable to use leave to attend her appointments.  In short, the type of schedule Complainant was on did not restrict her ability to attend appointments, medical or

xiii

otherwise, and there were no negative effects from her use of leave, because that

time was not counted against her for production purposes.

37. Did the Complainant submit the proper medical documentation to support her request for a maxi-flex/AWS schedule as a reasonable accommodation? If not, did you inform her of such? When did you inform her and what was her response?

Complainant did not submit the medical documentation to support her request for

a maxi-flex schedule. I asked her for the reason of her request, to which she

responded that she was requesting leave in order to schedule her medical

appointments on her non-core days instead of using sick leave.

38. Did you provide a response or decision regarding the Complainant's request for a maxi-flex/AWS schedule as a reasonable accommodation? If so, please provide the following information for each request:
   a. When and how (verbally or in writing)? If in writing, please provide a copy.
   b. What was your response?
   c. Was there a delay in providing this response to Complainant? If so, why? Please explain and be specific.

As detailed above, Complainant's Maxi-flex request was not a request for a reasonable

accommodation. I informed Complainant that her Maxi-Flex request had been denied on

March 20, 2020 by email. A copy of the email is provided.

I explained that her Maxiflex request was denied because one of the requirements is

that she is performing at or above the achieved expectations level and she was not

achieving expectations in the timeliness requirement under PPA standards. I also

attached the Maxi-flex MOA.

39. Did Complainant express concerns on how to successfully meet the demands of her position given her disabilities? If so, please provide the following information:
   a. When and how (verbally or in writing)? If in writing, please provide a copy.

xiv

    b.   What specific concerns did she express?

    c.   What was your response?

Complainant never expressed concerns on how to successfully meet the demands of her

      position given her disabilities.

40.   Did you engage with the Complainant in any manner to address her concerns on how to successfully meet the demands of her position given her disabilities? If so, when and how? Please explain and be specific.

Complainant never suggested to me that she needed a change of duties related to her

medical condition.

41.   Was Complainant provided with any alternate accommodations? If so, what alternate accommodations were provided and when?

Complainant never expressed the need for alternate accommodations.

42.   Complainant states that on March 20, 2020, her request for a maxi-flex/AWS schedule as a reasonable accommodation was denied without any engagement to address her concerns on how to successfully meet the demands of her position given her disabilities. Is this true? If not, what is your recollection? Please explain exactly what happened and be specific. (Include date, location and details about the incident, etc.)

Complainant never expressed that her maxi-flex request was made to successfully meet

      the demands of her position given her disabilities.

43.   What is your direct involvement in this matter? If not involved, please name the management official involved and their position title.

I received the Complainant's Maxi-Flex Request and recommended it be denied because

      the applicant did not meet the requirements per the Memorandum of Action

      (MOA) regarding Maxi-flex. As discussed above, Complainant never suggested

that her request was necessitated by a medical condition; rather, she explained

that it was a matter of convenience.

44. Within the last two years, have you denied any other employee's request for a maxi-flex/AWS schedule as a reasonable accommodation for similar reasons? Please explain and be specific.

I have never received a maxi-flex requests as reasonable accommodations.

45. If so, who? (Please include the employee's name, title and GS series/grade.) If known, what is his/her age, disability status, and prior protected activity status (i.e., requests for reasonable accommodation)?

Not applicable.

46. Did you actions in this matter have anything to do with the Complainant's age? If so, please explain and be specific.

My actions—i.e., my treatment of her—with Complainant had nothing to do with

Complainant's age. I have no knowledge of her age.

47. Did you actions in this matter have anything to do with the Complainant's disability? If so, please explain and be specific.

My actions in this matter had nothing to do with Complainant's disability.

48. Did you actions in this matter have anything to do with the Complainant's reasonable accommodation request? If so, please explain and be specific.

To my knowledge, Complainant never submitted a reasonable accommodation request.

49. Do you have any witnesses to support your contentions in this matter? Identify by name, title, email, and nature of information to be provided.

Not applicable.

**3. On March 27, 2020, you were terminated during your probationary period.**

xvi

000262

50. What is the agency's process/protocol for terminating an employee from his/her probationary employment?

My understanding is that employees are served a letter explaining the reasons for

termination.

51. Was Complainant terminated during her probationary period? If so, when?

Complainant was terminated on March 27, 2020, during her probationary period.

52. If you know, why was Complainant terminated during her probationary period? Please explain and be specific.

I was never provided with a copy of the termination letter.

53. If you know, was this explanation provided to Complainant? If so, <u>when</u> and <u>how</u> (verbally or in writing)?

I was on leave and my team, including Complainant, had been temporarily reassigned to

another Supervisory Asylum Officer on the date Complainant was terminated.

54. What is your direct involvement with the Complainant being terminated during her probationary period? If not involved, please name the management official involved and their position title.

I was the Complainant's first-line supervisor from December 9, 2019 until March 27,

2020. I communicated performance and conduct concerns to my first-line

supervisor (Complainant's second-line supervisor).

55. Did you rely on any Agency policies or legal regulations for this decision? If so, please provide them *and* explain your decision within the guidelines of this policy.

For conduct concerns, I relied on agency as well as local office policies regarding core

hours, office hours, and guidance on overtime.

000263

For performance concerns, I relied on the Employee Performance Plan and Appraisal

Form (PPA) and its Companion Guide for the Asylum Officer position.

56. Prior to Complainant being terminated, did you advise her of any performance or conduct issues? If so, what performance or conduct issues did you advise her of and when? If not, why not?

I advised complainant of performance and conduct issues on multiple occasions.

Performance:

On January 21, 2020, I returned a case to Complainant for revisions and provided

constructive feedback.

On January 10, I requested that Complainant make revisions to a case she submitted and

provided constructive feedback.

On January 20, 2020, I sent constructive feedback regarding a case submission.

On February 18, 2020, I formally returned a case to Complainant and explained the

reasons for the formal return. A formal return affects the Quality rating on an

Asylum Officer's final appraisal.

On February 10, I sent Complainant a list of cases that showed were still assigned to her

and not yet completed and asked for the status. On February 19, 2020, I informed

Complainant that we would be moving all her untimely/unsubmitted cases to the backlog shelf, meaning that they would be re-assigned for completion to other Asylum Officers working on the backlog reduction project. I made the decision to do this because I understood that Complainant still had a high number of cases left to submit and I hoped that by reassigning the cases that were already untimely, she would be able to focus on her more recent cases and give her an opportunity to catch up on her work. I explained to Complainant that the cases she interviewed during her 30-day grace period would not count toward her overall timeliness score, given that she was not rated on Quality and Timeliness during that period.  Before she submitted the incomplete cases for backlog reduction, I emailed Complainant a list of the A numbers of cases and made clear which ones would count toward her overall timeliness score. I worked with Complainant to get the files submitted to backlog shelf; Complainant submitted a few at a time. On March 5, 2020, I realized that Complainant was submitting completed cases to the backlog reduction shelf instead of submitting them to me for review. I discussed this with her.

On February 20, 2020, I emailed Complainant to inform her that her interview was not legally sufficient and therefore the case required a second interview. I also provided constructive feedback on her written decision and administrative tasks. I encouraged her to discuss the case with me, but she never did. Complainant was to schedule the second interview herself. On March 6, 2020, I followed up with her because complainant had not discussed this case with me and there was no

indication that the case had yet been scheduled for interview.  On March 10, Complainant informed me that she had scheduled it for April 1.

On February 28, 2020, a Supervisory Asylum Officer requested that Complainant make revisions to her written decision.

On March 3, 2020, Complainant did not communicate with the Duty Officer in a timely manner about being unable to conduct her second interview before the end of her workday. As a result, the applicant waited for several hours to be interviewed and ultimately had to be sent home to await a future interview. The Duty Officer sent an email to Complainant reminding her to timely communicate with the duty officer regarding these types of issues.

On March 4, 2020, I returned a case to Complainant and provided constructive feedback to her about her written decision and administrative tasks. I let her know that I had already provided her feedback about some of the things that needed corrections for this case.

On March 5, 2020, I emailed Complainant constructive feedback regarding the assessment of one of her cases. I placed the file on the backlog reduction shelf to be assigned to another Asylum Officer and made the decision to do that given that she had many files that were untimely and unsubmitted.

000266

On March 9, 2020, I gave Complainant a formal return of a case, meaning that it would impact her Quality Rating of her Final appraisal. I explained the reasons for the formal return. I gave her a formal return because she made mistakes that she had been provided constructive feedback on in the past.

On March 10, 2020, I provided constructive feedback on some administrative tasks that were not properly completed on a case.

On multiple occasions, I had to email Complainant to request the status of cases that were untimely and unsubmitted. For most of these cases, the applicants had been asked to return to the office to pick up their decision and because the cases were submitted late, we had to cancel the applicants' pick-up appointments and inform them that the decision would be mailed instead. I informed Complainant how her untimely submissions and lack of communication about these untimely submissions could impact her final appraisal.

On March 12, 2020, a Supervisory Asylum Officer provided her with written feedback regarding an adjudication and the need for a second interview.

Conduct:

On December 22, 2019, I discovered that Complainant was online on Skype. On December 23, 2019, I asked Complainant to come my office to discuss her use of her laptop outside of the office the previous day. At first Complainant was hesitant

000267

to come to my office because she was working but I explained that I had some time now and we needed to talk before I went on leave. Complainant interrupted me and explained that she had taken her laptop home because someone from IT had told her to test the Wi-Fi at her home and because she needed to work on travel arrangements for an upcoming work-related trip and webTA. I explained to Complainant that she could have let me know that she was instructed to take her laptop home the previous day when I discovered she was online on Skype. Complaint then said she tried to but and then I had told her to log off. When she repeated what I had written over Skype, Complainant changed her tone of voice and made a facial expression as to imitate me. I explained to her that her behavior was not appropriate, and that it was a written message so there was no tone of voice or facial expression. Complainant did not respond. I explained to her that she needs to talk to me before she takes her laptop home. I sent Complainant a follow up email memorializing our conversation regarding the use of government laptops outside of the office.

On January 27, Complainant indicated on her sign in sheet that she began her workday at 6 a.m. and was scheduled to work until 2:30 p.m. I sent Complainant a Skype message at 3:20 p.m. that day and she informed me that she was scheduled to leave at 3 p.m. On January 28, 2020, I discussed this incident with complainant and reminded her that she may not stay past her 8-hour workday without prior authorization, which she did not have. I sent her an email regarding office policies

xxii

for working past regular hours and indicate that she may be subject to disciplinary action if she does not abide by office policies.

On February 12, 2020, the building guards informed management that Complainant was in the office with applicants close to 6 p.m. This is against office policies given that at the time, applicants were to be escorted out of the building no later than 5:45 p.m. On February 13, 2020, I discussed this with Complainant. She indicated that she had arrived to the office at 9:14 a.m. on February 12, 2020, and did not notify the Duty Officer of her late arrival as she had arrived after core hours. I forwarded Complainant an email sent by the Deputy Director to all employees in December 2019 indicating building hours and core hours. The email also states that failure to follow office policies can lead to disciplinary action. Complainant was asked to take leave for the time she was out of the office during core hours consistent with office policies.

On February 24, 2020 I discovered that the applicant came into my office a few minutes before 4 p.m. However, her sign in sheet indicated that she arrived at the office at 6:45 a.m. and was scheduled to work until 3:45 p.m. I told Complainant to end her workday at that time. The following day, I sent her an email asking her not to stay past her 8-hour workday without prior authorization and that if this continued, she could be subject to disciplinary action.

000269

On March 24, 2020, I emailed Complainant to ask if she was working, as she had not emailed me at the start of her workday as required by Telework procedures.

On March 5, 2020, I discussed with Complainant about the cases she had submitted to the backlog shelf. Incomplete cases may be submitted to the backlog shelf at a Supervisor's discretion, and these cases are reassigned to another Asylum Officer for completion. It appeared that complainant had submitted completed cases to the backlog shelf. I discussed this with Complainant and explained that completed cases should be submitted to me for review; however, she continued to submit completed cases to the backlog shelf. I tried to explain this to her and we discussed which cases should go on the backlog shelf. Complainant became visibly upset and and interrupted me. I explained to her that it is important to maintain a respectful tone given that we are in a professional environment, which includes not raising her voice or imitating someone verbally or by facial expressions, as she has done to me in the past. Complainant then said that I was condescending coming in with my face. I explained to her that it was inappropriate to comment on other people's physical appearances in this office, and that she was required to behave in a respectful manner with all employees, including me. I asked Complainant if she had any questions or concerns about our conversation and she indicated that she did not. I discussed this incident with my Section Chief and wrote a memo for Complainant's employee file.

After the office ended affirmative interviews in March 2020 due to the pandemic, I instructed Complainant and the rest of my team to submit all untimely cases to me so they could be reassigned to other officers. The purpose of this was because the Asylum Officers on my team were going to be reassigned to a different project. I sent her multiple emails requesting her to submit these cases. It was time sensitive because these cases were going to be assigned to an Asylum Officer who otherwise might not have enough work. Complainant failed to follow the instructions and on March 24, 2020, I asked a support staff supervisor to remove the files from her office.

On March 23, 2020, I had to remind Complainant to send me an A file manifest of the files she took to her telework location per telework procedures.

57. Was Complainant given an opportunity to correct these issues? If so, when and for how long? If not, why not?

As I outlined in my Response 56, I gave Complainant substantial feedback regarding her performance to inform her that her work required revisions. My goal in providing feedback was for her to learn from her mistakes and become a stronger Asylum Officer.

Complainant struggled with submitting her cases in a timely manner. To meet expectations on her appraisal, she needed to submit 70% of her cases in a timely manner. I informed her multiple times in person and in writing about her timeliness rate. I would inform her of her timeliness rate and also explained to her

000271

that failing to meet expectations in Timeliness could lead to her being removed from the position.  When she was first moved to my team, her timeliness rate was 58.3%. I asked her to let me know by the due date (per office policy) if she ever needed a timeliness waiver. I would often explain in my emails how her work or late submissions impacted her overall rating. On January 25, 2020, I sent her an email in which I reminded her of an earlier conversation in which I indicated that her timeliness rate was at 61% as of Pay Period 26 and that it had increased to 65% after Pay Period 1. I noted that it did not include the untimely/unsubmitted cases still in her office. After factoring in Pay Period 6, her timeliness rate was 56%.

Additionally, Complainant was given more time to work on her own caseload due to the number of cases she had that were untimely and unsubmitted. As of January 17, 2020, Complainant had at least twelve of her own cases that she had interviewed and had not yet submitted, and was still on a full interview schedule. All of those cases were untimely as of that date. In order to ensure adjudication of these cases, Complainant was assigned three days off the interview schedule on February 3, 2020, February 4, 2020 and February 5, 2020 for her to complete these cases. Complainant was informed by email on January 17, 2020 that she would be given time off the interview schedule for her to work only on these cases. She was also informed that being taken off the schedule for her to complete these cases could impact various areas of her final appraisal. The reason for this is that by taking her off the interview schedule, she was allotted more time than others in order for her

to complete her own cases. However, the decision was made to give her this additional time with the hope that it would allow her to catch up on her work.

Regarding conduct problems, I would discuss with her in person and follow up in an email. In my emails I would also state that failure to comply by office policies could lead to disciplinary action.

In my emails and in person, I always encouraged Complainant to reach out to me by email, skype, or in person to discuss cases. Given that she rarely sought assistance, I scheduled a meeting with her on February 14, 2020 to discuss cases. When I returned cases, I often conducted research and included relevant sections from the Lesson Plans and other resources available to Asylum Officers in my feedback. My goal in doing this was to help her become a stronger adjudicator.

On February 14, 2020, I reviewed one of Complainant's cases and discovered that her written assessment required significant revisions. As this was a common issue with her cases, I asked Complainant to send me an electronic copy of her assessment. I went ahead and made the revisions myself and then emailed the final assessment to her for her to use as a resource in future cases that required similar analysis.

58.  Did the Complainant improve her performance or conduct? If so, why was she subsequently terminated? If not, please explain how she was deficient?

Complainant did not improve her performance or conduct. Her work continued to require significant revisions to her written assessment as well as administrative tasks,

xxvii

therefore affecting her quality score. She also continued to submit cases in an untimely manner, affecting her timeliness score. At the time she was terminated, her timeliness rate was 56%. She failed to communicate with me about untimely cases or as questions to improve the quality of her adjudications. Complainant continued to work past her 8-hour workday without prior authorization. Complainant struggled to adhere to telework policies, and only complied after I inquired.

59. Complainant identified Mai Ly, another AO, as possible comparators for this claim. She contends that Ms. Ly also had to do a backlog project, but to her knowledge, has not been terminated. What is your response to this contention?

Officer Ly was assigned to backlog reduction project only once in September 2020, after Complainant's termination. For this project, Officer Ly worked on completing adjudications of affirmative cases that were interviewed by other Asylum Officers who were now assigned to different projects or are no longer employed at the office. This assignment is typically given to Asylum Officers who are more experienced and have shown to have a good understanding of affirmative adjudications.

Complainant was not assigned to a backlog project, but rather, she was given more time to work on her own caseload due to the number of cases she had that were untimely and unsubmitted. As of January 17, 2020, Complainant had at least twelve of her own cases that she had interviewed and had not yet submitted. All of those cases were untimely as of that date. In order to ensure adjudication of these cases, Complainant was assigned three days off the interview schedule on February 3, 2020, February 4, 2020 and February 5, 2020 for her to complete these cases. Complainant was informed by email on January 17, 2020 that she would be given time off the interview schedule for her to work

000274

only on these cases. She was also informed that being taken off the schedule for her to

complete these cases could impact various areas of her PPA. The reason for this is that by

taking her off the interview schedule, she was allotted more time than others in order for

her to complete her own cases. Officer Ly was not given time to write her cases for the

same reasons as complainant during the time she was under my supervision.

    a.   More specifically, was Ms. Ly on probationary employment?

        I have no knowledge regarding whether Officer Ly was on probationary

        employment.

60.   Does Mai Ly report directly to you, as did Complainant? Was she the same GS grade or
      on the same Position Description as Complainant? Was she assigned the same tasks as
      Complainant? Please be as specific as possible.

Officer Ly Entered on Duty at the Los Angeles Asylum Office as a GS-12, the same

grade level as complainant. Both had the same title, although I have no knowledge

of the job description listed in the posting each applied to. Officer Ly and

Complainant were assigned to my team on December 9, 2019. At the time, they

were both assigned to the affirmative rotation until the office closed for interviews

due to the pandemic, after which most of the Asylum Officers were placed in I-730

data entry and adjudications training. While on the affirmative rotation, Officer Ly

and Complainant were assigned to the same tasks, specifically, affirmative

interviews. However, Officer Ly was on her 30-day grace period until February 27,

2020. During this time, Officer Ly was not rated. All Asylum Officers, including

Complainant, received this 30-day grace period. During the 30-day grace period, an

AO will not be rated until they have been assigned to and gained experience of 30

000275

days or more on that particular assignment. Scored evaluations by SAOs will begin

after the 30-day grace period. Offices have some discretion in extending the AO's

ramp-up period to ensure the officer is ready to transition to a full schedule.

Complainant's 30-day grace period had ended at the time I was assigned to be her

supervisor. This is because Complainant had an Entry on Duty date of June 9, 2019

and completed training before Officer Ly.

61. Did your actions in this matter have anything to do with the Complainant's age? If so, please explain and be specific.

My actions had nothing to do related to Complainant's age. I do not have knowledge of

the Complainant's age.

62. Did your actions in this matter have anything to do with the Complainant's disability? If so, please explain and be specific.

My actions in this matter have nothing to do with the Complainant's disability.

63. Did your actions in this matter have anything to do with the Complainant's reasonable accommodation request? If so, please explain and be specific.

I have no knowledge of the applicant submitting a Reasonable Accommodation request.

64. Can you provide any witnesses who can provide relevant information related to this claim? If so, please identify by name, title, telephone number and e-mail address. Please state the nature of the information to be provided by each witness.

Rebecca Tseng, Supervisory Asylum Officer, 714-368-5303,

Rebecca.a.tseng@uscis.dhs.gov

65. Is there anything you would like to add that is relevant to any of the above claims which

xxx

has not already been addressed?

## CERTIFICATION

I have read the attached affidavit consisting of 31 pages, and it is true and complete to the best of my knowledge and belief. In making this affidavit, I understand Section 1001, Title 18 of the U.S. Code which states:

> *"Whoever, is any manner within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up any trick, scheme, or device a material fact, or makes false, fictitious or fraudulent statements or representation, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than 5 years, or both."*

The collection of this information is authorized by Public Law 92.261, Equal Employment Act of 1972; and Executive Order 11478 as amended. This information will be used to adjudicate complaints of alleged Discrimination. As a routine use, this information may be disclosed to persons involved in the processing and/or adjudication of this compliant; to the Equal Employment Opportunity Commission or to the Merit System Protection Board, as appropriate, to adjudicate complaints of alleged discrimination; to a court, party or counsel for a party to judicial or administrative litigation; to a congressional office at your request; or to a labor organization as may be required by the NLRA. Provisions of the information requested are mandatory for the complainant, U.S. Citizenship and Immigration Services employees, and other federal employee witnesses. Failure of U.S. Citizenship and Immigration Services or other federal employees to provide the requested information could result in disciplinary action.

I declare under penalty of perjury that the foregoing is true and correct.


_____

Signature of Affiant

Myrna Miranda
_____
Printed or Typed Name


*Jennifer Weihert*
_____
Signature of Investigator

11|16|20
_____
Date

xxxi

# EXHIBIT 5

## Rebuttal Response Statement

**Name:** Rica Ty                     **Case Number:** CIS-01464-2020

I have reviewed the affidavit of Myrna Miranda, Responding Management

Official's answers related to my complaint, and:

(Please initial one)

_____                 I do not desire to comment further.

_RT_                      I desire to comment further as shown on this and/or the

following pages.

9. How/Why did anyone assume I did not require an accommodation?

Kindly reference my affidavit.  SOA Miranda confirmed being advised of my having a medical

condition by SAO Tseng and then went on to say she did not consider it appropriate to enquire

further about my medical treatment, but did not ask or correlate if the medical conditions

affected my job performance in any way.

I notified USCIS on various occasions about my disabilities. Kindly reference my affidavit and

formal complaint. Although SAO Miranda implies that somehow listing my medical conditions in

the Emergency Data Sheet in the "optional" field makes it less significant, it still does not detract

from the fact I notified USCIS of my medical conditions on multiple occasions and through

different methods. My disability is also visible, as noted in the affidavit of Mr. Radel.


14. My request to work maxi-flex was to accommodate my medical appointment schedule, which

was regular due to my disabilities. This was clear to my supervisor since it was not a request for a

one-time change, but for a permanent change to my schedule.  SAO Miranda also failed to

engage in further discussion regarding my request for reasonable accommodation.  Kindly note.

Page _1_ of _25_ Pages              Initials: _RT_

"[a] request does not have to include any special words, such as "reasonable accommodation,"

"disability," or "Rehabilitation Act.' A request is any communication in which an individual asks or

states that he or she needs USCIS to provide or to change something because of a medical

condition. A supervisor, manager, or OEOI Disability Accommodation Program staff, should ask

an individual whether he or she is requesting a reasonable accommodation if the nature of the

initial communication is unclear" (Management Directive: Disability Accommodations for

Employees and Job Applicants,  Effective Date: May 7, 2015, USCIS Management Directive No.

256-006; Page 5; https://www.uscis.gov/sites/default/files/document/legal-docs/Disability-

Accommodations-for-Employees-and-Job-Applicants-MD-256-006.pdf. (accessed November 21,

2020)).

Reasonable accommodation is defined as "[a]ny change in the workplace or the way things are

customarily done that provides an equal employment opportunity to an individual with a

disability…[R]easonable accommodations can cover most things that enable an individual

to…perform a job…and may include, but is not limited to: modifying work schedules, granting

breaks or providing leave; altering how or when job duties are performed, removing and/or

substituting a marginal function; providing telework; making changes in workplace policies;

providing assistive technology; removing an architectural barrier; or providing a reassignment to

another job." (*Id.*. page 3)


**15.** Kindly reference my affidavit


**16.** Kindly reference my affidavit.


**17.** Kindly reference my affidavit and Response 63 below. My request to work maxi-flex was to

accommodate my medical appointment schedule, which was regular due to my disabilities. This

Page __2__ of __25__ Pages                    Initials: __RT__

was clear to my supervisor since it was not a request for a one-time change, but for a permanent change to my schedule. SAO Miranda also failed to engage in further discussion regarding my request for reasonable accommodation. Kindly note, "[a] request does not have to include any special words, such as "reasonable accommodation," "disability," or "Rehabilitation Act." A request is any communication in which an individual asks or states that he or she needs USCIS to provide or to change something because of a medical condition. A supervisor, manager, or OEOI Disability Accommodation Program staff, should ask an individual whether he or she is requesting a reasonable accommodation if the nature of the initial communication is unclear" (Management Directive: Disability Accommodations for Employees and Job Applicants. Effective Date: May 7, 2015. USCIS Management Directive No. 256-006: Page 5; https://www.uscis.gov/sites/default/files/document/legal-docs/Disability-Accommodations-for-Employees-and-Job-Applicants-MD-256-006.pdf (accessed November 21, 2020)). Reasonable accommodation is defined as: "Any change in the workplace or the way things are customarily done that provides an equal employment opportunity to an individual with a disability… reasonable accommodations can cover most things that enable an individual to. perform a job... and may include, but is not limited to: modifying work schedules, granting breaks or providing leave; altering how or when job duties are performed; removing and/or substituting a marginal function; providing telework; making changes in workplace policies, providing assistive technology, removing an architectural barrier, or providing a reassignment to another job." (Id., page 3)

18. Kindly reference my affidavit. My door is always closed, whether I am in my office or not, unless housekeeping vacuums and I hold the door for him/her and move chairs around for them. My preference to close the door while working is because I conduct interviews and also because my hallway is a high foot traffic area as the applicant waiting room is nearby. The large

Page __3__ of __25__ Pages          Initials: _KT_

fan or turbine off the ceiling in front of the office next door to me would also vibrate and occasionally be loud. The multiple footsteps and conversations, as well as other noises throughout the day, would be louder and more distracting were I to leave my door open. January 28, 2020: Kindly reference my affidavit.

January 30, 2020: Kindly reference my affidavit. SAO Miranda monitors my work time, specifically when my Skype logs on. This is how she knows I've arrived in the office or she calculates my work time. Her office is situated behind the Duty Officer's Desk Area and PIV Office and she would have to go out of her way across a large open area to get to my office even if my office was near to the Duty Officer Desk. A partial office map is available for reference in the corresponding Addendum. It was also not the first time she was DO. Kindly also refer to the e-mail of March 23, 2020 in the Addendum as an example of how she monitors my time to the minute on skype, as well as her Affidavit Response # 56 where she confirms this.

March 04, 2020: Kindly reference my affidavit. I recall the March 04, 2020 date because on or around February 26, 2020 – March 03, 2020, SAO Miranda was at TDY. During this time we were also getting increasing reports/emails about the concerns for corona virus. On February 27, 2020, I interviewed an applicant and his son and noted the addresses listed in his application as being in Wuhan and he mentioned his daughter being unable to go back to another country to continue her studies because of the Corona virus. This was noted in my interview notes. I recall he and his son entered the US in December 2019. SAO Miranda returned to the office March 04, 2020 and that is when I was able to mention my concerns to her in person. She dismissed my health concerns despite confirming SAO Tseng advised her of my medical condition.

Page __4__ of __25__ Pages          Initials: __RT__

March 05, 2020: Kindly reference my affidavit.

19. Kindly reference my affidavit.

20. Kindly reference my affidavit and Response 63.

My request to work maxi-flex was to accommodate my medical appointment schedule, which was regular due to my disabilities. This was clear to my supervisor since it was not a request for a one-time change, but for a permanent change to my schedule. SAO Miranda also failed to engage in further discussion regarding my request for reasonable accommodation. Kindly note, "[a] request does not have to include any special words, such as "reasonable accommodation," "disability," or "Rehabilitation Act." A request is any communication in which an individual asks or states that he or she needs USCIS to provide or to change something because of a medical condition. A supervisor, manager, or OEOI Disability Accommodation Program staff, should ask an individual whether he or she is requesting a reasonable accommodation if the nature of the initial communication is unclear" (Management Directive: Disability Accommodations for Employees and Job Applicants, Effective Date: May 7, 2015. USCIS Management Directive No. 256-006; Page 5: https://www.uscis.gov/sites/default/files/document/legal-docs/Disability-Accommodations-for-Employees-and-Job-Applicants-MD-256-006.pdf. (accessed November 21, 2020)).

Reasonable accommodation is defined as: "Any change in the workplace or the way things are customarily done that provides an equal employment opportunity to an individual with a disability ...[R]easonable accommodations can cover most things that enable an individual to...perform a job...and may include, but is not limited to: modifying work schedules ..." (Id., page 3).

Page __5__ of __25__ . Pages          Initials: __RT__

21.

a. Kindly reference my affidavit. Kindly also reference Response 56 below regarding SAO Miranda's feedback and communication.

b. SAO Miranda's statements that I failed to communicate with her about the completed backlog cases are untrue. Kindly reference the emails dated March 05, 2020, February 19, 2020, February 18, 2020, and February 14, 2020 in the corresponding Addendum. The emails SAO Miranda sent on March 05, 2020, February 25, 2020, February 19, 2020 are part of the chain.

March 05, 2020:

One of SAO Miranda's emails on this day claims I failed to communicate with her regarding the status of cases that I had adjudicated and then submitted to the BLR instead of supervisory review. However, I communicated the status of the cases to her on February 14, 2020 and February 18, 2020, and specifically told her I had already written the assessments for certain cases and need more time to wrap up some of them. Yet she insisted I turn in the cases she listed in her emails of February 19, 2020 through March 05, 2020. So this is yet another example of SAO Miranda's dishonesty and how she purposely misled her first-line supervisor (my second-line supervisor) about my performance when she sent a copy of the e-mail to her supervisor and placed a printed copy in my employee file as she stated in her affidavit. And as mentioned in my affidavit, SAO Miranda mentioned she looked at one of the cases and thought something was wrong with it so she was just going to put it in the backlog and I don't have to worry about it. She did not even tell me specifically what was wrong with it because she was diverting cases from her own workload. She did it for another case, which she did email me about and eventually placed it in the backlog as well instead of reviewing the case properly and having me "fix it according to her standards.'

Page __6__ of   25   Pages          Initials: __R.T__

I also advised SAO Miranda of requiring to update the BISC because a new BISC was introduced in December 2019/January 2020 (from what I recall) for office use, which included additional checks and we were instructed then to use the new BISC moving forward.  As I had yet to submit the cases, this is why I told SAO Miranda I was going to update the old BISC. At no time was I "visibly upset" nor did I interrupt her. As always, I wait for a moment of pause to ensure SAO Miranda was finished before responding.  However, she then proceeded to raise her voice to me as well as talk over me as I was speaking. I had to lean back further on my chair as she was beginning to rise from her chair and lean over my desk, moving her neck and with her hand out towards me because she was moving in a threatening manner and violating my personal space

SAO Miranda never said "imitating someone verbally or by facial expression." She accused me of making faces at her, which was untrue. Kindly reference my affidavit regarding March 05, 2020.


22. Kindly reference Response 21b. above, the corresponding Addendum and my affidavit.


23. Kindly reference Response 63.

My request to work maxi-flex was to accommodate my medical appointment schedule, which was regular due to my disabilities  This was clear to my supervisor since it was not a request for a one-time change, but for a permanent change to my schedule   SAO Miranda also failed to engage in further discussion regarding my request for reasonable accommodation.  Kindly note. "[a] request does not have to include any special words, such as  reasonable accommodation," "disability," or "Rehabilitation Act." A request is any communication in which an individual asks or states that he or she needs USCIS to provide or to change something because of a medical condition. A supervisor, manager, or OEOI Disability Accommodation Program staff, should ask

Page __7__ of __25__  Pages                Initials: _KS_____

an individual whether he or she is requesting a reasonable accommodation if the nature of the initial communication is unclear" (Management Directive: Disability Accommodations for Employees and Job Applicants, Effective Date: May 7, 2015, USCIS Management Directive No. 256-006: Page 5; https://www.uscis.gov/sites/default/files/document/legal-docs/Disability-Accommodations-for-Employees-and-Job-Applicants-MD-256-006.pdf  (accessed November 21, 2020)).

Reasonable accommodation is defined as: "Any change in the workplace or the way things are customarily done that provides an equal employment opportunity to an individual with a disability... reasonable accommodations can cover most things that enable an individual to...perform a job...and may include, but is not limited to: modifying work schedules..." (Id. page 3).

24. Kindly reference my Affidavit.

25. Kindly reference my Formal Complaint and Affidavit of when I notified USCIS on various occasions about my medical condition. I began requesting leave once I got back from FLETC around mid-August 2019. Moreover, appointments with specialists can have a one or two month wait. In addition to Rheumatology, I had pulmonary and cardiovascular concerns. Moreover, SAO Miranda confirmed in her Affidavit Response #9 that SAO Tseng informed her I had a medical condition.

26. Kindly reference Response 63.

My request to work maxi-flex was to accommodate my medical appointment schedule, which was regular due to my disabilities. This was clear to my supervisor since it was not a request for a one-time change, but for a permanent change to my schedule. SAO Miranda also failed to

Page __8__ of __25__ Pages          Initials: _RK___

000146

engage in further discussion regarding my request for reasonable accommodation. Kindly note, "[a] request does not have to include any special words, such as 'reasonable accommodation,' 'disability,' or 'Rehabilitation Act.' A request is any communication in which an individual asks or states that he or she needs USCIS to provide or to change something because of a medical condition. A supervisor, manager or OEOI Disability Accommodation Program staff, should ask an individual whether he or she is requesting a reasonable accommodation if the nature of the initial communication is unclear" (Management Directive: Disability Accommodations for Employees and Job Applicants. Effective Date: May 7, 2015, USCIS Management Directive No. 256-006. Page 5; https://www.uscis.gov/sites/default/files/document/legal-docs/Disability-Accommodations-for-Employees-and-Job-Applicants-MD-256-006.pdf (accessed November 21, 2020)).

Reasonable accommodation is defined as: "Any change in the workplace or the way things are customarily done that provides an equal employment opportunity to an individual with a disability... reasonable accommodations can cover most things that enable an individual to.. perform a job...and may include, but is not limited to: modifying work schedules. ." (Id., page 3)

27. Kindly reference my Affidavit and Response 16 above.

28. Kindly reference my Affidavit and Response 18 above.

29. Kindly reference Response 63.

My request to work maxi-flex was to accommodate my medical appointment schedule, which was regular due to my disabilities. This was clear to my supervisor since it was not a request for a one-time change, but for a permanent change to my schedule. SAO Miranda also failed to

Page __9__ of __25__ Pages                    Initials: _____

engage in further discussion regarding my request for reasonable accommodation.  Kindly note.

"[a] request does not have to include any special words, such as "reasonable accommodation,"

"disability," or "Rehabilitation Act." A request is any communication in which an individual asks

or states that he or she needs USCIS to provide or to change something because of a medical

condition. A supervisor  manager, or OEOI Disability Accommodation Program staff, should ask

an individual whether he or she is requesting a reasonable accommodation if the nature of the

initial communication is unclear" (Management Directive: Disability Accommodations for

Employees and Job Applicants,  Effective Date: May 7, 2015. USCIS Management Directive No.

256-006; Page 5: https://www.uscis.gov/sites/default/files/document/legal-docs/Disability-

Accommodations-for-Employees-and-Job-Applicants-MD-256-006.pdf. (accessed November

21, 2020)).

Reasonable accommodation is defined as: "Any change in the workplace or the way things are

customarily done that provides an equal employment opportunity to an individual with a

disability. . reasonable accommodations can cover most things that enable an individual

to  .perform a job...and may include, but is not limited to: modifying work schedules, granting

breaks or providing leave; altering how or when job duties are performed; removing and/or

substituting a marginal function; providing telework; making changes in workplace policies;

providing assistive technology; removing an architectural barrier; or providing a reassignment to

another job." (Id. page 3)


30. Kindly reference my affidavit.  SAO Miranda had already begun leaning over my desk as

she was berating me.  It was a threatening move and a violation of my personal space.

especially as she had her hand out.


31. Kindly reference my affidavit

Page   10   of   25   Pages              Initials: ___

35. The only item "incomplete" about the maxiflex/AWS request was the placement of the EOD

date located above the schedule table of the form, which she asked for on March 18, 2020

Kindly reference the Maxi-Flex Request pdf. On March 17, 2020  I had corrected my initial

submission because I changed the work times I was initially requesting. The only thing she

asked me outside of the EOD date was the reasons for my maxiflex/AWS request (on March 19,

2020).

Kindly note that as I mentioned in my email to her, I had never submitted this request before. I

initially tried to request the schedule change through my telework request because of

COVID/office closure, and I thought I could do it simultaneously within the telework request

However, SAO Miranda stated that the Telework request needed to be approved based on my

original/current work schedule, i.e. the 5/8 schedule, and if I wanted to change my work

schedule then I needed to apply for maxi-flex/AWS. So I submitted my Telework request based

on my 5/8 schedule and then submitted the Maxiflex/AWS request simultaneously.


36. My request to work maxi-flex was to accommodate my medical appointment schedule,

which was regular due to my disabilities. This was clear to my supervisor since it was not a

request for a one-time change, but for a permanent change to my schedule.  SAO Miranda also

failed to engage in further discussion regarding my request for reasonable accommodation.

Kindly note, "[a] request does not have to include any special words, such as "reasonable

accommodation," "disability," or "Rehabilitation Act." A request is any communication in which

an individual asks or states that he or she needs USCIS to provide or to change something

because of a medical condition  A supervisor, manager, or OEOI Disability Accommodation

Program staff, should ask an individual whether he or she is requesting a reasonable

accommodation if the nature of the initial communication is unclear" (Management Directive:

Disability Accommodations for Employees and Job Applicants,  Effective Date: May 7, 2015,

Page __11__ of __25__ Pages               Initials: __RI__

USCIS Management Directive No. 256-006, Page 5;

https://www.uscis.gov/sites/default/files/document/legal-docs/Disability-Accommodations-for-Employees-and-Job-Applicants-MD-256-006.pdf. (accessed November 21. 2020))

Reasonable accommodation is defined as: "Any change in the workplace or the way things are customarily done that provides an equal employment opportunity to an individual with a disability . reasonable accommodations can cover most things that enable an individual to…perform a job,   and may include, but is not limited to. modifying work schedules…providing telework .." (*Id.*, page 3).

As mentioned in my Affidavit, because I was new. I was still accumulating leave time, which I have to use not only for myself but my minor child  Moreover, my Rheumatologist  Dr. Elizabeth Volkmann, who is an expert in my rare condition, both with ███████████████████ Disease complications, held her appointments only on Wednesdays at the UCLA Medical Center.  And as previously mentioned, in order to ensure interviews were being carried out as scheduled, I avoided scheduling appointments that would interfere with that as well. Therefore, this is why typically my Wednesdays were occupied and any other leave I took, even if for an hour or two on a non-Wednesday, also took up my write-up time. By requesting a schedule change to accommodate my medical appointments. that ensured my medical treatment/ appointments did not interfere with my write-up time and I can use them should a medical emergency arise  For example, in March 2018, I was hospitalized at the UCLA Medical Center. This was unexpected because I was just attending a rheumatology appointment and the doctor. Dr. Alan Gorn, another renowned specialist in scleroderma, had me admitted immediately and I was in the ICU for nine (9) days.

In addition, the leave system or rules in the office are not advantageous to the person requesting any partial leave on any working day because the day still counts as a business day in terms of counting timeliness. Therefore  if I am expected to conduct two interviews a day

Page  12  of  25  Pages              Initials:  RK

(non-Wednesdays) and then draft/turn in 1.5 cases per day, and I take leave after I completed interviews, even if for an hour or two. as well as anytime on Wednesdays. I have just used up my write-up time and the day is still counted as a business day when calculating timeliness for all cases that have been interviewed. So unless you take a full day's leave, only then does it not count against you for production purposes. I hadn't realized this until the Union president mentioned it post-termination. And as mentioned. I was still new and accumulating leave time. sick and personal. So I wanted to save sick and personal leave should I have no other option or an emergency arises, as described above

**37.** SAO Miranda only asked for my EOD date and the reason why I requested the schedule change. I was not asked for medical documentation before or after I mentioned my medical treatments/appointments. Kindly reference the maxiflex request pdf and my affidavit. Kindly note SAO Miranda's manipulation of words and information to depict an inaccurate picture instead of reality.

My request to work maxi-flex was to accommodate my medical appointment schedule, which was regular due to my disabilities. This was clear to my supervisor since it was not a request for a one-time change. but for a permanent change to my schedule.  SAO Miranda also failed to engage in further discussion regarding my request for reasonable accommodation.  Kindly note. "[a] request does not have to include any special words, such as "reasonable accommodation," "disability." or "Rehabilitation Act." A request is any communication in which an individual asks or states that he or she needs USCIS to provide or to change something because of a medical condition. A supervisor. manager. or OEOI Disability Accommodation Program staff. should ask an individual whether he or she is requesting a reasonable accommodation if the nature of the initial communication is unclear" (Management Directive. Disability Accommodations for Employees and Job Applicants,  Effective Date: May 7, 2015, USCIS Management Directive No.

Page __13__ of __25__ Pages                    Initials: __XT__

256-006; Page 5; https://www.uscis.gov/sites/default/files/document/legal-docs/Disability-Accommodations-for-Employees-and-Job-Applicants-MD-256-006.pdf. (accessed November 21, 2020)).

Reasonable accommodation is defined as: "Any change in the workplace or the way things are customarily done that provides an equal employment opportunity to an individual with a disability... reasonable accommodations can cover most things that enable an individual to.. perform a job...and may include, but is not limited to: modifying work schedules, .providing telework..." (*Id.*, page 3).


38. Kindly reference my Affidavit and Rebuttal Response dated November 11, 2020. My request to work maxi-flex was to accommodate my medical appointment schedule, which was regular due to my disabilities. This was clear to my supervisor since it was not a request for a one-time change, but for a permanent change to my schedule. SAO Miranda also failed to engage in further discussion regarding my request for reasonable accommodation. Kindly note, "[a] request does not have to include any special words, such as "reasonable accommodation," "disability," or "Rehabilitation Act." A request is any communication in which an individual asks or states that he or she needs USCIS to provide or to change something because of a medical condition. A supervisor, manager, or OEOI Disability Accommodation Program staff, should ask an individual whether he or she is requesting a reasonable accommodation if the nature of the initial communication is unclear" (Management Directive: Disability Accommodations for Employees and Job Applicants, Effective Date: May 7, 2015, USCIS Management Directive No 256-006; Page 5; https://www.uscis.gov/sites/default/files/document/legal-docs/Disability-Accommodations-for-Employees-and-Job-Applicants-MD-256-006.pdf. (accessed November 21, 2020)).


Page __14__ of __25__ Pages          Initials: _RT_ .

Reasonable accommodation is defined as: "Any change in the workplace or the way things are customarily done that provides an equal employment opportunity to an individual with a disability... [R]easonable accommodations can cover most things that enable an individual to ...perform a job,...and may include, but is not limited to: modifying work schedules...providing telework..." (Id. page 3).

39. Kindly reference my affidavit wherein SAO Miranda glossed over my mentioning my medical treatments/appointments as a reason for my backlog in January 2020, the times she looked at my hands with derision, and dismissed my health concerns about COVID-19. Given the history and frequency of discriminatory actions against me by SAO Miranda, as well as the subsequent denial of my reasonable accommodation request co-signed by Deputy Director Marianne Hong. I was unclear to any other recourse. SAO Miranda confirms in her response to #9 in her affidavit that she was informed by SAO Tseng that I had medical conditions. Moreover, my Emergency Data Sheet I provided to SAO Tseng in end summer/early fall 2019 which was to be placed in my employee file and SAO Miranda had access to, mentioned my medical conditions.

40. I was not requesting a change of duties. I made a reasonable accommodation request to change my schedule. Kindly refer to response 14 above. I also mentioned my medical treatments/appointments occupying my write-up time as contributing to my backlog in January 2020 as SAO Miranda and I were discussing my backlog. SAO Miranda dismissed it. Kindly reference my Affidavit.

41. My request to work maxi-flex was to accommodate my medical appointment schedule, which was regular due to my disabilities. This was clear to my supervisor since it was not a

Page __15__ of __25__ Pages        Initials: __RS__

request for a one-time change, but for a permanent change to my schedule. SAO Miranda failed to engage in further discussion regarding my request for reasonable accommodation, prior to being given SAO Miranda's reasons for the denial. In fact, SAO Miranda recommended the denial of the request (SAO Miranda's Affidavit response #43). Following denial, I informed SAO Miranda of wanting to reapply for maxiflex. However, SOA Miranda did not offer an alternate either to address my medical treatment/appointment concerns. Kindly reference the Maixflex Request pdf and my affidavit

**42.** SAO Miranda's assumption is incorrect. I realized my medical appointments and treatments were taking up more and more of my write-up time, and is why I requested the Maxiflex. As mentioned in Response 35 above, I initially indicated my schedule change in the telework request since we were already changing schedules due to COVID-19/office closure. However, SAO Miranda indicated I could only apply for telework based on my current schedule. i.e. 5/8. I then submitted the maxiflex request as a reasonable accommodation to change my original schedule to accommodate my medical treatment/appointments: and once approved, be able to tailor the telework schedule according to the new schedule change once approved. This solution was to improve my overall efficiency whilst working around my disabilities and medical treatments/ appointments. Kindly also reference my Maxiflex Request pdf, Affidavit Rebuttal Response 1 (dated November 11, 2020), and response 43 below.

**43.** My request to work maxi-flex was to accommodate my medical appointment schedule, which was regular due to my disabilities. This was clear to my supervisor since it was not a request for a one-time change, but for a permanent change to my schedule. SAO Miranda also failed to engage in further discussion regarding my request for reasonable accommodation. Kindly note. "[a] request does not have to include any special words, such as "reasonable accommodation,

Page __16__ of __25__ Pages          Initials: __RS__

"disability," or "Rehabilitation Act." A request is any communication in which an individual asks or states that he or she needs USCIS to provide or to change something because of a medical condition. A supervisor, manager, or OEOI Disability Accommodation Program staff, should ask an individual whether he or she is requesting a reasonable accommodation if the nature of the initial communication is unclear" (Management Directive: Disability Accommodations for Employees and Job Applicants,  Effective Date. May 7, 2015. USCIS Management Directive No. 256-008; Page 5: https://www.uscis.gov/sites/default/files/document/legal-docs/Disability-Accommodations-for-Employees-and-Job-Applicants-MD-256-006.pdf. (accessed November 21, 2020)).

Reasonable accommodation is defined as: "Any change in the workplace or the way things are customarily done that provides an equal employment opportunity to an individual with a disability.. [R]easonable accommodations can cover most things that enable an individual to. .perform a job. .and may include. but is not limited to  modifying work schedules..." (Id.. page 3).

46. Kindly reference my affidavit and Response 63

47. Kindly reference my affidavit and Response 63

48. My request to work maxi-flex was to accommodate my medical appointment schedule. which was regular due to my disabilities. This was clear to my supervisor since it was not a request for a one-time change, but for a permanent change to my schedule.  SAO Miranda failed to engage in further discussion regarding my request for reasonable accommodation  Kindly note. "A request does not have to include any special words. such as "reasonable accommodation." "disability." or "Rehabilitation Act." A request is any communication in which an individual asks or states that he

Page __17__ of __25__ Pages                    Initials: _____

or she needs USCIS to provide or to change something because of a medical condition. A supervisor, manager, or OEOI Disability Accommodation Program staff, should ask an individual whether he or she is requesting a reasonable accommodation if the nature of the initial communication is unclear." (Management Directive: Disability Accommodations for Employees and Job Applicants.  Effective Date. May 7, 2015, USCIS Management Directive No. 256-006, page 5. https://www.uscis.gov/sites/default/files/document/legal-docs/Disability-Accommodations-for-Employees-and-Job-Applicants-MD-256-006.pdf. (accessed November 21, 2020)). Reasonable accommodation is defined as "[a]ny change in the workplace or the way things are customarily done that provides an equal employment opportunity to an individual with a disability . reasonable accommodations can cover most things that enable an individual to...perform a job,   and may include, but is not limited to  modifying work schedules, . " (Id. page 3).

Kindly also reference my affidavit when I mentioned my medical appointment/treatment to her in January 2020, when she looked at my hands, or when she dismissed my health concern about COVID-19 on March 04, 2020. SAO Miranda also confirmed being informed of my medical conditions by SAO Tseng.


**52.** Kindly reference Deputy Director Marianne Hong's Affidavit Response 21 "On or around March 5, 2020, Complainant's first-level supervisor submitted a form to Labor and Employee Relations to initiate termination of Complainant's probation." which demonstrates SAO Miranda's dishonesty in claiming she did not know why I was terminated. She deceptively maneuvered around this response by framing it about not being provided a copy of the termination letter when the allegations in the termination letter stemmed from SAO Miranda's own narratives directly to my third-line supervisor and LER to orchestrate my termination. as stated in Deputy Director Marianne Hong's Affidavit and SAO Miranda's Response #21b in her

Page __18__ of . __25__ Pages            Initials:  R↑ __

affidavit where she stated she emailed a memo to her Section Chief and placed a hard copy in my employee folder, as well as SAO Miranda's Affidavit response #54 where she "communicated performance and conduct concerns to [her] first line supervisor (Complainant's second-line supervisor)," and along with any other memos she chose to "memorialize." (Response 21a.).  SAO Miranda presents multiple false façades: one to me verbally  one to me in her emails and another to management. which has been demonstrated in my affidavit and will be seen in further detail in the enclosed Addendum, her e-mails to management and her statements in her affidavit.  SAO Miranda can "memorialize" any emails or memos but they are often an inaccurate picture of reality to the point of a lie, e.g. her accusation of my being disrespectful to her.

Examples of SAO Miranda s discriminatory actions based on my disabilities and age include, but are not limited to the following: 1)  Consistently demonstrating a lack of understanding of EEO processes; 2) Failing to meet her obligations with respect to the provision of reasonable accommodations as per USCIS Management Directives; 3) Purposely recommending the denial of my reasonable accommodation request as stated in her affidavit: 4) Failing to engage and address my concerns regarding my medical appointment/treatments affecting my write-up time and hence timeliness; 5) Failing to engage in my health concerns regarding COVID-19 due to my higher risk of susceptibility as a result of my compromised immune system  which SAO Miranda confirms she was made aware of by SAO Tseng. SAO Miranda also had access to my employee file containing my emergency data sheets that I submitted to USCIS in late summer/early fall, 6) Her looks of derision towards my hands after I mentioned medical treatment/appointment, when I pointed out a detail on a file, as well as when my hands were placed in front of me on my desk particularly when she berated me: 7) Providing a hostile and intimidating work environment: 8) Berating me in public and private settings. 9) Purposely sabotaging my timeliness performance rating by placing me in a backlog project, which also

Page   19   of   25   Pages                 Initials: _RT_

negatively impacted my daily work tasks. 10) Requesting my termination to the LER through
deception.

56. There will always be a multitude of first-time scenarios and I expect that other SAOs will
offer different perspectives and may handle cases differently from others. Even experienced
AOs still have returns and follow-ups for a variety of reasons, despite being in their respective
positions for x number of years. AOs are rotated to a different SAO every six months and with
that brings a different SAO perspective, skill and management style. However, SAO Miranda
returned an exorbitant amount of cases in the short period of time she supervised me,
particularly in the first two and a half months specifically for a word choice or sentence
alteration, which did not make the case more "legally sufficient." Kindly refer to the Addendum
for further details. I also understood that SAO Miranda was inexperienced as a SAO. I therefore
did my best to adapt and comply with her various demands. However, she continually used her
position of authority to frequently carry out her discriminatory actions, including harassment, and
created a hostile and intimidating work environment for me. SAO Miranda has made statements
that are untrue and paint an inaccurate picture of situations. Kindly reference Response 21b and
56 in the Addendum as examples.

I also made multiple efforts to discuss my cases with her and mostly in person as the files are
with me and it would be easier to reference specific information I wanted to highlight. I often
discussed my cases personally with SAO Tseng and other SAOs for the same reason.
However, each time I approached SAO Miranda to discuss my cases with her, she insisted that
her point of view was correct and essentially mine was invalid. Again, it was difficult and
frustrating to discuss anything with her because of her constant need to be correct all the time.
She did not provide a constructive environment. I also discussed my cases and SAO Miranda's
feedback with colleagues, specifically Senior Asylum Officer Elena Oganova and Immigration

Page ___20___ of ___25___ Pages                    Initials: _RT___

Officer- FDNS (Fraud Detection and National Security) Phillip Johnson, who is my mentor. They both have agreed with my assessments of the cases. Senior Asylum Officer Oganova even told me that she had encountered my cases I had to submit to the general backlog and she said she did not find anything wrong with them and that I had also asked questions (interview) she did not think to ask.

For the sake of brevity, I have addressed the statements SAO Miranda mentioned in her Affidavit, especially the untrue statements alleged by SAO Miranda, in the Addendum.

More Importantly, SAO Miranda's discriminatory actions based on my disabilities and age have included, but are not limited to the following; 1)  Consistently demonstrating a lack of understanding of EEO processes; 2) Failing to meet her obligations with respect to the provision of reasonable accommodations as per USCIS Management Directives; 3) Purposely recommending the denial of my reasonable accommodation request as stated in her affidavit; 4) Failing to engage and address my concerns regarding my medical appointment/treatments affecting my write-up time and hence timeliness: 5) Failing to engage in my health concerns regarding COVID-19 due to my higher risk of susceptibility as a result of my compromised immune system, which SAO Miranda confirms she was informed of by SAO Tseng; SAO Miranda also had access to my employee file containing my emergency data sheet I submitted previously to USCIS in late summer/early fall; 6) Her looks of derision towards my hands after I mentioned medical treatment/appointment, or when I pointed out a detail on a file, as well as when my hands were placed in front of me on my desk particularly when she berated me, 7) Providing a hostile and intimidating work environment; 8) Berating me in public and private settings. 9) Purposely sabotaging my timeliness performance rating by placing me in a backlog project, which also negatively impacted my daily tasks; 10) Requesting my termination to LER through deception.

Page ___21___ of ___25___ Pages          Initials: _RT_

Lastly, kindly note that I have many years of experience in fraud detection working for the British Government. I have lived and worked in Pakistan, trained in the UK (United Kingdom). I have also worked at the British Consulate-General in New York and been deployed to UK Embassies and High Commissions in Jamaica, Colombia and Brazil, adjudicating cases for a majority of the western hemisphere, with the exception of Cuba. And during my time as an Asylum Officer, I adjudicated cases from foreign nationals across the globe. In fact, Mr. Radel was impressed with my CV when he interviewed me in 2015, stating it was unique and he had never seen a résumé with experience like mine. Part of my duties as an Asylum Officer also included identifying fraud, inconsistencies, and addressing other credibility concerns. And it is this combined experience that has allowed me to see right through SAO Miranda's deceptions, despite my disabilities.

57 Kindly reference response 56 above and the corresponding Addendum.

58. Kindly reference my affidavit, Responses 56 and 57 above, the corresponding Addendum, and my redacted biweekly timesheets pdf. I never had the opportunity to submit Biweekly timesheet PP06 as I was terminated by then. With regards to her complaint about "my struggling to adhere to telework policies," kindly reference Response 56 in the corresponding Addendum As can be seen in multiple responses, SAO Miranda is again manipulating information to depict an inaccurate picture to suit her own agenda.

59. SOA Miranda claimed no knowledge regarding whether Officer Ly was on probationary employment. However, in her Response #60, she was aware Ms. Ly had a 30-day grace period, given to all new employees who have recently received asylum officer training.

Page  22  of  25  Pages          Initials:  RT

Kindly also reference my Affidavit. My conversation with AO Mai Ly was about her personal backlog (12 cases that are untimely) not being assigned to work on other people's backlogs and that SAO Miranda was putting her in a backlog write up time so she could work on them. At the time I had this conversation with her. AO Ly felt bad about having 12 cases and I told her that my previous SAO told me that 12 was a normal load for other AOs, so she should not feel bad. but I told her that if SAO Miranda stated it would be helpful to her to be able to catch up and essentially start over. as I was told it would be helpful for me, then she should proceed   This conversation happened in her office and I recall asking her how SAO Miranda treated her (Affidavit).  Sometime later. during the week ending March 20, 2020, Officer Ly told me she sent her 12 cases to backlog and it does not appear to have negatively affected her despite their untimely status or her own probationary status. This last conversation happened in my office prior to us teleworking.  A SAO has discretion to waive any cases from being counted as untimely, including for times when an AO has been given time to work on their own personal backlogs.  However, SAO Miranda apparently never provided this for me despite claims of helpfulness; but instead used it to sabotage my timeliness and PPA. and then used performance. as well as her lie about my misconduct against her. to orchestrate my termination. The fact that SAO Miranda had given me time off my normal interview schedule to work on completing cases in my backlog was a project in itself. especially considering that SAO Miranda's preparation for and after the write up time took more than the time I was allotted and interfered with my regular daily work because she had me go through my case list a few times and berated me for including the status of each case as she was only concerned with whether they were untimely for her purpose of later forwarding them to the general backlog.   There was no need for me to be on this project especially if SAO Miranda counted all the cases I worked on against me in one biweekly period. which dramatically reduced my timeliness for biweekly

period PP03, instead of allowing me to handle my own caseload on my own time, as other AOs were.

61. Kindly reference my Affidavit and response 63.

62. Kindly reference my Affidavit and response 63.

63. My request to work maxi-flex was to accommodate my medical appointment schedule, which was regular due to my disabilities. This was clear to my supervisor since it was not a request for a one-time change, but for a permanent change to my schedule   SAO Miranda also failed to engage in further discussion regarding my request for reasonable accommodation. Kindly note, "[a] request does not have to include any special words, such as 'reasonable accommodation,' 'disability,' or 'Rehabilitation Act.' A request is any communication in which an individual asks or states that he or she needs USCIS to provide or to change something because of a medical condition. A supervisor, manager, or OEOI Disability Accommodation Program staff, should ask an individual whether he or she is requesting a reasonable accommodation if the nature of the initial communication is unclear" (Management Directive: Disability Accommodations for Employees and Job Applicants,  Effective Date: May 7, 2015, USCIS Management Directive No  256-006; Page 5; https://www.uscis.gov/sites/default/files/document/legal-docs/Disability-Accommodations-for-Employees-and-Job-Applicants-MD-256-006.pdf. (accessed November 21, 2020)). Reasonable accommodation is defined as: "Any change in the workplace or the way things are customarily done that provides an equal employment opportunity to an individual with a disability…[R]easonable accommodations can cover most things that enable an individual

Page ___24___ of ___25___ Pages          Initials: ℞𝒯 __

to. .perform a job .and may include, but is not limited to: modifying work schedules. ." (Id. page 3).

Kindly note. SAO Miranda confirmed in her affidavit response #9 that she was informed of my medical conditions by SAO Tseng. It is interesting to note that in every response where she denies discriminating against my age, disability or reasonable accommodation request, she specifically adds the statement that she has "no knowledge" of my age and "no knowledge" of my having submitted a reasonable accommodation request: yet SAO Miranda makes no mention of her knowledge about my disabilities (Kindly reference SAO Miranda Affidavit Response #s 17, 20, 23. 26. 29, 46, 47. 61, 62). She claims she never noticed I had a disability or had any problems with my hands, which she looked at with derision. Yet, Mr. Radel, who met me the first time in July 2015, recalls he noticed a problem with one of my hands during my interview, and he has seen me only a few other times in passing since my EOD. Kindly reference Director Radel's affidavit. SAO Miranda also confirmed being informed of my medical condition by SAO Tseng  Kindly reference the e-mail of March 23, 2020 in the Addendum (Response 18) and SAO Miranda's Affidavit Response #56 as examples of how SAO Miranda was closely monitoring my work time to the minute

**Signature**

**Date** 11/24/2020

*Jennifer Weihert*
**Investigator's Signature**

Page  25  of . 25 _ Pages          Initials: RT

**RICA TY - ADDENDUM TO REBUTTAL RESPONSE 2 (in reference to SAO Miranda's Affidavit):**

**18.** Here is an example of SAO Miranda monitoring my work time down to the minute via Skype



Reply  Reply All  Forward  IM

Mon 3/23/2020 10:22 AM

Ty, Rica

RE: TW

To  ☐ Miranda, Myrna M

Hi Myrna,

I was about to change that. I looked at the agenda and lunch is indicated at 12-1230. I will go with the agenda or whenever DM decides to break. Also my skype won't turn on and I don't want to leave webex to try to restart again. It took a while just getting back on.

Rica

**From:** Miranda, Myrna M <myrna.m.miranda@uscis.dhs.gov>
**Sent:** Monday, March 23, 2020 10:19 AM
**To:** Ty, Rica <rica.ty@uscis.dhs.gov>
**Subject:** RE: TW

Hi Rica,

I see you plan to take lunch from 12:45 to 1:15 p.m. - Please remember the I-730 training is from 9-12 and 12:30-2:30.

Also, are you having connectivity problems? I see you've been offline for 50 minutes. Please let me know if you need any help.

**21.a.** January 27 & 28, 2020: Kindly reference my Affidavit

The cases SAO Miranda kept returning to me were common claim cases, specifically Family Planning (from specific country) and religion [from specific nationality], where in I had been submitting these types of cases for months with other SAOs and have been accepted.  SAO Miranda repeatedly returned these cases claiming "legal insufficiency," but was simply her demand and preference for a specific word or phrase choice, which did not make the analysis any more "legal sufficient" than previously.  Doing this repeatedly interfered with my normal day to day tasks and thus impacting my timeliness for other cases.  Kindly refer to Response 56 below for details on the feedback and communication issues claimed.

**21b.** SAO Miranda's statements about not communicating with her about the status of the case are untrue. I communicated the status of the cases, including identifying the ones where I already

Page ___1___ of ___25___ pages                    Initials: _RT___

wrote the assessment in e-mails dated February 14, 2020, and February 18, 2020 and SAO

Miranda still included those cases to submit to BLR in her email chain from 2/19/20 to 3/05/20.



> Reply  Reply All  Forward  IM
>
> Thu 3/5/2020 8:07 AM
> **Miranda, Myrna M**
> **RE: BLR**
>
> To  Ty, Rica
>
> Hi Rica,
>
> Thank you for submitting these cases. I noticed that some of the cases you submitted with a BLR cover sheet were already completed and ready for SAO review. We discussed this earlier, but please make sure to communicate any questions/concerns with me. You sent me a list of cases that were untimely/unsubmitted, which I used to create the of cases for you to prepare for BLR. Please note that if you worked on any of those cases during this time, it was your responsibility to communicate this with me so we can come up with a game plan. This impacts customer service giver that a delay in submitting completed cases can impact when we serve the applicants their decisions.
>
> Thank you,
>
> Myrna Miranda
> Supervisory Asylum Officer
> Los Angeles Asylum Office
> (714) 368-5433



> Reply  Reply All  Forward  IM
>
> Thu 3/5/2020 7:52 AM
> **Ty, Rica**
> **RE: Missing files?**
>
> To  Miranda, Myrna M
>
> **From:** Miranda, Myrna M
> **Sent:** Wednesday, March 04, 2020 6:55 AM
> **To:** Ty, Rica <rica.ty@uscis.dhs.gov>
> **Subject:** RE: BLR
>
> Good morning Rica,
>
> Just following up on the cases I asked you to submit to me for BLR on 2/25. The final deadline for you to submit these cases to me is 2 pm today (please bring them to my office – do not submit to the hub). Please remember our conversation from last week about what to write on the BLR cover sheet under "Brief summary of case" – it does not have to be specific. Please see me with any questions/concerns.
>
> Thank you,
>
> Myrna Miranda
> Supervisory Asylum Officer
> Los Angeles Asylum Office
> (714) 368-5433
>
> **From:** Ty, Rica <rica.ty@uscis.dhs.gov>
> **Sent:** Tuesday, February 25, 2020 5:49 PM



⟲ Reply  ⟲ Reply All  ⟲ Forward  ⟲ IM

Wed 2/19/2020 1:51 PM

Miranda, Myrna M

BLR

To    Ty, Rica

Hi Rica,

We are going to move your untimely/unsubmitted cases to the backlog. Please submit the cases below by noon on Tuesday, February 25th. Please prepare BLR cover sheets for each of them (if you need help filling this out let me know) and make sure the files are assembled and there are interview notes in each of them.  Please RAILS them to me and bring them directly to my office – do not submit them to my hub as there is no space.

The following cases that you submit to BLR will be counted as untimely/unsubmitted:

487
761
584
367
909
000
107

These are cases you were given time to write up earlier this month but did not submit:

077
868
040
535
835
901

These are cases that you interviewed during your grace period:

803
660
536
883
787
779
226

Please let me know if you have any questions.

Thank you,

Myrna Miranda
Supervisory Asylum Officer
Los Angeles Asylum Office
(714) 368-5433

Page   3   of   25   pages          Initials: _____



Tue 2/18/2020 4:01 PM

**Ty, Rica**

**Feb 06, 2020**

To   ☐ Miranda, Myrna M

Hi Myrna,

Apologies for the delay in getting this to you.

I worked on/finished the assessments for the following cases on Feb 06, 2020:

~~XXXXX~~901
~~XXXXX~~779
~~XXXXX~~868
~~XXXXX~~484
~~XXXX~~7461
~~XXXXX~~933
~~XXXX~~8000
~~XXXX~~4736

I have not submitted some of these, but working on assembling and finalizing on global.

Regards,

**Rica Ty** | Asylum Officer | Los Angeles Asylum Office | DHS | USCIS | RAIO
14101 Myford Rd. | Tustin | CA | 92780 | ☎ (714) 368 - 5548 | ✉ Rica.Ty@uscis.dhs.gov



↩ Reply   ↩ Reply All   ➡ Forward   💬 IM

Fri 2/14/2020 12:55 PM

Ty, Rica

RE: Casebook

To   ☐ Miranda, Myrna M

ℹ You replied to this message on 2/14/2020 1:16 PM.

📄 TY Rica _case list 02.14.20.xlsx
15 KB

Hi Myrna,

Please find attached the list

Regards,

**Rica Ty** | Asylum Officer | Los Angeles Asylum Office | DHS | USCIS | RAIO
14101 Myford Rd. | Tustin | CA | 92780 | ☎ (714) 368 - 5548 | ✉ Rica.Ty@uscis.dhs.gov

| | A | B | C | D |
|---|---|---|---|---|
| | | | | |
| 1 | A-file | Ready for adjudication | Untimely | HOLD |
| 2 | █████9226-000 | y | y | |
| 3 | ████8779-000 | y | y | assessment written |
| 4 | A█████536-000 | y | y | |
| 5 | A████5077-000 | y | y | assessment written |
| 6 | █████0040-000 | y | y | |
| 7 | ████4868-000 | y | y | |
| 8 | █████5901-000 | y | y | assessment written |
| 9 | A████2487-000 | y | y | assessment written |
| 10 | A███8760-000 | y | y | assessment written |
| 11 | ████5584-000 | y | y | assessment written |
| 12 | ████7367-000 | y | y | assessment written |
| 13 | ████6300-000 | y | y | (this was a return) |
| 14 | █████3809-000 | y | y | (this was a return) |
| 15 | A████0000-000 | y | y | assessment written |
| 16 | ████5685-000 | y | y | assessment written |
| 17 | █████8787-000 | y | y | (this was a return) |
| 18 | █████3103-000 | y | y | (this was a return) |

As the backlog project dealt with cases that were still untimely, I still had to prioritize my daily tasks to ensure my current cases were timely. As mentioned, the project constantly took time away from my regular duties and was starting to impact my productivity for timely cases.

**56.**

Conduct:

December 22, 2019/ December 23, 2019: I was scheduled to depart for TDY on December 27, 2019. Because of the Christmas holidays, we were notified the week before that IT would have limited hours and therefore to submit any requests according to their limited schedule for the week beginning December 23, 2019. As per previous guidance from Brian Hwang, IT as well as an IT handout I received prior to departing for FLETC in June 2019, I was advised that prior to leaving for training or TDY that I should take the laptop home and log onto some sites like WebTA to ensure there wasn't a problem with connectivity or the laptop, since IT would not be able to assist once we departed. As soon as I logged on Sunday, December 22, 2019, I suddenly received a Skype

Page ___5___ of ___25___ pages          Initials: _R̄I__

message from SAO Miranda. She all of a sudden started interrogating me about why I was on Skype and instructed me to log off. We discussed this on December 23, 2019 in the office. I specifically told her it was Brian Hwang from IT. I was not hesitant at all. I was preparing for an interview and speaking to SAO Miranda can be taxing as I had already been experiencing her confrontational behavior even when discussing cases with her. At no time did I interrupt SAO Miranda, nor change my tone of voice or made a facial expression to imitate her. Despite Skype being a text platform, SAO Miranda has demonstrated hostility in her writing, as evidenced in how she chooses to "memorialize" events in her memos, e-mails and affidavit statements, as well as the time she demanded I answer her skype message immediately (Affidavit).

January 27 & 27, 2020: Kindly reference my affidavit.

February 10, 2020: This is untrue. When I had provided SAO Miranda the specific status for each case, e.g. if the case was awaiting evidence, had a computer glitch, was ready for adjudication, etc. because I wanted to ensure she had the complete picture, she called me on the phone to berate me for not following instructions as she only wanted to know if the cases were timely or untimely. Kindly reference 21b. above.  I also mentioned this in my Affidavit.

February 12, 2020: This is incorrect.  I Skyped with Section Chief Kim Trinh on or around 5:20 PM and I told her that I was in the middle of a Sworn Testimony for a possible Persecution Bar which was wrapping up. I was waiting for the applicant to understand document as dictated by his interpreter and sign the document. Sworn testimonies also require a second AO to witness the applicant's signature.  Section Chief Trinh said to finish by 5:55 PM in case they need to use the rest room.

February 13, 2020:

After my first interview that SAO Miranda observed, she remained in my office while I walked the applicants back to the waiting area. After I returned, she wanted to talk about the interview she

Page __6__ of __25__ pages                     Initials: _____

observed and then stated she received notification that I walked applicant's out at 5:59 PM the day before and wanted to remind me the building closes at 6 PM.

Myrna: Let's talk about what happened yesterday. You walked applicant's out at 5:59 PM. You know the building closes at 6 PM.

Rica: I did not walk applicants out at 5:59. Jim walked them out on my behalf because he was allowed to stay past 6. I was finishing up a sworn testimony for a persecutor bar. Jim was my witness and he volunteered to walk them out for me.

[silence]

Myrna: Well you should have stopped the interview 15 minutes before 6. You can always reschedule and call them back.

Rica: But this was already their follow-up interview, we were in sworn testimony for a persecutor bar, they were already reviewing it and I didn't want them to have to come back for a third time.

Myrna: They can always come back. As a practice you need to end the interview 15 minutes before because they may need to use the restroom but they have to be outside the building by 6 PM

Rica: Kim Trinh [Section Chief] said 5:55 was ok

[silence]

Myrna: Oh.., Kim said that?

Rica: Yes, she skyped in and I explained what was happening and she said just make sure to end it by 5:55 in case they need to go to the bathroom

[silence]

Myrna: Well…, best practice should be 15 minutes before 6.

Rica: ok

Myrna: I only got a message that said you were spotted walking applicant's out at 5:59 so that's why I had to talk to you about it.

Rica: yes and like I said as soon as the interview finished, Jim volunteered to walk them out so I can leave on time.

Page ___7___ of ___25___ pages          Initials: _____

--Then SAO Miranda spoke to me in a rapid-fire interrogating tone:

Myrna: Well what time did the interview end?

Rica: 5:57

Myrna: Well what time did YOU leave?

Rica: 5:59

Myrna: And what time did you arrive?

Rica: 9:14

Myrna: 9:14? [pause…then now also in a snarky tone] Well core hours are from 9 to 2:30. Did you

call the DO to let them know you would be late?

Rica: No, but

Myrna: Did you notify the Duty Desk or a supervisor?

Rica: No, but it's a Wednesday. It's training day. Which typically starts at or after 9:30. I was here

for that. We're not even required to sign in on DSI.

Myrna [still snarky and rapid]: Well it doesn't matter. Core hours are 9 to 2:30. You are supposed to

be here between 9-2:30 unless you have prior permission to work outside of it. But you failed to

notify the office appropriately. I'm gonna have to talk to the Section Chief about that and you might

need to make up that time.

Rica: I made up the time that day already. I worked 8 hours.

Myrna: Well I still have to check with the Section Chief because core hours are 9 to 2:30.

Rica: ok


On February 19, 2020, SAO Miranda instructed me to take leave for the 14 minutes.  However, I

had already  made up the time that day.  Regardless, I used comp time for the 14 minutes but that

technically put me in over time that day.


SAO Miranda's accounting of events again are tailored to her own narrative.  I had multiple AOs

and two or three SAOs skyping in with me from 5 PM onwards because they all wanted to make

Page ___8___ of ___25___ pages                    Initials: _____

sure I had support to find an available AO to witness or to see if a DO can authorize an extension of time.

February 24, 2020: SAO Miranda implies I just happened to come to her office a few minutes before 4 PM. However this was not the case. Kindly refer to my Affidavit regarding this event. I sent SOA Miranda a Skype message as well. In addition, there are multiple cameras situated at the Duty Desk area and hallways near my office and SAO Miranda's office as there is a relatively large open space in between the applicant waiting room area to the Duty desk Area,  If you are able to look at the feeds for that time period, my accounting of the story will be corroborated by the videos, and not SAO Miranda's deceptive accounting.

March 24, 2020: Again, SAO Miranda paints the portrait that I am purposely violating Telework procedures by not reporting my hours to her. I was in the office on or before 8:30 in the morning so I did not need to e-mail her.  I was trying to complete timely cases due that day and the following day and there was also Webex training at 9 AM.  However, when I got to the office, I discovered my drawers were unlocked and all my files were missing. Since, I did not have the files I needed to finish, I rushed home in order to make it back by 9AM to start the Webex Training because the training was mandatory and therefore the priority. So I did not get a chance to even get on my email as the training was interactive. I mentioned this March 24, 2020 event in my Affidavit. Kindly reference my e-mail of March 24, 2020 below:



Tue 3/24/2020 11:27 AM
Miranda, Myrna M
RE: Are you in the office?
To ☐ Ty, Rica

FW: TW procedures
Outlook item

From: Ty, Rica <rica.ty@uscis.dhs.gov>
Sent: Tuesday, March 24, 2020 11:20 AM
To: Miranda, Myrna M <myrna.m.miranda@uscis.dhs.gov>
Subject: RE: Are you in the office?

Hi Myrna,

I was in the office before 8:30 then I went home because the files I was going to finish today were all missing and I didn't want to start the WebEx at the o
if I didn't need to be there. I am now in telework.

Regards,

**Rica Ty** | Asylum Officer | Los Angeles Asylum Office | DHS | USCIS | RAIO
14101 Myford Rd. | Tustin | CA | 92780 | ☎ (714) 368 - 5348 | ✉ Rica.Ty@uscis.dhs.gov

March 05, 2020: Kindly reference above regarding the submission of backlog cases, with e-mail evidence.

Regarding SAO Miranda's statement of submitting untimely cases to the backlog prior to office closure: SAO Miranda's statement is untrue.  I had been submitting files to the backlog since the week before as instructed and I was submitting them to Supervisor (Support) Carlos Mejia because from what I recall SOA Miranda already started teleworking early in the week of March 16, 2020. In fact I was advised by Supervisor (Support) Carlos Mejia that the AOs assigned to backlog already had plenty of backlog cases on or before Friday, March 20, 2020.  Moreover, the remaining files in my office drawer were not untimely. They were actually due on March 24, 2020 and March 25, 2020 and two other cases were to be forwarded to FDNS (Fraud Detection and National Security) as protocol, one of which I marked as NOID.  I had come into the office on March 24, 2020, on or around 8:20/8:30 so that I could work on them and turn them in timely. Kindly note above. However, I noticed my drawers were unlocked and all my files were missing. Kindly reference the emails below where I specifically stated the status of each case that was in my drawer, after I found out from SAO Miranda that she had the files taken from my office and wherein I specifically

Page ___10___ of ___25___ pages          Initials: _____

told her the cases were still timely. I also mentioned this March 24, 2020 event in my Affidavit.

Again, this is another example of SAO Miranda's dishonesty in crafting her tales to present an

inaccurate picture.  She also purposely interfered with my timeliness percentage by removing

cases I was attempting to turn in timely.



Thu 3/26/2020 1:28 PM
Ty, Rica
RAILs list for OA636

To   ☐Lynn, Mallory L

From: Miranda, Myrna M <myrna.m.miranda@uscis.dhs.gov>
Sent: Tuesday, March 24, 2020 11:37 AM
To: Ty, Rica <rica.ty@uscis.dhs.gov>
Cc: Frederick, Douglas D <douglas.d.frederick@uscis.dhs.gov>
Subject: RE: Untimely/Unsubmitted cases

Hi Rica,

Thanks for letting me know. Please email me the interview notes for the 4 cases today and CC Mallory. Please also confirm the location of the files assigned to OA636. Copying
Doug since he will be covering you the rest of this week.

Thank you,
Myrna

From: Ty, Rica <rica.ty@uscis.dhs.gov>
Sent: Tuesday, March 24, 2020 11:30 AM
To: Miranda, Myrna M <myrna.m.miranda@uscis.dhs.gov>
Subject: RE: Untimely/Unsubmitted cases

Hi Myrna,
Updates in blue below.

Rica